**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA BORRELL,

     Plaintiff,

        v.

BLOOMSBURG UNIVERSITY,
GEISINGER MEDICAL CENTER, and
ARTHUR F. RICHER and MICHELLE
FICCA in their individual and official
capacities,

     Defendants.

CIVIL ACTION NO. 3:CV-12-2123

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are motions to dismiss Plaintiff Angela Borrell's Amended Complaint filed by Defendants Bloomsburg University and Michelle Ficca (Doc. 29) and Geisinger Medical Center and Arther F. Richer. (Doc. 32.)  Angela Borrell, formerly a student in the Nurse Anesthesia Program offered by Bloomsburg University in partnership with Geisinger Medical Center, contends Defendants breached the terms of their contractual agreements and violated her due process and equal protection rights when she was expelled from the program.  The motions to dismiss will be granted in part and denied in part.  Because the claims against Bloomsburg University, Michelle Ficca in her official capacity, and Arthur F. Richer in his official capacity as a Bloomsburg University employee are barred by Eleventh Amendment immunity, these claims will be dismissed.  Furthermore, since neither the Bloomsburg University Department of Nursing Handbook nor the Geisinger Medical Center Drug and Alcohol Policy created binding contracts, the breach of contract claims will be dismissed.  However, because Angela Borrell adequately alleges claims for the violation of her Fourteenth Amendment due process and equal protection rights, she will be permitted to proceed on these claims.

# I. Background

The Amended Complaint alleges the following:

Plaintiff Angela Borrell ("Borrell"), at all times relevant to this action, was a student in the Bloomsburg University Nurse Anesthesia Program with a 3.69 GPA through the Fall 2012 semester. (*Am. Compl.*, ¶ 15.) Defendants in this action are Arthur F. Richer ("Richer"), Michelle Ficca ("Ficca"), Bloomsburg University ("Bloomsburg"), and Geisinger Medical Center ("Geisinger"). Defendant Richer is the Director of the Bloomsburg University Nurse Anesthesia Program. (*Id*. at ¶ 5.) Defendant Ficca is the Chairperson of the Bloomsburg University Department of Nursing. (*Id*. at ¶ 6.) Defendant Bloomsburg is an institute of higher education under the control and operation of the Commonwealth of Pennsylvania by virtue of its membership in the Pennsylvania State System of Higher Education. (*Id*. at ¶ 2.) Defendant Geisinger is a Pennsylvania entity providing health care services. (*Id*. at ¶ 3.)

Bloomsburg, by way of its Department of Nursing, partnered with Geisinger to provide a Nurse Anesthesia Program with accompanying certifications and/or degrees. (*Id*. at ¶ 4.) Students in the Nurse Anesthesia Program are governed by the code of conduct established by the Bloomsburg University Nursing Department Handbook (the "Handbook"). (*Id*. at ¶ 11.) The Handbook outlines standards of conduct for students, as well as the processes and procedures for disciplining students that fail to comply with those standards. (*Id*. at ¶ 12.) Students in the Nurse Anesthesia Program performing clinical hours are also governed by the Geisinger Drug and Alcohol Policy (the "Drug Policy"). (*Id*. at ¶ 13.) The Drug Policy provides disciplinary procedures for those students in the Nursing Anesthesia Program who deviate from the applicable standards of conduct. (*Id*. at ¶ 14.) The Bloomsburg Nurse Anesthesia Program curriculum requires students to complete a set number of clinical training hours at Geisinger involving hands-on tasks while under

observation by licensed anesthetists. (*Id*. at ¶ 10.)

On September 24, 2012, Borrell was summoned from her clinical training to speak with Richer. (*Id*. at ¶ 17.) Richer indicated that he had noticed a change in her appearance and demeanor. (*Id*. at ¶ 18.) Borrell found the comments surprising, as she had never been reprimanded about her appearance or demeanor by her clinical supervisors, professors, or Ficca. (*Id*. at ¶ 19.) Borrell asked Richer to further explain his concerns. He refused, and instead requested her to submit to a drug test. (*Id*. at ¶¶ 20-21.) Borrell was shocked by the implication that she was on drugs because she was not, and had never been, on any type of illegal drug. (*Id*. at ¶ 22.) Borrell informed Richer that she was not on drugs and that she did not want her school record to indicate that she was administered a drug test. (*Id*. at ¶¶ 23-24.) Borrell was told by Richer to immediately comply with the drug test request or she would "face the consequences." (*Id*. at ¶ 25.)

During this conversation, Richer never identified the specific provisions of the Handbook or Drug Policy that Borrell was suspected of violating, the provisions requiring immediate compliance with the drug test request, or the provisions authorizing the administration of a drug test in Borrell's circumstances. (*Id*. at ¶¶ 26-27; 49-54.) Richer further did not identify the consequences Borrell would face if she failed to comply with the demand for a drug test, or what provisions of the Handbook or Drug Policy authorized the threatened consequences. (*Id*. at ¶¶ 28-29.)

Because Richer refused to explain the basis of his accusations or the consequences she could face, Borrell believed Richer was hiding his reasoning for requesting her to submit to a drug test. (*Id*. at ¶ 30.) Borrell informed Richer that she wanted the opportunity to discuss the request with her parents. (*Id*. at ¶ 32.) After talking with her parents, she decided to submit to the drug test. (*Id*. at ¶ 33.)

Early the following morning, Borrell called Richer's personal cell phone to advise him

3

that she would comply with his request. (*Id*. at ¶ 34.)  Since Richer did not answer his cell phone, Borrell called his office. (*Id*. at ¶ 35.)  Richer's secretary stated that he was in a meeting and would return her call. (*Id*. at ¶ 36.)  Borrell never received a return call. (*Id*.) Because Richer was unavailable, Borrell asked the secretary if she could speak to Brenda Wands, the co-director of the Nurse Anesthesia Program. (*Id*. at ¶ 37.)  Wands, however, did not feel comfortable speaking with Borrell. (*Id*. at ¶ 38.)

Borrell then called the grievance coordinator at Bloomsburg, Bob Wislock. (*Id*. at ¶ 39.)  Wislock directed Borrell to contact Bob Marande, the Dean of the College of Science and Technology, prior to filing a grievance, and to keep him abreast of her situation. (*Id*. at ¶ 40.)  Despite several attempts, Borrell has been unable to reach Wislock since this initial conversation. (*Id*. at ¶ 41.)

Later on September 25, 2012, Borrell contacted Marande to explain the situation. (*Id*. at ¶ 42.)  Marande indicated that she should not face problems if she complied with the drug test request. (*Id*.)  He also instructed her to document her willingness to take the drug test in writing. (*Id*.)  That afternoon, Borrell sent an email to Richer, with copies to Wands and Debra Minzola, a clinical director and professor of the program, reiterating the reasoning behind her actions and stating her willingness to submit to a drug test. (*Id*. at ¶ 43.)

Borrell unsuccessfully attempted to contact the Directors of the Nurse Anesthesia Program and Marande on September 26, 2012. (*Id*. at ¶¶ 44-45.)  The next day, Borrell received a letter signed by Richer and Ficca informing her that she had been expelled from the Nurse Anesthesia Program as a result of her refusal to take the drug test. (*Id*. at ¶ 46.) While the letter indicates that her refusal to take the drug test violated the Handbook and the Drug Policy, it fails to indicate those provisions specifically violated, (*id*. at ¶ 47), because neither the Handbook nor the Policy required Borrell to take a drug test in her circumstances. (*Id*. at ¶¶ 48-57.)

4

Upon receiving the expulsion letter, Borrell immediately sent Ficca a letter explaining her position, appealing the expulsion, and requesting the review process and a review panel hearing as set forth in the Handbook. (*Id*. at ¶ 59.) Yet, to this day, Bloomsburg has never responded to her request for review. (*Id*. at ¶ 60.)

Borrell, on September 27, 2012, contacted Marande about her expulsion. (*Id*. at ¶ 61.) Marande informed her that Geisinger dismissed her from the Nurse Anesthesia Program and/or terminated her ability to perform clinical work at Geisinger. (*Id*.) Borrell also learned from Marande that Richer and Ficca were instructed not to speak with her by a member of Geisinger's Human Resource Department, believed to be Human Resources Director Brion Lieberman. (*Id*.) Borrell's expulsion from the Nurse Anesthesia Program was ordered, agreed, and/or consented to by both Bloomsburg and Geisinger. (*Id*. at ¶ 62.)

The following week, on or about October 3, 2012, Borrell's counsel sent a letter to Richer and Ficca reiterating her position and requesting review of her expulsion. (*Id*. at ¶ 63.) To date, Bloomsburg has not responded to Borrell's letter. (*Id*. at ¶ 64.) Instead, on October 19, 2012, Geisinger's counsel contacted Borrell's lawyer and threatened a *Dragonetti* action if the matter was pursued further. (*Id*. at ¶ 65.)

Prior to her expulsion, Borrell paid her tuition, attended classes, and worked in all required clinical aspects of the Nurse Anesthesia Program. (*Id*. at ¶ 69.) And, while Borrell was a student in the Nurse Anesthesia Program, Richer specifically related to the students a story about a prior student with a narcotic addiction that stole narcotics from the program or Geisinger. (*Id*. at ¶ 79.) That student was not expelled. (*Id*.) Rather, the student was offered treatment and counseling and allowed to return as a student to the Nurse Anesthesia Program. (*Id*.)

Since her expulsion, Defendants have told Borrell that prospective employers contacting them about the circumstances of her termination from the Nurse Anesthesia

Program will be informed that she failed to comply with their drug testing policy. (*Id.* at ¶ 71.) Borrell has also been told that her expulsion would be considered in admissions decisions if she applied to any other graduate nursing programs at Bloomsburg. (*Id.* at ¶ 72.) Borrell's employment with Geisinger in the Pediatric Intensive Care Unit from which she was on academic leave while a student in the Nurse Anesthesia Program was terminated by Geisinger. (*Id.* at ¶ 74.) Defendants also informed the American Association of Nurse Anesthetists that Borrell was no longer a student in the program as a result of her failure to comply with the drug testing policy. (*Id.* at ¶ 75.) The expulsion of Borrell for failure to comply with the drug testing policy and for using controlled substance was also made public by Defendants. (*Id.* at ¶ 73.)

Based on the foregoing events, Borrell commenced this action on October 24, 2012. On February 19, 2013, Borrell filed an Amended Complaint asserting claims for violation of her due process and equal protection rights, as well as state law breach of contract claims. Defendants Bloomsburg and Ficca moved to dismiss the Amended Complaint on April 22, 2013, (Doc. 29), and Defendants Geisinger and Richer filed a motion to dismiss on April 30, 2013. (Doc. 32.) The motions are now fully briefed and ripe for disposition.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

6

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  The statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Detailed factual allegations are not required.  *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.  However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id.*  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).  As such, "[t]he touchstone of the pleading standard is plausability." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955).  "The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679, 129 S. Ct. 1937.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id*. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

### III. Discussion

Defendants advance a series of arguments seeking dismissal of the Amended Complaint in its entirety. For the reasons that follow, the motions to dismiss will be granted in part and denied in part.

**A.      Eleventh Amendment Immunity**

Defendants first argue that all claims against Bloomsburg and all claims against Ficca in her official capacity and Richer in his official capacity as an employee of Bloomsburg are barred by Eleventh Amendment sovereign immunity. The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  Although the Eleventh Amendment refers only to "States," immunity also extends to entities that are considered "arms of the state." *Bowers v. NCAA*, 475 F.3d 524, 545 (3d Cir. 2007) (citations omitted).  "A state entity is properly characterized as an arm of the state and thus 'entitled to immunity from suit in a federal court under the Eleventh Amendment when a judgment against it would have essentially the same practical consequence as a judgment against the State itself.'" *Id*. at 545-46 (quoting *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989)).  While the determination of whether a public university is entitled to Eleventh Amendment immunity requires a fact-intensive review, the Third Circuit has "held in the past that the Pennsylvania System of Higher Education was entitled to Eleventh Amendment immunity." *Id*. at 546 (citing *Skehan v. State System of Higher Educ.*, 815 F.2d 244 (3d Cir. 1987); *see also Lewis v. Kelchner*, 658 F. Supp. 358, 360 (M.D. Pa. 1986).  Further, "[i]ndividual state employees sued in their official capacity are also entitled to Eleventh Amendment immunity because 'official-capacity suits generally represent only another way of pleading an action' against the state." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) (quoting *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)).

Pursuant to this authority, Bloomsburg, as a state university organized under the Pennsylvania State System of Higher Education, (*Am. Compl.*, ¶ 2), is entitled to Eleventh Amendment immunity.  Likewise, Ficca and Richer are entitled to Eleventh Amendment immunity for the claims against them in their official capacities.

However, a State's immunity from suit is not absolute. *See Lombardo v. Pa., Dep't of Public Welfare*, 540 F.3d 190, 195 (3d Cir. 2008).  Congress may abrogate a State's sovereign immunity in enforcing the Fourteenth Amendment, a State may consent to suit by making a clear declaration that it intends to submit itself to federal court jurisdiction, or a state may waive its immunity from suit by invoking federal court jurisdiction voluntarily. *Id*.

at 195-96 (citations omitted).

Here, Borrell asserts that Bloomsburg and Ficca in her official capacity waived Eleventh Amendment immunity by having its lawyers enter appearances, (Docs. 5; 8; 9), and by filing a motion to continue a hearing on Borrell's request for a preliminary injunction. (Doc. 6.) Borrell cites *Clark v. Barnard*, 108 U.S. 436, 2 S. Ct. 878, 27 L. Ed. 780 (1883) to support her claim that Eleventh Amendment immunity has been waived in this action. In *Clark*, "the state of Rhode Island appeared in the cause and presented and prosecuted a claim to the fund in controversy, and thereby made itself a party to the litigation to the full extent required for its complete determination." *Id*. at 448, 2 S. Ct. 878.

The Supreme Court and the Third Circuit have interpreted *Clark* as holding that a State's voluntary appearance in federal court amounts to a waiver of its Eleventh Amendment immunity. *See, e.g., Lapides v. Board of Regents of the University of System of Georgia*, 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002) (stating in reference to *Clark* "that more than a century ago this Court indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity."); *Lombardo*, 540 F.3d at 196 (*Clark* held that a State's voluntary intervention in an action in federal court to assert its own claim constituted waiver of its Eleventh Amendment immunity). The Third Circuit has indicated that courts should examine the extent to which a State has participated in the lawsuit and whether it has defended the case on the merits. *See Coll. Sav. Bank. v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 131 F.3d 353, 365 (3d Cir. 1997) (citations omitted). Significantly, immunity "is an issue that may be raised at any time during the pendency of the case," and "merely because a state appears and offers defenses on the merits of the case [ ] does not automatically waive Eleventh Amendment immunity." *Id*. (citing *Florida Dep't Of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 683 n.18, 102 S. Ct. 3304, 73 L. Ed. 2d 1057 (1982)).

In the instant case, Bloomsburg and Ficca have not waived their Eleventh Amendment immunity. The action was initiated in federal court by Borrell. Defendants appeared only to defend this action, and they raised sovereign immunity at the earliest stages of this litigation. Furthermore, the conduct that Borrell claims amounts to a waiver of immunity, the entry of appearance by Defendants' attorneys and filing a motion to continue a preliminary injunction hearing, do not sufficiently demonstrate a waiver of Eleventh Amendment immunity. Here, Defendants' presence in federal court was involuntary, and Eleventh Amendment immunity has not been waived. Accordingly, the claims against Bloomsburg and Ficca in her official capacity will be dismissed.[1]

## B.     The Section 1983 Claims

Borrell asserts 42 U.S.C. § 1983 claims against Defendants Ficca, Richer, and Geisinger for violations of her Fourteenth Amendment due process and equal protection rights. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)).

Ficca, Richer, and Geisinger seek dismissal of the § 1983 claims. First, Geisinger argues that the § 1983 claims should be dismissed because it did not act under color of

---

[1]     To the extent that Richer is an employee of Bloomsburg, the official capacity claims against him in his official capacity are barred by Eleventh Amendment immunity. Borrell has conceded this point. (Doc. 39, 17.) The claims against Richer in his official capacity as a Bloomsburg employee will be dismissed.

state law.  Second, Defendants argue that Borrell does not have a cognizable liberty or property interest at issue in this case.  Third, Defendants maintain that Borrell failed to adequately state an Equal Protection Clause claim.  Lastly, Geisinger argues that Borrell failed to sufficiently plead the causation requirement of her § 1983 claims because she seeks to hold it liable on a theory of *respondeat superior*.

### 1.    Under Color of State Law

Geisinger first argues that the § 1983 claims against it should be dismissed because it did not act under color of state law.  It is well-settled that private actors may be regarded as acting under color of state law pursuant to § 1983. *See, e.g., Donnell v. Corr. Health Servs., Inc.*, 405 F. App'x 617, 622 n.5 (3d Cir. 2010).  Actions "under color of law" are considered the equivalent of "state action" under the Fourteenth Amendment. *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)

While there is no simple line between state and private actors, the Third Circuit, in considering Supreme Court precedent, has articulated "three broad tests" to determine if a private defendant is a state actor: (1) whether the defendant exercised powers that are "traditionally the exclusive prerogative of the state;" (2) whether the defendant acted "with the help of or in concert with state officials;" or (3) whether the "state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity[.]" *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).  The principal issue is "'whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'" *Id*. (quoting *Leshko*, 423 F.3d at 339).  The inquiry is "fact-specific," *id*., as Supreme Court precedent makes clear that "the facts are crucial." *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 233-34 (3d Cir. 2002) (en banc).  The approach used to conduct this inquiry should "be

tailored to the facts of the case before it." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 639 n.17 (3d Cir. 1995) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)).

Geisinger's motion to dismiss Borrell's § 1983 claim for lack of state action will be denied. Here, Borrell alleges that Geisinger partnered or entered into a joint venture with Bloomsburg to provide a Nurse Anesthesia Program with accompanying certifications and/or degrees. (*Am. Compl.*, ¶¶ 4, 9, 85.) Moreover, Borrell was informed of her dismissal from the Nurse Anesthesia Program by a joint correspondence from Richer and Ficca. (*Am. Compl.*, Ex. B.) Consistent with these allegations and considering the Amended Complaint in its entirety, Borrell pleads sufficient facts that Geisinger acted under color of state law. While Geisinger may ultimately prove to be correct that it was not a state actor for purposes of § 1983 in this case, based on the well-pleaded allegations, it would be premature to resolve the state actor question at this point in the proceedings. *See, e.g., Stacey v. City of Hermitage*, 178 F. App'x 94, 101 (3d Cir. 2006) ("Absent any evidence of the relationship between Sereday and the City, however, lack of state action does not provide a basis for dismissal. This argument is more appropriately raised in a motion for summary judgment.").

**2. Due Process**

In Count I of the Amended Complaint, Borrell asserts the deprivation of liberty and property rights without due process of law. Specifically, Borrell claims that she had a property interest in her continued participation in the Nurse Anesthesia Program, and that she was deprived of her right when she was expelled from the program. Additionally, Borrell argues that she was deprived a cognizable liberty interest.

The Fourteenth Amendment to the United States Constitution provides that a state may not "deprive any person of life, liberty, or property, without due process of law, . . ." U.S. Const. amend. XIV, § 1. To state a procedural due process claim under 42 U.S.C. §

13

1983, a plaintiff must allege:

> (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the Defendant was acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process.

*Sample v. Diecks*, 885 F.2d 1099, 1113-14 (3d Cir. 1989).

### a.    Property Interest

For purposes of procedural due process, a court looks to state law to determine whether a property interest exists. *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L. Ed. 2d 548 (1972) ("Property interests are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.")). Courts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study under Pennsylvania law. *See Coulter v. East Stroudsburg Univ.*, No. 10-CV-0877, 2010 WL 1816632, at *2 (M.D. Pa. May 5, 2010); *Manning v. Temple Univ.*, No. Civ. A. 03-4012, 2004 WL 3019230, at *8 (E.D. Pa. Dec. 30, 2004) ("Under Pennsylvania law, it has been held that a graduate student has a property interest protected by procedural due process in the continuation of her course of study."); *Stoller v. College of Medicine*, 562 F. Supp. 403, 412 (M.D. Pa. 1983); *Ross v. Pennsylvania State Univ.*, 445 F. Supp. 147, 153 (M.D. Pa. 1978). Indeed, this Court noted in *Ross* that graduate students have "a reasonable expectation based on statements of policy by [the university] and the experience of former students that if [they] perform[ ] the required work in a satisfactory manner and pay[ ] [their] fees [they] will receive the degree [they] seek[ ]." *Ross*, 445 F. Supp. at 152.

Consistent with this authority, Borrell had a property interest in her continued

participation in the Nurse Anesthesia Program. Ficca, however, contends that Borrell had a property interest only with respect to her enrollment in Bloomsburg University, as opposed to her continued participation in the Nurse Anesthesia Program. This, Ficca claims, results from the fact that an academic dismissal from the Department of Nursing does not necessarily mean dismissal from Bloomsburg University. This distinction is insignificant. Borrell's property interest was in the continuation of her course of studies in pursuit of the graduate degree she sought from the Nurse Anesthesia Program. Whether Borrell could theoretically obtain a different degree from Bloomsburg University is irrelevant.

Ficca also argues that even if Borrell had a property interest in continued enrollment in the Nurse Anesthesia Program, she was afforded all process due before she was dismissed. According to Ficca, Borrell was expelled for academic reasons. As a result, her due process rights were satisfied when she was provided with an informal faculty evaluation prior to her expulsion. Borrell disputes Ficca's characterization of her dismissal as academic. Rather, Borrell insists that she was terminated for disciplinary reasons, and, even if her termination was for academic reasons, she adequately alleges that she was denied an informal faculty evaluation.

The Supreme Court had occasion to address the due process rights of students in state operated universities in *Board of Curators of the University of Mo. v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978), and *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985). These cases, according to the Third Circuit, draw "a clear distinction between disciplinary and academic dismissals." *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir. 1986).

> [C]ourts are generally ill-equipped to review subjective academic appraisals of educational institutions, and admonished courts to permit university faculties a wide range of discretion in making judgments as to the academic performance of students. In *Horowitz*, for instance, the Court wrote that "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the

> procedural tools of judicial or administrative decisionmaking." The *Horowitz* court held, therefore, that when a university decides to dismiss a student, due process does not require a formal hearing; rather, all that is required is an "informal-give-and-take" between the student and the administrative body.

*Hankins v. Temple Univ.*, 829 F.2d 437, 444 (3d Cir. 1987) (citations omitted). As such, "in the procedural due process context, informal review and evaluation sessions between student and faculty meet constitutional requirements." *Mauriello*, 781 F.2d at 50.

Ficca's motion to dismiss Borrell's due process property interest claim will be denied. Based on the allegations set forth in the Amended Complaint, Borrell adequately pleads that she was expelled from the Nurse Anesthesia Program for disciplinary, non-academic reasons without sufficient process. Moreover, even if the expulsion was for academic reasons, the facts as alleged by Borrell sufficiently state that she was denied an informal faculty evaluation before she was expelled. On the facts as set forth in the Amended Complaint, Borrell alleges a plausible due process claim against Ficca for the deprivation of her property interest in the continuation of her course of study. Furthermore, since the Amended Complaint adequately pleads that Geisinger was a state actor for purposes of the § 1983 claims, that Geisinger partnered with Bloomsburg to provide the Nurse Anesthesia Program, and that Richer was personally involved in the alleged deprivation of her property interest, Borrell will be permitted to proceed against Geisinger and Richer on this claim.

### b. Liberty Interest

Borrell also asserts a claim for deprivation of a liberty interest. The Supreme Court held in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971) that an individual has a protectable interest in reputation. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 437, 91 S.Ct. 507; *see also Goss v. Lopez*, 419 U.S. 565, 574-75, 95 S. Ct. 729, 42 L. Ed. 2d (1975). Courts "subsequently clarified, however, that 'reputation alone is not an interest protected by the Due Process

Clause.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoting *Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1371 (3d Cir. 1993)).  But, a plaintiff may make out a due process claim for deprivation of a liberty interest in reputation by showing "'a stigma to his reputation plus deprivation of some additional right or interest.'" *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008) (quoting *Hill*, 455 F.3d at 236).

To satisfy the "stigma" prong, the purportedly stigmatizing statements must have been made publically and be false. *Hill*, 455 F.3d at 236 (citations omitted); *see also Brown v. Montgomery Cnty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (to establish the "stigma" prong, the employee must show: "1) publication of 2) a substantially and materially false statement that 3) infringed upon the reputation, honor, or integrity of the employee.").  And, the Third Circuit has held that a property interest may qualify as a "sufficient 'plus'" in the stigma-plus analysis.  *See Dee*, 549 F.3d at 234; *see also Hill*, 455 F.3d at 236 (in the public employment context, "the creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'").

Under the facts as alleged in the Amended Complaint, Borrell sufficiently states a liberty interest claim.  Specifically, Borrell alleges that Defendants made false statements and disseminated a false impression that she had a substance abuse problem in connection with her dismissal from the Nurse Anesthesia Program. (*Am. Compl.*, ¶¶ 70.)  These statements were made public by Defendants, including to members of the operating room staff. (*Id*. at ¶ 73.)  As a result, Borrell's good name, reputation, and integrity have been infringed upon. (*Id*. at ¶ 78.)  Thus, Borrell sufficiently alleges the "stigma" requirement of her liberty interest claim.  Moreover, because Borrell had a property interest in the continuation of her graduate studies under Pennsylvania law, she alleges a sufficient "plus."  Borrell will therefore be permitted to proceed on her liberty interest claim against Ficca, Richer, and Geisinger.

### 3. Equal Protection

Count II of Borrell's Amended Complaint asserts a claim for violation of the Equal Protection Clause. Borrell's equal protection claim is based on a "class of one" theory.

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), the Supreme Court outlined the "class of one" theory of equal protection. Under a "class of one" claim, a plaintiff asserts that "he has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Id*. at 564, 120 U.S. 1073. According to the Third Circuit, to state a "class of one" claim, a plaintiff must allege that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill*, 455 F.3d at 239.

As to the first element, "[a]t the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of . . . similarly situated parties." *Perano v. Twp. of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011). While "'[p]ersons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects,'" *Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 825 (3d Cir. 2009) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)), "the law in the Third Circuit does not require [the plaintiff] to show that the [comparators] are identical in all relevant respects but only that they are alike." *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp. 2d 616, 628 (W.D. Pa. 2012) (citing *Startzell*, 533 F.3d at 203); *see also Simmermon v. Gabbianelli*, - - - F. Supp. 2d - - -, 2013 WL 1137102, at *5 (D. N.J. Mar. 18, 2013); *Thomas v. Coopersmith*, No. 11-7578, 2012 WL 3599415, at *5 (E.D. Pa. Aug. 21, 2012). "Determining whether an individual is 'similarly situated' to another individual is a

case-by-case fact-intensive inquiry." *Chan v. Cnty. of Lancaster*, No. 10–3424, 2011 WL 4478283, at *15 (E.D. Pa. Sept. 26, 2011) (citing *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004)). "For that reason, some courts in this Circuit have stated that 'a final determination of this issue is inappropriate at the motion-to-dismiss stage.'" *Thomas*, 2012 WL 3599415, at *5 (quoting *Chan*, 2011 WL 4478283, at *15).

Richer and Geisinger seek dismissal of the equal protection claim on the basis that Borrell fails to adequately plead that she was treated differently from others similarly situated. According to Richer and Geisinger, Borrell admits that she was wholly different from her comparator because he was a drug user with a drug addiction that stole narcotics, while she was not a drug user and did not steal narcotics. Additionally, Richer and Geisinger contend that the claim should be dismissed because Borrell "fails to allege the other student refused to be drug tested, which is the only relevant aspect in which she would have to be similarly-situated to that student." (Doc. 33, 21.)

Richer and Geisinger's motion to dismiss the equal protection claim will be denied. Here, Borrell adequately alleges that she was treated differently than a similarly situated individual. (*Am. Compl.*, ¶¶ 79-81.) Specifically, Borrell alleges that both her and her comparator were alike in that they were students in the Nurse Anesthesia Program with known or perceived substance abuse problems. Despite these similarities, Borrell was expelled, whereas her comparator was provided counseling and ultimately allowed to return to the program. At this stage in the litigation, these are sufficient allegations that Borrell and her comparator were similarly situated to allow Borrell to proceed on her equal protection claim against Richer and Geisinger.

Ficca also seeks dismissal of the equal protection claim. Ficca argues that the Amended Complaint fails to state her personal involvement in the alleged denial of Borrell's equal protection rights. Essentially, Ficca suggests that the equal protection claim is

deficient as to her because Borrell fails to identify her role in providing the comparator in the Nurse Anesthesia Program with different and better treatment than that received by Borrell.

Ficca's motion to dismiss the equal protection claim for lack of personal involvement will be denied. As noted, Borrell alleges that a different student in the program received better treatment than her, and that Ficca was involved in the decision to expel her from the program. With respect to Borrell's comparator, while Ficca's role in providing this student with better treatment is not set forth in the Amended Complaint, it is reasonable under the facts as stated that discovery will reveal evidence that the Chairperson of the Bloomsburg Department of Nursing participated in providing better treatment to Borrell's comparator. The equal protection claim against Ficca in her individual capacity will not be dismissed.

### 4. Causation

Lastly, Geisinger seeks dismissal of the § 1983 claims on the basis that a private entity cannot be held vicariously liable under § 1983. In opposition, Borrell argues that Geisinger's liability is not premised on *respondeat superior*, but is based on the acts of its final decisionmaker, Richer.

The Third Circuit has determined that a private company cannot be held responsible pursuant to § 1983 for the acts of its employees under a theory of *respondeat superior* or vicarious liability. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). Instead, for a private employer defendant to be liable under § 1983, the plaintiff must establish an employer policy or custom, and that the policy caused the constitutional violation alleged. *See id*. at 584 (citing *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). The *Natale* court identified three situations in which the acts of an employee may be attributed to his or her private employer under § 1983:

20

The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale*, 318 F.3d at 584 (internal citations omitted).

"In order to ascertain who is a policymaker, 'a court must determine which official has final, unreviewable discretion to make a decision or take action.'" *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)). Thus, a Court must determine "(1) whether as a matter of state law, the official is responsible for making policy in the particular area of . . . business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill*, 455 F.3d at 245 (internal citations omitted).

In the private employer context, "the relevant 'policymaker' inquiry is whether [the employee], as a matter of state and local positive law, or custom or usage having the force of law, exercised final policymaking authority." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir. 1999) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) ). And, the Third Circuit has indicated that an individual, even without final policymaking authority, can bind his or her employer when the entity delegates authority or ratifies his or her conduct. *See Laverdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003). But ratification occurs only "when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (plurality opinion). "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy." *Id*. at 130, 108 S.Ct. 915.

21

The Amended Complaint contains sufficient allegations that Richer was Geisinger's final policymaker or that he implemented a formal policy when he terminated Borrell from the Nurse Anesthesia Program. Specifically, Richer was the Director of the Nurse Anesthesia Program. Additionally, the exhibits attached to the Amended Complaint suggest that the decision to terminate her from the Nurse Anesthesia Program was made by Richer or by Richer and Ficca jointly. (*Am. Compl.*, Ex. B.) And, following her expulsion from the Nurse Anesthesia Program, Geisinger is alleged to have ratified this decision. (*Am. Compl.*, ¶ 62.) Considering the Amended Complaint in its entirety, Borrell adequately alleges that Richer acted pursuant to a formal policy when he terminated her from the Nurse Anesthesia Program, or, alternatively, that Richer was "responsible for making policy in the particular area of . . . business in question," *i.e.*, expulsion decisions. *See Hill*, 455 F.3d at 245.

**D.      Breach of Contract Claim Against Ficca and Richer**

Count III of the Amended Complaint asserts a breach of contract claim against Ficca and Richer. Borrell alleges that the parties had a contractual agreement by way of the Handbook. (*Am. Compl.*, ¶ 122.)

To state a breach of contract claim under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999) (citing *Gen. State Auth. v. Coleman Cable & Wire Co.*, 27 Pa.Cmwlth. 385, 365 A.2d 1347, 1349 (Pa. Cmwlth. 1976)).

Pennsylvania courts have held that the relationship between a student and a private college is "strictly contractual in nature." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. 2007) (citing *Barker v. Trustees of Bryn Mawr College*, 278 Pa. 121, 122, 122 A. 220, 221 (1923)). "The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Swartley v.*

*Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999) (citing *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987)); *see also Hart v. Univ. of Scranton*, No. 11-CV-1576, 2012 WL 1057383 (M.D. Pa. Mar. 28, 2012). Thus, a student's breach of contract claim against a private college based on a student handbook is treated as any other agreement between two private parties. *See Reardon*, 926 A.2d at 480 (citing *Murphy v. Duquense Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 428 (2001)).

In comparison, however, Pennsylvania courts have "declined to construe the student handbook of a public university as a contract between the public university and the student." *Tran v. State Sys. of Higher Educ.*, 986 A.2d 179, 183 (Pa. Cmwlth. 2009) (citing *Crabtree v. California Univ. of Pa.*, 606 A.2d 1239, 1240 n.3 (Pa. Cmwlth. 1990)). In distinguishing between public universities and private colleges, the *Tran* court emphasized that due process safeguards students' rights at public universities whereas students enrolled in private colleges have contractual rights. *See id*. at 182-83. According to *Tran*, a student cannot state a breach of contract claim against a public university pursuant to a university handbook. *See id*. at 183; *see also Bradshaw v. Pa. State Univ.*, No. 10-4839, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5, 2011).

The breach of contract claim asserted against Ficca and Richer will be dismissed. Borrell alleges that the Handbook is a contract between Bloomsburg, a public university, and its students, and that it sets forth policies related to student conduct and discipline. (*Am. Compl.*, ¶¶ 122-124, 127-130.) But, because the Handbook did not establish a contractual relationship, Borrell fails to state a necessary element of her breach of contract claim: the existence of a contract. In addition, Richer and Ficca "cannot be held personally liable for an alleged breach of contract by [their] principal." *Hart*, 2012 WL 1057383, at *4 (citing *Rossi v. Pa. State Univ.*, 489 A.2d 828, 837 (Pa. Super. 1985)). The breach of the Handbook claim in Count III will be dismissed.

**E.    Breach of Contract Claim Against Geisinger**

In Count IV of the Amended Complaint, Borrell asserts a breach of contract claim against Geisinger.  According to Borrell, the Drug Policy was "a contract between all Nurse Anesthesia Program students, including Ms. Borrell, and GMC." (*Am. Compl.*, ¶ 138.)  And, the contract was allegedly breached by Geisinger when it failed to follow the procedures established by the Drug Policy prior to disciplining Borrell. (*Id*. at ¶ 142.)  Additionally, in her brief in opposition to Geisinger's motion to dismiss, Borrell suggests that she set forth a breach of an implied in fact contract claim, and she also seeks leave to amend to allege a tortitious interference with contractual relations claim.

Geisinger argues that the Amended Complaint fails to state a breach of contract claim in Count IV because the Drug Policy is not a contract, and even if it is a contract, Borrell fails to identify the specific provision of the Drug Policy that Geisinger allegedly breached.  The Drug Policy, (*Am. Compl.*, Ex. G), defines "Geisinger Health System Employee" as "any individual who uses Geisinger Health System facilities or resources to perform work," including "students." (*Id*.)  The Drug Policy provides that all Geisinger Health System Employees "shall be deemed to have consented to testing as required by this Policy." (*Id*.)  And, any Geisinger Health System Employee "who refuses to cooperate in any aspect of the Drug and/or Alcohol testing process described in this Policy shall be subject to disciplinary action, including termination, for a first refusal or any subsequent refusal." (*Id*.)  The Drug Policy also notes that "[n]othing in this policy is to be construed to create in any Geisinger Health System Employee any status other than as an employee-at-will." (*Id*.)

"Pennsylvania courts have consistently upheld a stringent standard in construing handbooks, manuals or other communications to be binding contracts." *Watson v. Vulcraft Sales Corp.*, No. 12-cv-0628, 2012 WL 2572056, at *5 (W.D. Pa. July 2, 2012) (citing *Jacques v. Akzo Int'l Salt Inc.*, 422 Pa. Super. 419, 619 A.2d 748, 753 (Pa. Super. 1993)).

Similarly, "'[a] written personnel policy may serve as the basis for a cause of action for breach of a provision contained within it it if under all of the circumstances, the parties manifest an intent that it become a legally binding contract.'" *Henderson v. Merck & Co.*, 998 F. Supp. 532, 538 (E.D. Pa. 1998) (quoting *Curran v. Children's Service Center*, 396 Pa. Super. 29, 578 A.2d 8, 10 (Pa. Super. 1990)); *cf. Richardson v. Charles Cole Mem'l Hosp.*, 320 Pa. Super. 106, 466 A.2d 1084, 1085 (Pa. Super. 1983) ("failure to adhere to a company personnel policy does not create a cause of action for breach of an employment contract."). Courts have also "held that in order for a claim to survive a motion to dismiss, a plaintiff 'must identify the specific provision in the manual which they allege the defendants to have breached.'" *Watson*, 2012 WL 2572056, at *5 (quoting *Sweeney v. St. Joseph's Hosp.*, 769 F. Supp. 747, 751 (M.D. Pa. 1991) *aff'd*, 980 F.2d 724 (3d Cir. 1992)).

Here, the breach of contract claim against Geisinger will be dismissed. Borrell does not point to any provisions in the Drug Policy to suggest that it was meant to establish a contractual relationship. Indeed, the Drug Policy's clear statement that it was not meant to alter the at-will relationship between Geisinger and its employees, which students were considered, indicates that Geisinger did not intend to become a party to an express contract. Moreover, even if the Drug Policy was a contract, Borrell does not identify the specific provision of the Drug Policy which Geisinger breached. Rather, Borrell only broadly alleges that Geisinger "failed to follow the terms and conditions" of the Drug Policy prior to disciplining her and it "failed to properly advise [her] of her rights." (*Am. Compl.*, ¶¶ 141-142.) As such, Borrell fails to state a claim in Count IV of the Amended Complaint for breach of the Drug Policy by Geisinger.

Moreover, as to Borrell's alternative argument that she states a breach of an implied in fact contract claim, the Amended Complaint does not contain any allegations that such a contract existed between herself and Geisinger. Similarly, she fails to identify the specific

contract provision Geisinger breached. *See, e.g., Hart*, 2012 WL 1057383, at *3 ("reliance on an implied contract theory does not relieve Hart of her obligation to identify the breach of a specific contract provision"); *see also Cavaliere v. Duff's Bus. Inst.*, 413 Pa. Super. 357, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (affirming a dismissal of an alleged breach of an implied contract for a quality education where there was no "pleading of any other specific misrepresentation or failure to perform a contractual undertaking."). The breach of the Drug Policy claim in Count IV of the Amended Complaint will be dismissed.[2]

## IV. Conclusion

For the above stated reasons, the motions to dismiss will be granted in part and denied in part. All claims against Defendant Bloomsburg University, Michelle Ficca in her official capacity, and Arthur F. Richer in his official capacity as a Bloomsburg University employee will be dismissed with prejudice. Likewise, the breach of contract claims in Counts III and IV of the Amended Complaint will be dismissed with prejudice. Plaintiff Angela Borrell, however, will be permitted to proceed on her claims in Counts I and II of the Amended Complaint.

An appropriate order follows.

June 28, 2013          /s/ A. Richard Caputo
Date          A. Richard Caputo
         United States District Judge

---

[2]      Lastly, as to Borrell's request to amend her pleading to raise a tortious interference claim, the Third Circuit has instructed that a district court must permit a curative amendment if a claim is vulnerable to a 12(b)(6) dismissal, unless amendment would be inequitable or futile. *See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 236 (3d Cir. 2008). Since Borrell fails to identify an existing contract between herself and either Bloomsburg or Geisinger, leave to amend would be futile as she cannot state an essential element of the tortious interference cause of action. *See, e.g., Maverick Steel Co. v. Dick Corp./Barton Malow*, 54 A.3d 352, (Pa. Super. 2012) (citation omitted) (among other elements, tortious interference claim requires proof of "the existence of a contractual or prospective contractual relation between the complainant and a third party").