UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELA BORRELL, | : | |
| | : | CIVIL ACTION–LAW |
| Plaintiff, | : | |
| | : | |
| V. | : | JURY TRIAL DEMANDED |
| | : | |
| BLOOMSBURG UNIVERSITY, | : | |
| GEISINGER MEDICAL CENTER, | : | |
| and ARTHUR F. RICHER and | : | |
| MICHELLE FICCA in their | : | |
| individual and official capacities, | : | |
| | : | No. 3:12-cv-2123 |
| Defendants. | : | Judge Caputo |

PLAINTIFF'S COUNTER STATEMENT OF FACTS IN
OPPOSITION TO DEFENDANTS' JOINT STATEMENT
OF "UNDISPUTED" MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Angela Borrell ("Ms. Borrell"), by her attorney Barry H. Dyller,

of the Dyller Law Firm, submits this counter statement of facts in opposition

to Defendants' Joint Statement of "Undisputed" Material Facts in Support

of Defendants' Motions For Summary Judgment ("Defendants' SOF") (Doc.

115).

1.  Admitted.  Geisinger had previously (from 1981 to 1990) had an

academic affiliation with Susquehanna University to create an

undergraduate degree program in which students would obtain a B.S.

degree from Susquehanna University and a certificate of completion from

Geisinger Medical Center ("GMC" or "Geisinger").  That academic affiliation was two separate programs, as compared to the "collaborative agreement" GMC subsequently developed with Bloomsburg University, which was a single program with joint employees of both GMC and Bloomsburg University.  (Doc. 101, 85-86 of 213; Plaintiff's Exhibit N, Richer Deposition, 54:10 - 55:8).[1]

In 2006, GMC asked defendant Richer to develop a nurse anesthesia educational program in conjunction with a university.  Bloomsburg University was selected.  The specific purpose of the joint Nurse Anesthesia Program ("NAP") between GMC and Bloomsburg University was to provide a source of recruitment for future nurse anesthetists to staff the Geisinger entities.  (Doc. 101, 87-88 of 213; Plaintiff's Exhibit N, Richer Deposition, 56:16 - 57:3).

2.  Admitted.  Geisinger's and Bloomsburg University's collaborative program was defined by a contract with each other to run the NAP together.  (Doc. 89, 8-21 of 56; Plaintiff's Exhibit 10, Collaboration Agreement).

---

[1]Unless otherwise noted, all exhibits referred to herein are to exhibits which were attached to plaintiff's summary judgment motion.  Those exhibits are part of this Court's document numbers 89-104.

The Collaboration Agreement between Geisinger and Bloomsburg University provides, *inter alia*, that:

A.  Geisinger and Bloomsburg University agreed "to collaborate" with each other "to support the Academic Training portion of the Program," and "to collaborate" with each other "to support the Clinical Training portion of the Program."  (Doc. 89, 8 of 56; Plaintiff's Exhibit 10, Collaboration Agreement, 4th and 5th "Whereas" clauses);

B.  Geisinger and Bloomsburg University defined the "Program" as "the collaborative nurse anesthesia program in which Students receive Academic Training at University leading to a MS Degree and Clinical Training at Geisinger leading to a Certificate."  (Doc. 89, 8 of 56; Plaintiff's Exhibit 10, Collaboration Agreement, § 1.3).

C.  Geisinger and Bloomsburg University defined "Program Director" to mean "the individual interviewed, approved and employed by both University and Geisinger to oversee the Program and serve as the liaison between Geisinger and University relative to the Program. . . ."  Such Program Director is "an employee of both Geisinger and [Bloomsburg] University."  (Doc. 89, 8 of 56; Plaintiff's Exhibit 10, Collaboration Agreement, § 1.4).

3

D.  There were various joint duties and responsibilities of both Bloomsburg University and Geisinger.  (Doc. 89, 9-10 of 56; Plaintiff's Exhibit 10, Collaboration Agreement, § 2; Doc. 95, 72 of 128; Plaintiff's Exhibit E (Ficca Deposition), 22:6 - 22:17).

E.  Bloomsburg University was obligated to pay Geisinger "50 % of the billed tuition and fees" "for each credit hour in which the Student is participating in the Clinical Training portion of the Program."  (Doc. 89, 11 of 56; Plaintiff's Exhibit 10, Collaboration Agreement, § 5.1; Doc. 95, 72-73 of 128; Plaintiff's Exhibit E (Ficca Deposition), 22:23 - 23:7).

F.  Bloomsburg University and Geisinger acknowledged that they were "doing business" with each other in connection with the Collaboration Agreement.  (Doc. 89, 16-17 of 56; Plaintiff's Exhibit 10, Collaboration Agreement (Exhibit A to Collaboration Agreement)).

3.  Admitted.  (See Doc. 89, 8 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement) (first Whereas clause).

4.  Admitted in part; disputed in part.  The NAP which was formed through the collaboration of Geisinger and Bloomsburg University was distinct in that it was the first nurse anesthesia collaboration between Geisinger and Bloomsburg University.  However, Geisinger previously had

4

its own program, and also had a similar program through an academic affiliation with Susquehanna University.  Defendant Richer was in charge of and ran all of these programs.  (Doc. 89, 22 of 56; Plaintiff's Exhibit 11 (Richer Resume)).  The NAP was only distinct in that it was the first time Geisinger partnered with **Bloomsburg University** for such a program. The NAP was not distinct in that it was part of Geisinger's long time practice, since at least 1978, of conducting a program to educate nurses in anesthesia so that Geisinger could have ready access to nurse anesthetists to staff the Geisinger entities.  (Doc. 89, 22-23 of 56; Plaintiff's Exhibit 11 (Richer Resume); Doc. 101, 84-87 of 213; Plaintiff's Exhibit N (Richer Deposition), 53:18 - 56:19).

5.   Admitted.  In other words, the NAP which is a joint program of Bloomsburg University and GMC contemplates that the hands-on work part of the program would take place at GMC with GMC employees, including joint employees of GMC and Bloomsburg University.  Those joint employees at the time Ms. Borrell was in the NAP were Arthur Richer and Brenda Wands.  (Doc. 89, 22-23 of 56; Plaintiff's Exhibit 11 (Richer Resume); Doc. 101, 46-47 of 213; Plaintiff's Exhibit N (Richer Deposition),

15:14 - 16:22; Doc. 103, 65-67 of 113; Plaintiff's Exhibit O (Wands

Deposition), 15:21 - 17:17).

6.  Admitted.

7.  Disputed.  Mr. Lieberman did testify to the existence of a

"contracts department" which is managed by the legal department.  (Doc.

97, 60 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 40:4 - 40:16).

However, that does not mean that GMC's contract department has

responsibility within GMC over the Collaboration Agreement.  Rather,

everyone involved in the operation of the NAP would have responsibility,

commensurate with their roles, in implementing the Collaboration

Agreement.  Those people include the various Geisinger signatories to the

Collaboration Agreement and its amendments (Doc. 89; 15, 19 and 20 of

86; Plaintiff's Exhibit 10 (Collaboration Agreement)), as well as those

employees within Geisinger whose role was to perform under the

Collaboration Agreement.

8.  Admitted that the Collaboration Agreement between GMC and the

University, which created the joint NAP and required joint employees and

shared tuition, divided responsibilities between GMC and the University

such that students would receive "clinical education in nurse anesthesia" at

6

GMC, and would receive "academic education in nurse anesthesia" at Bloomsburg University.  (Doc 89, 8 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement), Definitions 1.1 and 1.2).

9.  Admitted in part.  The formal Masters of Science degree was to be awarded by Bloomsburg University.  GMC was to "provide a Certificate of Completion to the Students that will count towards completion of a MS Degree in nursing."  (Doc 89, 9 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement), § 2.1).

10.  Admitted.  The Collaboration Agreement extensively discusses the division of responsibilities between Geisinger and the University in their joint NAP.

11.  Admitted.  Joint GMC/Bloomsburg University employee defendant Richer testified that he developed the NAP in conjunction with the nursing program at the University.  Richer testified that it is a 33 month Master of Science Program, with approximately 24 of those months at GMC in the clinical part of the NAP.  In order to obtain the Masters of Science degree from the University, 24 of the 33 months were taught at Geisinger.  (Plaintiff's Exhibit N (Richer Deposition), Doc. 101, 40-41 of 213, 9:24 - 10:8; Doc. 103, 33 of 113, 377:3 - 377:8).

7

12.  Admitted in part.  The Collaboration Agreement provides that Geisinger has sole authority and control over all aspects of Clinical Training provided to Students. . . ."  (Doc 89, 10 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement), § 2.4).  Of course, neither the Collaboration Agreement nor anything else can divest Geisinger of its responsibility when acting in collaboration or concert with state actor Bloomsburg University to abide by the U.S. Constitution.

13.  Admitted in part.  We note that in paragraph 13 of Defendants' SOF they refer to the NAP as the "Bloomsburg Nurse Anesthesia program."  This is wrong.  It is undisputed that it is a joint NAP of both Bloomsburg University and Geisinger, established by the Collaboration Agreement (Doc. 89, 8-21 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement)), with joint employees, joint responsibilities, and constant interaction between the joint employees and employees from each institution.  It is admitted that within the joint NAP, the site of the clinical training is at Geisinger's facility.

14.  Admitted in part; disputed in part.  The Collaboration Agreement requires the University to advise the students that while participating in the Clinical Training portion of the Program, they are expected to adhere to

Geisinger's policies.  (Doc 89, 10 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement), § 2.8).  While it is not relevant to the disposition of the current or related motion, there is no evidence that the University actually complied with that part of the Collaboration Agreement.

More important, however, is that not only were the students required to abide by Geisinger's Drug and Alcohol policy (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13 (Drug and Alcohol Policy)), but Geisinger's discretion to require drug testing was limited by the terms of that policy.  In other words, Geisinger could only require drug testing when permitted by the written terms of its Drug and Alcohol Policy.  (Doc. 89, 29 of 56; Plaintiff's Exhibit 13) (requiring drug testing only upon "reasonable suspicion of substance abuse").  Similarly, Geisinger's Drug and Alcohol Policy had very specific "prohibitions."  (Doc. 89, 28 of 56; Plaintiff's Exhibit 13) (none of which apply to the underlying facts).  Other than the defined "prohibitions," Geisinger could not penalize a person for suspected drug or alcohol conduct which did not fall within those written "prohibitions."

As discussed herein, in the accompanying briefs in opposition to each defendant's summary judgment motion, and in plaintiff's papers in support of her summary judgment motion, even giving Geisinger and the

9

other defendants the benefit of all factual inferences, under the terms of

Geisinger's Drug and Alcohol policy Ms. Borrell was not required to take a

drug test.  Further, giving every inference to Geisinger, Ms. Borrell did not

violate any prohibition contained in its Drug and Alcohol Policy.  (Doc. 88,

¶¶ 23-36 (Plaintiff's Statement of Undisputed Facts in support of her

summary judgment motion).

15.  Admitted.  The part of the Collaboration Agreement to which

GMC and Richer refer is § 8.2C.  Section 8.2C gives GMC the right, as

between it and the University, to exclude a student from the required

Clinical Training if "(ii) the Student fails to comply with applicable policies

and standards of Geisinger."  As discussed herein, in plaintiff's statement

of facts in support of her own summary judgment motion (Doc. 88, ¶¶ 23-

36), and throughout the summary judgment papers, Ms. Borrell did not fail

to comply with Geisinger's actual, written policies and standards.

16.  Disputed.  Defendants use the phrase if an issue was

"determined" to involve violation of a GMC standard.  However, in the

context of a joint program with a state actor such as the NAP, a

determination can only be made with appropriate due process.  Regardless

of the fact that the Collaboration Agreement does not provide for due

process, that contractual arrangement cannot decrease the constitutional protections afforded to persons subject to a collaboration between a state actor and a traditional non-state actor.  Further, Geisinger maintains that it could determine "in its sole discretion" whether there was a violation of its policy.  Again, any such discretion would only be in the first instance; action to deprive a person of a property or liberty interest, in collaboration with a state actor, requires due process.

Further, Bloomsburg University's Department of Nursing, Master of Science in Nursing, Student Handbook, 2012-2013 (Doc. 89, 51-56 of 56 and Doc. 90, 1-4 of 112; Plaintiff's Exhibit 16) provided for a procedure of hearings in order to provide due process.  Defendants Ficca and Richer are listed on the second cover page of the Student Handbook.  At page 70 of the Student Handbook, it states that "[t]he review process will be initiated for a student in the nursing program who has a suspected violation of university, department, clinical agency alcohol/substance use and abuse policies. . . ."  At page 72 of the Student Handbook, a series of procedures are delineated for "Review Process" and a "Review Panel Hearing Process."

In addition, the joint NAP program had its own set of procedures, which are contained in Plaintiff's Exhibit 46.[2]  When confronted with a specific policy in a joint Geisinger/Bloomsburg University Nurse Anesthesia Program Administrative Manual (Plaintiff's Exhibit 46) which appeared to provide for a grievance process, defendant Richer insisted that that grievance process did not apply because it was "superseded" by Geisinger's drug and alcohol policy.  (Doc. 103, 24 of 113; Plaintiff's Exhibit N (Richer Deposition), 342:3 - 343:8).  Richer admits that there would be no way for a student to know that the policies providing for a grievance hearing were somehow superseded.  (Doc. 103, 23 of 113; Plaintiff's Exhibit N (Richer Deposition), 339:4 - 339:15).  There is no writing which somehow indicates that the NAP's due process policy was in fact superseded.

17.  Admitted.  Defendants' termination of Ms. Borrell from the clinical portion of the program was a termination from the entire joint Bloomsburg University/Geisinger NAP.

---

[2]With the Court's approval, Plaintiff's Exhibit 46 was previously filed under seal, because defendants stamped it as confidential.

12

18.  Disputed.  First, nothing in the Hallick Declaration to which defendants refer supports the proposition contained in their paragraph 18. Regardless, defendants' statement that GMC had to have full control and authority over application of its policies and procedures, including the ability to exclude registered nurses (students) from the NAP, is patently false.

GMC had complete control over the terms of its Drug and Alcohol Policy.  It could have created any policy it desired.  It chose the language contained in its actual policy (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13 (Geisinger's Drug and Alcohol Policy)).  While GMC had complete control over the terms of its policy, it cannot pretend the policy says what it does not.  Nothing in the policy's terms required Ms. Borrell to take a drug test under the facts as understood by defendants at the time.  Further, no fact indicated that Ms. Borrell had violated any of the policy's "prohibitions." (Doc. 88, ¶¶ 23-36 (Plaintiff's Statement of Undisputed Facts in support of her summary judgment motion), and evidentiary materials referred to therein).

19.  Admitted in part; disputed in part.  Defendant Ficca testified generally that there are similar agreements with other outside entities with

13

which Bloomsburg University contracts.  However, Ficca testified that

"each agreement is somewhat different," and she was not sure if those

contracts give the right of exclusion to the outside entity.  (Doc. 95, 75-76

of 128; Plaintiff's Exhibit E (Ficca Deposition), 25:12 - 26:3).  Regardless, a

state actor cannot simply contract away a person's constitutional rights,

i.e., Bloomsburg University (a state actor) cannot contract away the right to

exclude a graduate student from her graduate program without due

process.  GMC, with its significant legal department and contract

department, should also be aware that it cannot contractually collaborate

with a state actor but not provide for constitutional protections.

20.  Disputed.  First, we cannot locate the language quoted by the

defendants.  Regardless, assuming the language to be present, it does not

affect the fact that Geisinger and the University entered into an elaborate

contract, acted together, had joint employees, shared tuition payments and

worked together in countless ways in their joint NAP.  Geisinger and

Bloomsburg University even had joint letterhead, including on the letter

they used to terminate Ms. Borrell from the NAP.  (Doc. 90, 8 of 112;

Plaintiff's Exhibit 23 (September 25, 2012 Termination Letter)).

21.  Admitted in part.  It is admitted that Richer worked for Geisinger from 1976 until his retirement on October 1, 2013.  During 2010 until his retirement in 2013, and including the crucial time period in this case which was in 2012, Richer was also an employee of Bloomsburg University, working in the joint Geisinger/Bloomsburg University NAP.  (Doc. **89**, 22-23 of 56; Plaintiff's Exhibit 11 (Richer Resume)).  See also (Doc. **88**, ¶ 10 (Plaintiff's Statement of Undisputed Facts in support of her summary judgment motion), and evidentiary materials referred to therein).

22.  Admitted.  In 2007 and 2008, Richer was an employee of Geisinger only.  After the formation of the joint NAP, Richer became a joint employee of Geisinger and the University.  (Doc. **103**, 32 of 113; Plaintiff's Exhibit N (Richer Deposition), 375:8 - 375:13).

23.  Admitted.  Richer became a joint employee of Geisinger and Bloomsburg University as director of the NAP in April or May 2010.  (Doc. **103**, 32 of 113; Plaintiff's Exhibit N (Richer Deposition), 375:8 - 375:13).

24.  Admitted.  However, even during that time when Richer was not yet an employee of Bloomsburg University, the accreditation process to which defendants refer involved Geisinger, Bloomsburg University and their respective employees, working together.  For example, in the trip to

15

Chicago to which defendants refer to meet before the Council on

Accreditation, Richer and Dr. Wands of Geisinger attended, along with

defendant Ficca and Dr. Alichnie of Bloomsburg University.  (Doc. 103, 32

of 113; Plaintiff's Exhibit N (Richer Deposition), 373:22 - 374:4).

   25.  Admitted.  Each year until Richer's retirement, Bloomsburg

University renewed Richer's contract.  The employment contract between

Bloomsburg University and Richer which was in place in September 2012

at the time of the underlying events is Plaintiff's Exhibit 9 (Doc. 89, 6-7 of

56).

   26.  Admitted.  However, as defendants admit in paragraph 27 of

Defendants' SOF, because Richer was now a joint employee of

Bloomsburg University, it began paying a portion of his salary.

   27.  Admitted.

   28.  Admitted.  However, the fact that Richer did not receive a pay

increase as a result of Bloomsburg University's payment to him of an

annual salary of $47,035.01 (Doc. 89, 6-7 of 56; 2012 Contract, Plaintiff's

Exhibit 9), has no bearing on any issue.  Because Bloomsburg University

paid part of Richer's salary, Geisinger paid less of the salary.  Richer was a

joint employee, with responsibilities to each institution.

16

29.  Admitted.

30.  Admitted.

31.  Admitted in part; disputed in part.  It is admitted that Ficca testified that chairpersons are not considered administrators, but are considered faculty.  (Doc. 95, 58 of 128; Plaintiff's Exhibit E (Ficca Deposition), 8:21 - 8:23).  However, Ficca's description of her duties indicates that she is in fact an administrator.  Ficca carries a teaching load of only three credits (one course).  She has responsibilities for day-to-day operations within the nursing department.  She makes recommendations relating to budgeting, class schedules, hiring of faculty, and other matters. (Doc. 95, 58-59 of 128; Plaintiff's Exhibit E (Ficca Deposition), 8:21 - 9:19). For example, within the Bloomsburg University hierarchy, even though defendant Richer was the director of the joint Geisinger/Bloomsburg University NAP, as part of his employment with Bloomsburg University, Ficca was his direct boss.  (Doc. 101, 59-60 of 213; Plaintiff's Exhibit N (Richer Deposition), 28:22 - 29:11).  Further, on August 10, 2012, approximately one and one-half months prior to the operative events in this case, defendant Ficca as chairperson of the University's Department of Nursing was a signatory to the Second Amendment to the Collaboration

17

Agreement for Nurse Anesthesia Education between Geisinger and Bloomsburg University.  (Doc. 89, 21 of 56).  This was an example of defendant Ficca acting in an administrative role, in particular for the NAP.

32.  Admitted in part; disputed in part.  It is admitted that Robert Marande was Bloomsburg University's Dean of the College of Science and Technology from 2001 to 2013.  (Doc. 98, 34 of 98; Plaintiff's Exhibit H (Marande Deposition), 6:1 - 6:7).  It is disputed that decision-making only occurs at the dean level or above.  Further, regardless of who has official decision-making authority within Bloomsburg University, decisions were made by defendants Richer and Ficca in their individual capacities.  Richer was also acting as the highest decision-maker for Geisinger in the NAP.  (Doc. 97, 28-30 of 96; Doc. 98, 2-3 of 98; Plaintiff's Exhibit G (Lieberman Deposition), 8:21 - 9:25, 10:5 - 10:16, 78:15 - 79:3; Doc. 97, 3 of 96; Plaintiff's Exhibit F (Hallick Deposition), 69:14 - 70:21).

33.  Admitted.  It is admitted that Dr. Marande testified that he was responsible for "overseeing" the nine departments within the University's College of Science and Technology, including the Department of Nursing.  Dr. Marande explained that his oversight consisted of monthly meetings with the nine chairs of the nine departments within the College of Science

and Technology (this was all department heads together, in a single meeting), and an annual report from each department.  The annual report would contain a summary of all the activities within the department for the previous year, such as how many faculty were working with students, how many faculty presented papers at conferences, how many papers did the faculty publish, how many papers did the students publish and what were the grant activities.  (Doc. 98, 34-38 of 98; Plaintiff's Exhibit H (Marande Deposition), 6:22 - 10:11).

34.  Admitted in part; disputed in part.  It is admitted that Dr. Marande had responsibility for academic and non-academic issues.  However, it is disputed that Dr. Marande had "all" responsibility for such matters, in particular non-academic matters.

35.  Admitted.

36.  Admitted.

37.  Admitted in part; disputed in part.  It is admitted that GMC is a private hospital, owns the buildings in which it operates and primarily is not controlled by Bloomsburg University.  However, due to GMC's contract with Bloomsburg University (Doc. 89, 8-21 of 56; Plaintiff's Exhibit 10 (Collaboration Agreement)), GMC owes certain obligations to Bloomsburg

19

University.  Further, as a party acting in concert with Bloomsburg University and its staff, and having joint staff, GMC has certain constitutional obligations as a matter of law, which it would not otherwise have but for its concerted action with state actors.

38.  Disputed.  As part of the Collaboration Agreement (Plaintiff's Exhibit 10), Bloomsburg University was obligated to pay Geisinger "50 % of the billed tuition and fees" "for each credit hour in which the Student is participating in the Clinical Training portion of the Program. [the NAP]" (Plaintiff's Exhibit 10, Collaboration Agreement, § 5.1 (Doc. 89, 11 of 56)). Bloomsburg University was also required to hire the NAP's Program Director as a full-time tenure track graduate faculty member of the Department of Nursing.  (Plaintiff's Exhibit 10, Collaboration Agreement, § 5.1 (Doc. 89, 11 of 56)).  This was a requirement that the University pay a portion of the salary of a person who had previously been only a Geisinger employee.  That person, initially, was defendant Richer.  As defendants admit, when Richer began getting a salary from Bloomsburg University (initially $45,225.97, and in 2012 raised to $47,035.01), it did not increase Richer's total salary.  (Defendants' SOF, ¶¶ 26-28; *see also* ¶¶ 26-28,

*supra*).  Instead, it reduced Geisinger's fiscal responsibility for part of Richer's compensation.  This amounted to funding to Geisinger.

39.  Admitted in part; disputed in part.  Ms. Borrell has no reason to doubt that Geisinger has great concern for patient care, and therefore admits that statement.

However, Geisinger cannot avoid its obligations when acting in collaboration with a state university by insisting that it has sole authority over implementation of its policies and procedures in the NAP.  Besides the fact that Geisinger actually did not implement its Drug and Alcohol Policy in accordance with its actual terms (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13 (Drug and Alcohol Policy); ¶¶ 14-18, *supra*), Geisinger cannot and does not have authority to supersede the requirements of the United States Constitution, which apply to Geisinger with respect to its actions in collaboration with Bloomsburg University in implementing the NAP.

Further, in allegedly "implementing" GMC's Drug and Alcohol Policy, it is significant that defendant Richer did not even bother to actually read the Drug and Alcohol Policy to determine if the facts concerning Ms. Borrell were a violation of that policy.  (Doc. 101, 125-126 of 213; Plaintiff's Exhibit N (Richer Deposition), 93:15 - 94:9).  It is undisputed that Richer was

21

Geisinger's highest employee with the power to terminate a student from the NAP, and there was no person with the power to review Richer's decision to terminate a student from the NAP.  (Doc. 97, 28-30 of 96, 8:21 - 9:25, 10:5 - 10:16; Doc. 98, 2-3 of 98, 78:15 - 79:3; Plaintiff's Exhibit G (Lieberman Deposition); Doc. 97, 3 of 96; Plaintiff's Exhibit F (Hallick Deposition), 69:14 - 70:21).

40.  Disputed.  As a matter of law, GMC cannot have sole discretion in applying policies or procedures in violation of its obligations to provide due process and equal protection of the law pursuant to the U.S. Constitution.  Geisinger cannot contract away its Constitutional obligations when working in collaboration with a state actor.

41.  Admitted.

42.  Disputed.  Defendant Richer was director of the NAP, and was a joint employee of GMC and Bloomsburg University.  Similarly, non-party Brenda Wands was a joint employee of GMC and Bloomsburg University, and was the NAP's assistant director.  (*See* ¶ 5, *supra*).  Both of these joint employees interacted regularly with the registered nurses in the NAP.  As joint employees, Richer and Wands were under the control of both GMC and the University.

43.  Admitted.

44.  Admitted.

45.  Admitted, upon information and belief.

46.  Admitted.

47.  Admitted in part.  It is admitted that Richer's presentation included about a a student in the nurse anesthesia program which at the time was an academic affiliation between GMC and Susquehanna University to create an undergraduate degree program.  That student had been stealing strong narcotics (fentanyl) from GMC.  The student's clinical performance was less than was expected of a student at that level of experience.  There was an obvious change in performance.  The student was arrogant, argumentative, defensive and at times disrespectful to patients, staff, faculty and co-workers.  There were complaints about the student's attitude and interpersonal skills, in patient care and other areas. Faculty had complained about the student's poor judgment and inflexibility and his ability to accept constructive criticism.  None of these criticisms or complaints applied to Ms. Borrell, nor was she stealing drugs.  (Doc. 102, 67-70 of 130; Plaintiff's Exhibit N (Richer Deposition), 248:11 - 251:4). Despite these felonious, insubordinate and abusive behaviors, Richer and

GMC did not terminate that student from the program.  They worked with him and re-admitted him to the program.  (Defendants' SOF, ¶ 47).

48.  Admitted in part.  The other student was not asked to take a drug test because he was caught stealing addictive medications from GMC.  The program the other student was in was an academic affiliation between GMC and Susquehanna University.  The program included defendants GMC and Richer, but not Ficca or Bloomsburg University. (*See* ¶ 47, *supra*).

49.  Disputed.  None of the record citations to which defendants refer support such paragraph.  More importantly, such paragraph (and most of defendants' stated facts) have no bearing on whether defendants deprived Ms. Borrell of a property interest or a liberty interest without due process.

50.  Admitted in part; disputed in part.  It is admitted that registered nurses in the NAP are committed to 50 to 60 hours per week of work and study while in the Clinical Training portion of the NAP.

It is disputed that the use of controlled or illegal substances was strictly forbidden.  Geisinger's Drug and Alcohol Policy defined what was forbidden, in a section entitled "Prohibitions."  The following "Prohibitions" related to employees (students were considered employees, under the

definition section of the policy) such as Ms. Borrell (the other prohibitions are parallel prohibitions relating to contractors, and a provision relating to applicants for employment):

A.  "No Geisinger Health System Employee may use, possess, transport, promote or sell Alcohol, or any Drug or Drug Paraphernalia **while performing work for Geisinger**. . . ."  (Doc. 89, 28 of 56; Plaintiff's Exhibit 13 (Geisinger Drug and Alcohol Policy, p. 5 (item 1); emphasis added).

B.  "No Geisinger Health System Employee **may report for work, or go or remain on duty** while: 1.  under the influence of or impaired by Alcohol; and/or 2.  under the influence of or impaired by any Drug.  (Doc. 89, 28 of 56; Plaintiff's Exhibit 13 (Geisinger Drug and Alcohol Policy, p. 5 (item 3); emphasis added).

There was never a suspicion or suggestion that Ms. Borrell reported to work, remained on duty or performed work at Geisinger while under the influence or impaired by any drug or alcohol.  (Doc. 101, 108-110 of 213, 76:6 - 76:10, 76:25 - 77:3, 77:11 - 78:1, Doc. 101, 127-129 of 213, 95:20 - 97:9, Doc. 101, 130-131 of 213, 98:3 - 99:3, Doc. 101, 141 of 213, 109:10 - 109:23; Plaintiff's Exhibit N (Richer Deposition); Doc. 97, 39 and 41 of 96;

Plaintiff's Exhibit G (Lieberman Deposition), 19:15 - 19:23, 21:5 - 21:16;

Doc. 96, 86 of 96; Plaintiff's Exhibit F (Hallick Deposition), 17:8 - 19:3).

There was never a suspicion or suggestion that Ms. Borrell used,

possessed, transported, promoted or sold alcohol, or any drug or drug

paraphernalia while performing work for Geisinger.  (Doc. 101, 127-132 of

213, 95:20 - 100:10, Doc. 103, 26 of 113, 349:14 - 349:19, Doc. 103, 28 of

113, 358:4 - 358:17; Plaintiff's Exhibit N (Richer Deposition)).

There were never any signs at any time that Ms. Borrell had violated

any of the prohibitions contained in Geisinger's Drug and Alcohol Policy.

(Doc. 89, 24-31 of 56; Doc. 89, 32-38 of 56; Plaintiff's Exhibits13 and 14).

(Doc. 101, 33 of 213; Plaintiff's Exhibit N (Richer Deposition), 101:5 -

101:8).

Richer admitted that the prohibitions contained in Geisinger's Drug

and Alcohol Policy only concern drug or alcohol use while at work.  Richer

also does not think that students should infer things that are not contained

in the written policy.  (Doc. 103, 34-35 of 113; Plaintiff's Exhibit N (Richer

Deposition), 383:20 - 384:19).  Susan Hallick, Geisinger's executive vice

president, system chief nursing officer (Doc. 96, 83 of 96; Plaintiff's Exhibit

F (Hallick Deposition), 5:13 - 5:16) also agrees that the prohibitions in

Geisinger's Drug and Alcohol Policy (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13) only apply to alcohol or drugs while at work, and not while at home.  (Doc. 96, 83 of 96; Plaintiff's Exhibit F (Hallick Deposition), 20:24 - 27:5, 31:5 - 31:24).  Ms. Hallick agrees that the prohibitions contained in Geisinger's Drug and Alcohol Policy do not prohibit drug or alcohol use at the employee's home.  (Doc. 96, 86-89 of 96; Plaintiff's Exhibit F (Hallick Deposition), 38:19 - 39:1).

Thus, neither Geisinger nor any defendant made the use of controlled or illegal substances strictly forbidden.

51.  Admitted in part.  Ms. Borrell has no reason to doubt the statements contained in paragraph 51 of Defendants' SOF.

However, Ms. Borrell's equal protection claim is based on two different incidents.  One is discussed above, in which a student in Geisinger's prior incarnation of the NAP was stealing drugs and had other serious issues.  That student was not terminated from the program.  The second incident concerns a student named Elizabeth Peterman.

In 2010, GMC and Richer (and either Ficca or Ficca's predecessor at Bloomsburg University) attempted to terminate Ms. Peterman from the joint Geisinger/Bloomsburg University NAP for "unsuitability."  (Doc. 103, 14-21

of 113; Plaintiff's Exhibit N (Richer Deposition), 302:4 - 330:18).[3]

Defendants Geisinger and Richer gave Ms. Peterman due process.  They

gave Ms. Peterman an opportunity to submit evidence to refute the claim of

unsuitability.  (Doc. 103, 15 of 113, Plaintiff's Exhibit N (Richer Deposition),

304:25 - 305:12).  They gave Ms. Peterman information about the

procedures related to dismissal from the program.  (Doc. 103, 15 of 113;

Plaintiff's Exhibit N (Richer Deposition), 305:13 - 305:16).  They scheduled

a meeting with Ms. Peterman to review the documentation and to clarify

questions.  (*Id.*, at 305:18 - 306:1).  Ms. Peterman was given the

opportunity to learn what was stated against her, and to explain herself and

contest the accuracy of the claims against her.  (*Id.*, at 306:2 - 306:10).

Ms. Peterman was afforded the right to have a representative with her at

the meeting.  (*Id.*, at 306:11 - 306:23).  These were all rights afforded to

Ms. Peterman, in termination proceedings from the same NAP as Ms.

Borrell was enrolled in.  Unlike in Ms. Peterman's situation, none of these

rights were afforded to Ms. Borrell.

---

[3]Also submitted herewith is Plaintiff's Exhibit 45, which is a series of
documents about the charge against Ms. Peterman and the proceedings in
which she was afforded and utilized due process rights.

Just as happened with Ms. Borrell, Richer and GMC's Brion

Lieberman met with Ms. Peterman.  However, they were honest with Ms.

Peterman about why she was being charged with unsuitability.  (*Id*., at

308:7 - 308:25).  GMC's Richer and Lieberman were dishonest with Ms.

Borrell about why they wanted her to take a drug test.[4]  Unlike with Ms.

Borrell, Richer and Lieberman did not withhold from Ms. Peterman any

_____

[4]On the morning of September 21, 2012, NAP student Lindsey Reilly spoke with joint Geisinger/Bloomsburg employee Brenda Wands.  Ms. Reilly stated that she had seen Angela Borrell use cocaine one time, two months earlier, in July 2012, on a weekend (not during or before work). (Doc. 101, 114, 117-118, 138 of 213; Plaintiff's Exhibit N (Richer Deposition), 82:7 - 82:24, 85:22 - 86:6, 106:11 - 106:18; Doc 100, 102, 106 of 172; Plaintiff's Exhibit M (Reilly Deposition), 9:4 - 9:20, 13:1 - 13:19). Although even if this report were true it would not have been a violation of GMC's Drug and Alcohol Policy *(see* ¶ 50, *supra)*, it was the reason defendants wanted Ms. Borrell to take a drug test.

However, defendants lied to Ms. Borrell.  Defendant Richer and Mr. Lieberman told Ms. Borrell they wanted her to take a drug test because her "appearance and demeanor had changed."  (Doc. 93, 4 of 52, Plaintiff's Exhibit B (Angela Borrell Deposition), 166:1 - 166:15; Doc. 101, 149-150 of 213, Plaintiff's Exhibit N (Richer Deposition), 117:7 - 117:9, 118:9 - 118:10; Doc. 97, 54-55 of 96, Plaintiff's Exhibit G (Lieberman Deposition), 34:18 - 35:1; Doc. 90, 6 of 112, Plaintiff's Exhibit 18 (defendant Richer's handwritten note on a Bloomsburg University form indicating that Ms. Borrell had been told that her appearance and demeanor had changed); Doc. 90, 8 of 112, Plaintiff's Exhibit 23 (September 25, 2012 letter from defendants Richer and Ficca, on joint Bloomsburg University and Geisinger letterhead, terminating Ms. Borrell from the NAP, and stating that she had been asked to take a drug test because of changes in her appearance and demeanor)).

information.  (*Id*., at 311:2 - 311:8).  The pertinent information was withheld

from Ms. Borrell.  (*Id*., at 321:11 - 321:19).  There were many other

procedural rights afforded to Ms. Peterman.  (*Id*., at 323:7 - 324:13).  Ms.

Peterman utilized her rights.  (*Id*., at 325:3 - 327:13).  After Ms. Peterman

lost the initial hearing, she appealed within the University/NAP system, and

was reinstated into the NAP.  (*Id*., at 328:18 - 330:18).

Within the same NAP, and with the same individual defendants and

non-parties, Ms. Peterman was given her due process rights, and she

ultimately prevailed.  Ms. Borrell was given no hearing, no notice, and no

other rights.  She was terminated from the program.  While the stated

reasons for the terminations differed – unsuitability vs. refusal to take a

drug test (in a situation in which the drug testing policy did not require

testing) – that is a distinction without a difference.  Ms. Borrell was treated

unequally from a student similarly situated in all material respects.

52.  Disputed.  According to GMC's Drug and Alcohol Policy (Doc.

89, 24-31 of 56; Plaintiff's Exhibit 13), GMC could only administer a

substance abuse test "upon reasonable suspicion of substance abuse,"

and only "to assure compliance with Geisinger Health System's

prohibitions."  Under defendants' understanding of the term "substance

abuse," the report (whether true or false) about Ms. Borrell's one time use of cocaine two months earlier on a weekend did not qualify as "substance abuse."  Geisinger's human resources director defines "substance abuse" as dependence on alcohol or an illegal drug or a legal drug outside prescribed limits.  Such dependence means that reliance on the substance is the key to whether its use constitutes "substance abuse."  (Doc. 97, 42 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 22:1 - 22:20).  Defendant Richer cannot define or explain the term "substance abuse."  Richer thinks the term is too ambiguous and complicated to explain.  (Doc. 101, 98-101 of 213; Plaintiff's Exhibit N (Richer Deposition), 67:8 - 70:2).

53.  Admitted.  The relevance of such statement is disputed.

54.  Ms. Borrell has no way to verify or dispute such allegation.  It is thus admitted.  The relevance of such statement is disputed.

55.  Ms. Borrell has no way to verify or dispute such allegation.  It is thus admitted.  The relevance of such statement is disputed.

56.  Disputed.  While Ms. Borrell does not have sufficient information to dispute the actual numbers GMC states, defendants are not calculating the true benefit of the NAP to GMC.  GMC did not participate with Bloomsburg University in the NAP in order to make a profit from the NAP.

31

Rather, GMC participates in the NAP "as a source of recruitment for future nurse anesthetists to staff the Geisinger entities." (Doc. 101, 87 of 213; Plaintiff's Exhibit N (Richer Deposition), 56:16 - 56:19). The NAP thus serves as a means for GMC to train certified registered nurse anesthetists in GMC's facilities and its culture, and to recruit them for its various money making facilities.

57. Disputed. (*See* ¶ 56, *supra*). Relevance of such statement is also disputed.

58. Admitted. It is admitted that Susan Hallick had some responsibility spanning Geisinger's systems including the NAP. However, Richer was Geisinger's highest employee with the power to terminate a student from the NAP, and there was no person with the power to review Richer's decision to terminate a student from the NAP. (Doc. 97, 28-30 of 96; Doc. 98, 2-3 of 98; Plaintiff's Exhibit G (Lieberman Deposition), 8:21 - 9:25, 10:5 - 10:16, 78:15 - 79:3; Doc. 97, 3 of 96; Plaintiff's Exhibit F (Hallick Deposition), 69:14 - 70:21).

59. Admitted. However, Hallick did not have the power to review Richer's decision to terminate a student from the NAP. (*See* ¶ 58, *supra*).

60.  Admitted in part; disputed in part.  It is disputed that Hallick made sure that GMC's Drug and Alcohol Policy was applied properly.  (See ¶¶ 50, 52 herein).

61.  Admitted in part.  As discussed above, Hallick did not have the power to review Richer's decision to terminate a student from the NAP. (*See* ¶ 58, *supra*).

62.  Admitted in part; disputed in part.  It is admitted that Richer does not have authority over the content of GMC's Drug and Alcohol Policy; in other words, he did not draft it.  It is disputed that GMC's Human Resources department is "in charge" of that policy.  Besides the fact that being "in charge" of a policy is vague, the undisputed evidence reveals that Richer alone was in charge of terminating Ms. Borrell from the NAP for allegedly violating the Drug and Alcohol Policy.  (*See* ¶ 58, *supra*).  It is also clear that, giving every inference to the defendants, Ms. Borrell did not violate that policy's prohibitions, its drug testing provision, or any other provision.  (*See* ¶¶ 50, 52, 80 herein).

63.  Admitted.

64.  Disputed.  While Dr. Wands now states that she noticed Ms. Borrell looking disheveled and appearing moody and tired, Dr. Wands

33

admits it was never sufficiently significant to write it down at the time of the alleged observations.  (Doc. 104, 20 of 74; Plaintiff's Exhibit O (Wands Deposition), 83:8 - 83:11).

Moreover, because the defendants had told Ms. Borrell that the reason for requesting a drug test was "changes in her appearance and demeanor," the various NAP students deposed were all asked about Ms. Borrell's appearance and demeanor.  All of them except one (Ombongi) were represented by Geisinger's lawyers.  They all confirmed that there was no change in Ms. Borrell's appearance or demeanor.  (Doc. 100, 57-58 of 172, Plaintiff's Exhibit L (Patel Deposition), 40:15 - 41:4; Doc. 92, 6, 8 of 57, Plaintiff's Exhibit A (Adams Deposition), 10:14 - 11:7, 17:10 - 18:3; Doc. 104, 68-69 of 74, Plaintiff's Exhibit P (Yagel Deposition), 8:15 - 9:18, 12:12 - 12:18; Doc. 100, 121 of 172, Plaintiff's Exhibit M (Reilly Deposition), 28:1 - 28:14; Doc. 100, 3, 6 of 172, Plaintiff's Exhibit K (Ombongi Deposition), 32:1 - 32:7, 41:24 - 42:23; Doc. 99, 35-36 of 86, Plaintiff's Exhibit I (Masemer Deposition), 12:16 - 13:15).

65.  Disputed.  (*See* ¶ 64, *supra*).

66.  Disputed.  (*See* ¶ 64, *supra*).

67.  Admitted.

34

68.   Admitted.   What happened was that on the previous weekend, on a trip to New York, Ms. Borrell had had a big argument with fellow classmate Lindsey Reilly.   Ms. Borrell and Ms. Reilly returned that Sunday, and were not speaking to each other.   (Doc. 92, 52-55 of 57, Plaintiff's Exhibit B (Borrell Deposition), 132:22 - 144:21).   Several days later, Ms. Reilly went to a friend (Justin Young) in the class ahead of her and Ms. Borrell's class and told him a story that she had witnessed Ms. Borrell use cocaine some time previously.   Mr. Young told Ms. Reilly that she had to come forward and tell someone in charge of the NAP that she had witnessed a fellow student use cocaine, and that if Ms. Reilly did not make that disclosure, then Mr. Young would do so.   (Plaintiff's Exhibit Q (Young Deposition), 16:10 - 17:17).   At that point, Ms. Reilly had no choice but to stick to her story.   Ms. Reilly had omitted from her story to Mr. Young that she and Ms. Borrell had had a big fight.   (*Id.*, at 20:7 - 20:21).   Mr. Young subsequently told his friend in his NAP class, Monica Masemer, about what Ms. Reilly had told him.   Ms. Masemer then told Brenda Wands that someone would come forward to discuss a classmate's potential drug use. (*Id.*, at 21:10 - 24:11).

In the Brenda Wands Declaration she states that an NAP student told her that Ms. Borrell had a drug problem and that "all the NAP students were talking about it."  (Wands Declaration, ¶¶ 8-9).  Besides the fact that there was no drug problem, it was also false that "all the NAP students were talking about it."  Rather, a single student (Ms. Reilly) attempted to destroy Ms. Borrell's reputation by telling Justin Young.  Justin Young then told Monica Masemer.  There were no other students talking about any drug problem.  (Plaintiff's Exhibit Q (Young Deposition), 19:13 - 19:16).

It all originated with a single student with a grudge.  By not affording Ms. Borrell with basic due process, defendants deprived Ms. Borrell of the opportunity to engage in a fact-finding process in which credibility and bias could be explored and the truth revealed.

69.  Admitted in part.  It is admitted that such conversation occurred. It is disputed that Ms. Reilly actually had concerns about a drug issue with Ms. Borrell.  (*See* ¶ 68, *supra*).

70.  It is admitted that Young and Masemer testified as stated.  Ms. Borrell disputes the relevance of such testimony.  It is also noted that Young and Masemer also testified that they never saw anything on Facebook or heard anything about Ms. Borrell using drugs.  (Plaintiff's

Exhibit Q Young Deposition), 18:2 - 18:4; Doc. 99, 35 of 86; Plaintiff's

Exhibit I (Masemer Deposition), 11:1 - 11:6).

71.  Admitted.  (*See* ¶ 68, *supra*).

72.  Admitted.  Of course, this has nothing to do with whether GMC

complied with its own Drug and Alcohol Policy or whether it afforded Ms.

Borrell due process.

73.  Admitted in part; disputed in part.  Admitted that Ms. Reilly told

Dr. Wands the things stated in such paragraph.  Disputed that any of such

things were true.  Even were such statements true, they were not a

violation of GMC's Drug and Alcohol Policy.  Further, had defendants

afforded Ms. Borrell due process, she would have explored Ms. Reilly's

bias, motive to fabricate and credibility.

It is also noted that Ms. Reilly's statement (unrelated to the falsity of

it), was that she had witnessed Ms. Borrell use cocaine two months earlier

on a weekend.  (Doc. 100, 102-104 of 172; Plaintiff's Exhibit M (Reilly

Deposition), 9:4 - 11:16).  That would not have violated GMC's Drug and

Alcohol Policy.

74.  Admitted.  Wands told both defendants Richer and Ficca about

her conversation with Lindsey Reilly.  (Wands Declaration, ¶ 18).

75.  Admitted.  Richer and Dr. Wands were at Bloomsburg University meeting with Ficca and others, engaging in joint activity with the University and its personnel, interviewing applicants for the next NAP class.  Dr. Wands told Richer and Ficca about her conversation with Lindsey Reilly. (Doc. 95, 101-102 of 128; Plaintiff's Exhibit E (Ficca Deposition), 51:1 - 52:9).

76.  Disputed.  While Richer did testify that sometime in July or August [2012] Dr. Wands told him that Ms. Borrell was keeping to herself and separate from some of the other students, that is false.  For example, Plaintiff's Exhibit 20 is a series of photographs which had been placed on Facebook.  The photos start on April 27, 2012.  Going into July, 2012, there is a July 14, 2012 photograph of Angela Borrell with Lindsey Reilly. After several photos which cannot be clearly identified, there is a September 2, 2012 photograph of Angela Borrell, Lindsey Reilly and two men.  Next is a September 8, 2012 photograph of Angela Borrell and Lindsey Reilly.  Next is a September 14, 2012 photograph of Angela Borrell, Lindsey Reilly and Nisha Patel.

Ms. Borrell's former boyfriend also testified to a number of social occasions throughout the summer and into September 2012 when Ms.

38

Borrell was with Ms. Reilly and sometimes Ms. Patel.  (Plaintiff's Exhibit R (Yeastedt Deposition), 18:6 - 21:11).

77.  Admitted in part.  It is admitted that Dr. Wands, Richer, Ficca and Hallick had a meeting the morning of September 24, 2012.  However, they were obviously not concerned that Ms. Borrell was under the influence of any substance.  That morning of Monday, September 24, 2012, Ms. Borrell reported as usual to her clinical assignment at Geisinger at about 6:00 a.m.  Under the supervision of a certified registered nurse anesthetist, Ms. Borrell performed work, including administering anesthesia, on a patient or patients for approximately three to five hours.  (Doc. 92, 38 of 57; Doc. 93, 3, 30 of 52; Plaintiff's Exhibit B (Angela Borrell Deposition), 77:8 - 77:16, 162:23 - 163:15, 270:14 - 270:16; Doc. 101, 115-116 of 213; Doc. 103, 13-14 of 113, Plaintiff's Exhibit N (Richer Deposition), 83:4 - 84:14, 299:13 - 300:17; Doc. 99, 66-68 of 86, Plaintiff's Exhibit J (Minzola Deposition), 20:18 - 21:16, 22:4 - 22:22).

Neither Geisinger nor Richer would have permitted Ms. Borrell to have worked on patients the morning of September 24, 2012 if they suspected she were under the influence of any substance.  (Doc. 101, 117, 120, 124-125 of 213; Plaintiff's Exhibit N (Richer Deposition), 85:4 - 85:19,

88:14 - 88:23, 92:3 - 93:1).  Geisinger and Richer permitted Ms. Borrell to

work on patients that morning because they did not believe she was under

the influence of any substance.  (Doc. 101, 117, 145 of 213; Plaintiff's

Exhibit N (Richer Deposition), 85:14 - 85:19, 113:19 - 113:24; Doc. 93, 10

of 52; Plaintiff's Exhibit B (Angela Borrell Deposition), 190:18 - 191:18).

78.  Admitted.  Interestingly, Lieberman's understanding of the

underlying events, as discussed in the pages of his deposition which

defendants reference, is at odds with the actual facts as explained by other

witnesses.  That is not say that Lieberman is being other than truthful; it is

simply testament to the fact that due process procedures would have

served a purpose of having a clear understanding of the facts.

79.  Disputed.  Defendants' statement that "GMC followed its normal

process of reviewing the information with Human Resources, reviewing the

policy, and taking the safest and appropriate next step for the patients"

makes no sense.  GMC as an entity cannot review information with

anyone.  What is clear is that neither Richer nor GMC's human resources

professional Brion Lieberman gave Ms. Borrell a copy of Geisinger's Drug

and Alcohol Policy to review for herself.  Richer and Lieberman also did not

talk to Ms. Borrell about any of the language of Geisinger's Drug and

Alcohol Policy.  (Doc. 93, 4 of 52; Plaintiff's Exhibit B (Angela Borrell

Deposition), 167:12 - 167:19; Doc. 101, 160-161 of 213, 128:17 - 129:4,

Doc. 102, 75-76 of 130, 256:9 - 257:7; Plaintiff's Exhibit N (Richer

Deposition); Doc. 97, 14-75 of 96; Plaintiff's Exhibit G (Lieberman

Deposition), 54:18 - 55:7, 55:18 - 55:20, 56:5 - 56:7).

80.  Admitted.  However, by its terms Geisinger's drug testing policy

in fact only required drug testing upon "reasonable suspicion of substance

abuse."  (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13).  Geisinger's

prohibitions regarding drug or alcohol use only included during times when

the employee was working.  (Doc. 89, 24-31 of 56; Plaintiff's Exhibit 13).

As discussed herein, none of these provisions applied to the situation with

Ms. Borrell, even assuming all factual disputes in favor of Geisinger,

because none of the facts available suggested "reasonable suspicion of

substance abuse."

81.  Admitted.  Prior to the meeting, Ms. Borrell had been

administering anesthesia and otherwise engaging in patient care for three

to five hours.  (*See* ¶ 77, *supra*).

82.  Admitted only that Richer told Ms. Borrell that there were

concerns about changes in her appearance and demeanor.  It is disputed

41

that Richer or Lieberman told Ms. Borrell that they had a report that she had used cocaine or "abused a substance" (albeit, two months earlier, during a non-working weekend).  (Doc. 101, 153 of 213; Plaintiff's Exhibit N (Richer Deposition), 121:18 - 121:21; Doc. 97, 53-54 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 33:23 - 34:1).

Ms. Borrell asked Richer for an example of her appearance or demeanor changing.  Richer would not or could not give an example. (Doc. 93, 1 and 4 of 52; Plaintiff's Exhibit B (Angela Borrell Deposition), 155:25 - 156:24, 166:22 - 167:11; Doc. 101, 150, 152, 156, 157 of 213, 118:9 - 118:10, 120:13 - 120:16, 124:25 - 125:16, Doc. 102, 22 of 130, 203:4 - 203:7; Plaintiff's Exhibit N (Richer Deposition)).

While defendants now contend that Ms. Borrell's appearance or demeanor had changed, they never documented any such change, although **after** they terminated Ms. Borrell they created a document.  Nor was there ever any document indicating that anyone should observe or keep an eye on Ms. Borrell.  (Doc. 97, 54, 56, 57 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 34:3 - 34:13, 36:17 - 37:10; Doc. 103, 29 of 113; Plaintiff's Exhibit N (Richer Deposition), 360:24 - 361:3; Doc. 103, 106-108 of 113; Plaintiff's Exhibit O (Wands Deposition), 56:24 - 58:10).

Ms. Borrell stated to Richer and Mr. Lieberman that there was nothing of concern about her appearance.  Neither Richer nor Lieberman disputed that in any way.  (Doc. 97, 76 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 56:8 - 56:21).

Significantly, any alleged change in Ms. Borrell's appearance or demeanor did not make Richer think she was using drugs or alcohol. (Doc. 101, 154 of 213; Plaintiff's Exhibit N (Richer Deposition), 122:10 - 122:24).

As discussed above, the various NAP students deposed confirmed that there was no change in Ms. Borrell's appearance or demeanor.  (*See* ¶ 64, *supra*).

83.  Admitted in part; disputed in part.  With respect to Ms. Borrell becoming "verbal," Richer did testify using that word.  However, when questioned about what that means, the best he could explain was "she started just saying a bunch of things."  (Doc. 101, 149 of 213; Plaintiff's Exhibit N (Richer Deposition), 117:16 - 117:22).  Later, Richer explained that Ms. Borrell questioned him about what he meant by her appearance and demeanor.  (Doc. 101, 150 of 213; Id., 118:9 - 118:10).

With regard to Ms. Borrell accusing Richer and Lieberman of lying, it is admitted.  In fact, we know that Richer and Lieberman were lying.  They specifically withheld the true reason they were requesting the drug test - which was that Lindsey Reilly had stated she had seen Ms. Borrell use cocaine two months earlier on a weekend.  Ms. Borrell did not know the true reason Richer and Lieberman were asking her to take a drug test, but she knew they were lying, as a change in her appearance and demeanor did not make sense, they would not give her an example and, as confirmed by subsequent depositions of the students, there was no change in Ms. Borrell's appearance or demeanor.  (*See* ¶ 64, *supra*).

With regard to whether Ms. Borrell was "aggressive," that term is ambiguous.  To the extent that Ms. Borrell stated that she wanted more information and that she believed Richer and Lieberman were lying, if that is considered aggressive then Ms. Borrell admits such allegation.

84.  Disputed.  It is not clear what defendants mean by their statement that Ms. Borrell "was given the opportunity to respond to those concerns."  The only concerns expressed were the false ones about Ms. Borrell's "appearance and demeanor."  There was no meaningful opportunity to respond because of the false pretense under which Richer

44

and Lieberman were requesting a drug test, and because they did not provide Ms. Borrell with a copy of the Drug and Alcohol Policy or go over its terms.  (*See* ¶¶ 50, 52, 80, 82, *supra*).

85.  Admitted in part; disputed in part.  Ms. Borrell asked Richer for an example of her appearance or demeanor changing.  Richer would not or could not give an example.  (Doc. 93, 1 and 4 of 52; Plaintiff's Exhibit B (Angela Borrell Deposition), 155:25 - 156:24, 166:22 - 167:11; Doc. 101, 150, 152, 156-157 of 213, 118:9 - 118:10, 120:13 - 120:16, 124:25 - 125:16, Doc. 102, 22 of 130, 203:4 - 203:7; Plaintiff's Exhibit N (Richer Deposition)).  (*See* ¶¶ 50, 52, 80, 82, 84, *supra*).  To the extent that defendants' paragraph 85 somehow implies that this meeting afforded Ms. Borrell due process, that is specifically denied.

86.  Admitted.

87.  Admitted.  As Ms. Borrell explained, "I don't always use proper terminology.  I guess it is the words that came out that day, but I felt like I was being singled out more or less.  Like why am I the only one who they are saying this to in the class.  What did I do?  Because I had – I didn't act any different than anybody else.  I had the same grades as everybody.  I had a high GPA.  I showed up on time.  I wasn't late.  I didn't – I looked

professional every day I arrived.  I interacted with everybody.  I treated my patients with respect.  I treated staff with respect.  I treated every professor with respect.  I – for what reason were they saying this to me?"  (Doc. 93, 70 of 52; Plaintiff's Exhibit B (Borrell Deposition), 180:16 -181:4).

This testimony reveals that Ms. Borrell may have had the opportunity to speak, but she did not have the opportunity to actually respond to what was going on, because defendants were keeping her in the dark about why they were asking her to take a drug test.  Of course, not reviewing the Drug and Alcohol Policy and its terms which did not permit drug testing under the existing circumstances was a further limitation of Ms. Borrell's opportunity to engage in a meaningful response.

88.  Admitted.  Ms. Borrell further explained that because defendants were not giving her real information, she was guessing why they wanted a drug test.  ". . .  When you're confronted with something you start to second guess yourself.  Well, could possibly have I looked different?  Could I possibly have done that, which I never thought I did at any point in time.  And I still don't think I did.  But when you get, when you try to defend yourself and people are saying things, I was second guessing myself; well, maybe I looked this way because I am stressed about this situation.  But

46

never – and now that I recall, I never did change my appearance and behavior, but they were just some life events that were on going on in my life at the time."  (Doc. 93, 6 of 52; Plaintiff's Exhibit B (Borrell Deposition), 176:14 - 177:2).

89.  Admitted.  Again, Ms. Borrell's statements were because defendants had lied to her and were concealing from her the reason they had asked her to take a drug test, so she was guessing at why they might have claimed that her appearance and demeanor had changed.

90.  Admitted.

91.  Admitted.

92.  Admitted.  As Ms. Borrell explained, when applying for jobs the prospective employer asks for records, and it would be known that she had a urine/drug screen conducted.  That would have raised a suspicion of drug use.  (Doc. 93, 9 of 52; Plaintiff's Exhibit B (Borrell Deposition), 186:22 - 187:6).  Geisinger's Brion Lieberman admitted that many employers require employees, before officially hiring them, to have a release of their medical records.  With such a release which might be required by prospective employers, the confidentiality of Ms. Borrell's

47

records would be waived.  (Doc. 97, 67 of 96; Plaintiff's Exhibit G

(Lieberman Deposition), 47:1 - 47:10).

94.  Admitted.  Ms. Borrell explained that "I felt like people were lying

to me, so how could I trust anything from that point forward?  How could I

trust what you're saying is true?  How can I trust that you're not going to do

something if you are going to lie to me about the real reason you're asking

me for a drug test?  Who knows what you're going to do from this point on?

(Doc. 93, 11-12 of 52; Plaintiff's Exhibit B (Borrell Deposition), 197:24 -

198:6).  Ms. Borrell further explained "If you would have just said, Lindsey

said you do cocaine, or you do drugs, that was expressed to me, then I

would have understood where he was coming from.  (*Id*., 195:18 - 195:21).

94.  Disputed.  Ms. Borrell was told "you will face consequences.  If

you don't take it right now you will face consequences."  (*Id*., 192:11 -

192:15).

95.  Admitted.  Whatever "consequences" defendants thought were

appropriate should have been subject to due process.  At such a due

process hearing, the facts about defendants' lies to Ms. Borrell would have

been explored.  Significantly, the terms of the GMC Drug and Alcohol

Policy would have been discussed and it would have been clear that on the

48

facts, even the undisclosed facts about Ms. Reilly's statement, Ms. Borrell had not violated the policy and the policy did not require or permit testing. (*See* ¶¶ 50, 52, *supra*).

96.   Disputed.   Defendants now take the litigation position that GMC and Richer **acted** primarily as GMC and not as Bloomsburg University, in order to pretend that they were not state actors by virtue of the Collaboration Agreement with Bloomsburg University.   Defendants now purport to have determined that the information communicated by Lindsey Reilly was a GMC issue only.   However, defendants are wrong.   Ms. Borrell was part of the NAP, which was a joint program of GMC and the University. Richer was also a joint employee of GMC and the University.   Neither GMC nor anyone else had the right to simply decide that this was exclusively a GMC decision.

Defendants Richer, Geisinger **and Ficca** simply terminated Ms. Borrell from the joint Geisinger/Bloomsburg University Nurse Anesthesia Program.   The termination letter was on joint Geisinger/Bloomsburg University letterhead, and was signed by both Richer (an employee of both Geisinger and Bloomsburg University) and by Ficca (an employee of Bloomsburg University and Richer's supervisor there).   (Doc. 90, 80 of 112;

Plaintiff's Exhibit 23 (September 25, 2012 termination letter); Doc. 102, 4 of 130; Plaintiff's Exhibit N (Richer Deposition), 185:6 - 185:17; Doc. 95, 116-118 of 128; Plaintiff's Exhibit E (Ficca Deposition), 66:22 - 68:5).  Richer, Ficca, Brenda Wands (a joint employee of both Geisinger and Bloomsburg University) and others all contributed to the writing, editing, additions and deletions from the termination letter.  (Doc. 102, 8-10, 13-15 of 130; Plaintiff's Exhibit N (Richer Deposition), 189:16 - 191:4, 194:16 - 196:23; Doc. 104, 34-35, 41-45 of 74; Plaintiff's Exhibit O (Wands Deposition), 97:12 - 98:20, 104:9 - 108:4; Doc. 95, 122-124 of 128, 72:10 - 74:1, Doc. 96, 41-47 of 96, 119:10 - 125:7; Plaintiff's Exhibit E (Ficca Deposition); Doc. 97, 72 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 52:6 - 52:21; Doc. 90, 9, 25-41, 42 of 112; Plaintiff's Exhibits 24, 41 and 41A (emails of the termination letter with edits and comments)).

Not only did Ficca sign the September 25, 2012 termination letter, she was also Richer's direct supervisor at Bloomsburg University.  (Doc. 101, 59-60, 67-68 of 213; Plaintiff's Exhibit N (Richer Deposition), 28:22 - 29:11, 36:5 - 37:7).  Ficca did not take any steps to prevent her subordinate Richer from sending the termination letter, and she directly sent it herself by signing it.  Ficca also did not take any steps to intervene

to permit Ms. Borrell to have any appeal or grievance proceeding.  (Doc. 103, 28 of 213; Plaintiff's Exhibit N (Richer Deposition), 359:11 - 359:18). Ficca also asked Richer to submit Bloomsburg University paperwork concerning the alleged violation of the Bloomsburg Code of Academic and Professional Conduct Agreement.  (Doc. 90, 6 of 112; Plaintiff's Exhibit 18; Doc. 101, 194-195 of 213; Plaintiff's Exhibit N (Richer Deposition), 162:4 - 163:16).  While Richer was the ultimate decisionmaker on terminating a person from the NAP (Doc. 95, 106-107, 108 of 128; Plaintiff's Exhibit E (Ficca Deposition), 56:25 - 57:6, 58:16 - 58:20; Doc. 97, 28 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 8:4 - 8:10), he had to consult with others, including his direct supervisor at Bloomsburg University, defendant Ficca.  (Doc. 95, 109 of 128; Plaintiff's Exhibit E (Ficca Deposition), 59:13 - 59:15).  Ficca did not intervene to prevent Richer from violating Ms. Borrell's constitutional rights.

Significantly, the termination letter (Doc. 90, 8 of 112; Plaintiff's Exhibit 23) listed as an enclosure the pages from the Bloomsburg University Department of Nursing Student Handbook which provide for a "Review Process" and for a "Review Panel Hearing Process," *i.e.*, due process.  (*See* Plaintiff's Exhibit 16 Doc. 89, 51-56 of 56 and Doc. 90, 1-4

of 112).  That the termination letter was on joint letterhead, and that it

enclosed due process procedures from the University, further indicates that

defendants did not even subjectively consider the issue to be an exclusive

GMC issue.

97.  Admitted in part.  Lieberman testified that Geisinger does **not**

have a policy which indicates that if an employee refused to test he or she

is terminated and does not have an opportunity to test at a later date.

Lieberman testified that that is simply Geisinger's unwritten practice.  (Doc.

97, 71 of 96; Plaintiff's Exhibit G (Lieberman Deposition), 51:5 - 51:15).

More important is that Ms. Borrell was part of the joint NAP program.

Because actions within the NAP were state actions, Geisinger's normal

policies or practices were superseded as a matter of law.  In the case of

the NAP, Geisinger, the University and their employees involved with the

NAP were required to comply with the U.S. Constitution, including

providing due process.

98.  Admitted in part; disputed in part.  It is disputed that Richer was

not aware of any appeal mechanism.  Richer in fact was aware of several

appeal mechanisms.  That is why, with the termination letter, he enclosed

copies of Bloomsburg University's policies explaining the appeal

processes.  (Doc. 90, 8 of 112; Plaintiff's Exhibit 23).  (*See also* ¶ 96, *supra*).  In addition, Richer is a member of the Bloomsburg University Department of Nursing.  Plaintiff's Exhibit 16 is excerpts from Bloomsburg University's Department of Nursing Graduate Student Handbook.  On the second page of the exhibit (BSU000164), Richer is listed as the Director of the NAP.  On page 72 of the handbook (BSU000239), the "Review Process" and the "Review Panel Hearing Process" are explained.

Plaintiff's Exhibit 46 is the Geisinger Health System/Bloomsburg University of Pennsylvania Nurse Anesthesia Program Administrative Manual, 2012-2013.  At page 194 of the manual (GMC00013001) is a grievance procedure.

With all of these mechanisms in place, Richer cannot now pretend to know of no appeal mechanism.

It is admitted that once defendants refused to permit Ms. Borrell to finish her clinical training at GMC, she could no longer continue in the NAP.  In other words, defendants deprived Ms. Borrell of her property interest in her status as a graduate student in the NAP.  They did so without affording her due process.

99.  Disputed.  GMC was not applying its Drug and Alcohol Policy. (*See* ¶¶ 50, 52, 80, *supra*).  An actual read of the policy reveals that even under the facts withheld from Ms. Borrell (Lindsey Reilly's story about cocaine), Ms. Borrell had not violated any of the policy's "prohibitions." Under the policy's drug testing provision, the facts were insufficient to require a drug test from Ms. Borrell, because there was not evidence of "reasonable suspicion of substance abuse."

100.  Disputed.  Richer's testimony to which defendants refer indicates his belief that the Collaboration Agreement (Doc. 89, 8-21 of 56; Plaintiff's Exhibit 10) between GMC and Bloomsburg University somehow gives GMC unilateral right to terminate students from the clinical training portion of the NAP (which would mean that they are terminated from the NAP as a whole (*See* Defendants' SOF, ¶ 98)).  However, there is nothing in the Collaboration Agreement which indicates that the University or its chair of the nursing department somehow forfeit their rights, or the right (and obligation) to provide for due process.  Rather, the part of the Collaboration Agreement to which witnesses have referred to support that position (and which defendants now omit from the Defendants' SOF) is section 2.8.  Section 2.8 merely states that the "University agrees to advise

Students that Students will, while participating in the Clinical Training

portion of the Program, be expected to adhere to all applicable policies and

standards of Geisinger including . . . B. Geisinger's Drug and Alcohol

Policy."  There is nothing about GMC having exclusive right to terminate

students, nothing about due process standards or University grievance

procedures not applying, and nothing about NAP grievance policies not

applying.

Indeed, Bloomsburg University and Ficca had the duty (as did GMC),

when action was being taken against Ms. Borrell, to assure that she was

provided with due process.

101.  Admitted in part; disputed in part.  It is admitted that Ficca was

informed of and agreed with the decision that Ms. Borrell would be

terminated from the NAP.  Indeed, Ficca signed the termination letter.

(Doc. 90, 8 of 112; Plaintiff's Exhibit 23).  It is also admitted that Ficca

participated in discussions about what should be done and that Ms.

Borrell's actions allegedly violated GMC's policy.  Significantly, neither

Ficca nor anyone in the discussions actually had the policy or discussed

any of the language in the policy.  (Doc. 95, 103-104 of 128; Plaintiff's

Exhibit E (Ficca Deposition), 53:19 - 54:15).  Therefore, the discussion of

alleged violation of policy was fatally flawed, in that no one knew what the actual policy said or whether Ms. Borrell's actions violated the actual policy.

It is disputed that the decision to terminate Ms. Borrell was "solely that of GMC."  Rather, GMC and the NAP, through their final decisionmaker Richer, simply made that decision.  Ficca acquiesced to it, signed the termination letter, and declined to provide Ms. Borrell with due process.

Indeed, Ms. Borrell went to great lengths to seek due process, and defendants went to great lengths to deny her due process.  Ms. Borrell requested a hearing in various ways.  She contacted various officials of Geisinger and Bloomsburg University to request a grievance hearing. (Doc. 90, 11 of 112; Plaintiff's Exhibit 27 (September 26, 2012 email from defendant Richer to Sue Hallick explaining that Ms. Borrell had contacted Bloomsburg University's Dean of Graduate Studies to request a non-academic grievance; explaining that Richer met with Bob Marande and Michelle [Ficca] of Bloomsburg University and Brion Lieberman of Geisinger about Ms. Borrell's request for a grievance hearing); Doc. 90, 12 of 112; Plaintiff's Exhibit 28 (email from Richer to Lieberman discussing

Ms. Borrell's decision to grieve her termination, and that Ms. Borrell had

informed defendant Ficca); Doc. 90, 13-14 of 112; Plaintiff's Exhibit 29

(series of emails, including 10/2/12 email at 3:13 p.m., in which Richer

states that "Sue [Hallick, of Geisinger] wanted to make sure that we had all

of our documentation before the university tells the student that there will

be no grievance hearing"); Doc. 90, 15-16 of 112; Plaintiff's Exhibit 30A

(Ms. Borrell's September 27, 2012 letter to defendant Ficca "requesting a

review process take place and I am requesting a review panel hearing,"

and also explaining Ms. Borrell's side of the events); Doc. 90, 17-19 of 112;

Plaintiff's Exhibit 31 (October 3, 2012 letter from Ms. Borrell's prior lawyer

Eric Prock to defendants Richer and Ficca requesting a review process or

hearing); Doc. 93, 21 of 52; Plaintiff's Exhibit B (Angela Borrell Deposition),

234:5 - 234:15, 235:22 - 236:14).

        Ms. Borrell tried telephoning and emailing Richer, but he would not

accept her phone calls or respond to her emails.  (Doc. 101, 170-171 of

213, 138:22 - 139:8, Doc. 102, 22-23 of 130, 203:18 - 204:18; Plaintiff's

Exhibit N (Richer Deposition)).  Geisinger did not respond to Ms. Borrell.

(Doc. 102, 57 of 130; Plaintiff's Exhibit N (Richer Deposition), 238:3 -

238:4).

Defendants refused to permit Ms. Borrell a hearing of any kind. (Doc. 102, 47-48, 56-57 of 130; Plaintiff's Exhibit N (Richer Deposition), 228:17 - 229:2, 237:14 - 238:4, 238:3 - 238:23; Doc. 96, 9-10, 23 of 96; Plaintiff's Exhibit E (Ficca Deposition), 87:14 - 88:14, 101:5 - 101:13). They would not permit her to explain herself, to explain why she initially refused the drug test, to explain that she had not actually violated Geisinger's drug or drug testing policy, or to argue any mitigation or any penalty short of termination from the Nurse Anesthesia Program.  (Doc. 103, 22 and 29 of 113; Plaintiff's Exhibit N (Richer Deposition), 332:5 - 333:5, 360:8 - 360:23; Doc. 96, 31-32, 33 of 96; Plaintiff's Exhibit E (Ficca Deposition), 109:17 - 110:7, 111:1 - 111:9).

102.  Disputed.  As a joint employee of both GMC and the University, and as director of the NAP, Richer cannot maintain that his action in terminating an NAP student was solely a Geisinger act and not also a Bloomsburg University act.  He cannot claim that as director of a joint program he segregated his actions as being for one or the other institution.

103.  Disputed.  The fact that the Geisinger Drug and Alcohol Policy's actual language shows that Ms. Borrell did not actually violate it, combined with the fact that GMC terminated Ms. Borrell for allegedly violating the

policy, indicates that the policy is not consistently enforced according to its actual terms.  In addition, regardless of enforcement of the policy with respect to GMC employees who are not entitled to due process (because they are not involved in a collaborative program with a state entity or other state actor), with respect to NAP students GMC must apply standards which are consistent with the U.S. Constitution, including providing due process.

104.  Admitted in part; disputed in part.  It is admitted that nurses have been terminated.  It is disputed that defendants tried to enforce the actual terms of the Drug and Alcohol Policy in this case.  Because this factual situation concerned the NAP, GMC's normal procedures are inapplicable, and constitutional requirements attach.

105.  Admitted in part; disputed in part.  It is admitted that GMC decided to apply its Drug and Alcohol Policy (without reading it and without GMC actually conforming its own acts to the policy's terms) to the students in the NAP in the same way it applied the policy to its own nurses, at least with respect to absence of due process.  However, that decision not to provide due process, while it may be a legal choice with respect to GMC nurses who are not part of the NAP, was an illegal choice with respect to

59

nurses/students in the NAP, which was a joint program with state actor

Bloomsburg University.  Further, Richer was a state actor in his own right,

as he was an employee of Bloomsburg University.

106.  Ms. Borrell has no knowledge with which to address this

allegation.  However, as discussed above, GMC may treat its own nurses

how it wishes, but with respect to NAP students, it must comply with the

U.S. Constitution.

107.  Admitted.

108.  Admitted.

109.  Admitted.

110.  Admitted.  Unrelated to the fact that defendants had not

reviewed GMC's Drug and Alcohol Policy and that it did not in fact require

Ms. Borrell to take a drug test under the circumstances, Ms. Borrell was

willing to take a drug test to avoid termination from the NAP.

111.  Admitted.  Marande told Ms. Borrell to send a letter stating that

she was willing to comply with the drug test.  Marande told Ms. Borrell she

needed to do that within 72 hours in order to comply with the grievance

process.  (Doc. 93, 20 of 52; Plaintiff's Exhibit B (Borrell Deposition), 233:1

- 233:8). Marande also told Ms. Borrell that the reason no one from GMC

or the University was responding to her phone calls, emails and texts was

because their legal team advised them not to reply to Ms. Borrell.  (Doc.

93, 20 of 52; Plaintiff's Exhibit B (Borrell Deposition), 231:10 - 231:20).

112.  Admitted.  In other words, the day after Ms. Borrell did not take

the drug test, defendants terminated her from the NAP.  Both Richer and

Ficca signed the letter, and it was on joint Geisinger and Bloomsburg

University letterhead.  There was no due process.

113.  Admitted in part.  The words of the September 25, 2012 letter

did indeed state that Ms. Borrell was terminated from the NAP.  Because

the only program Ms Borrell was enrolled in was the NAP, which was a

joint program of Bloomsburg University and GMC, she was terminated from

every aspect of her enrollment with Bloomsburg University.  Submitted as

Plaintiff's Exhibit 74 is the December 10, 2010 letter from Ficca, on joint

Bloomsburg University and Geisinger letterhead, informing Ms. Borrell that

she was accepted into the NAP.  The letter did not accept Ms. Borrell into

any other program at Bloomsburg University.  The letter is signed by both

defendants Ficca and Richer.

114.  Admitted, although we do not understand defendants' use of

the word "again."  Ms. Borrell spoke or texted with Ms. Patel, Ms. Reilly and

Mr. Ombongi; in the course of those communications it was conveyed that she was terminated from the NAP.

115.  Admitted that Ms. Borrell contacted and spoke with Dr. Marande.

116.  Admitted.  However, Dr. Marande was wrong.  Because GMC was acting in its capacity as part of the joint NAP with the University, due process procedures should have been available.  While GMC may have sole authority and control over how the Clinical Training is provided, it did not as a matter of law have sole control over terminating a student and depriving her of property and/or liberty rights.  GMC also did not have the right to deprive a student in the NAP of property and/or liberty rights without due process.

117.  Admitted that Marande testified that he had a telephone conversation with Ms. Borrell about other options.  There was no writing. However, Ms. Borrell's acceptance by Bloomsburg University was specifically into the NAP, and not into any other program.  (Plaintiff's Exhibit 74).  Ms. Borrell would have had to apply for other options, *i.e.*, nurse practitioner or community health, within Bloomsburg University. (Doc. 96, 11-12 of 96; Plaintiff's Exhibit E (Ficca Deposition), 89:18 -

90:24).  Ms. Borrell subsequently did mitigate the damage caused by defendants by obtaining a masters degree from Walden University, in a nurse practitioner program.  (Doc. 94, 32, 33, 34 of 74; Plaintiff's Exhibit B (Borrell Deposition), 308:23 - 309:2, 314:7 - 317:9).

118.  Disputed.  The part of the record referred to by defendants does not support the proposition in Defendants' SOF.  Regardless, Ms. Borrell was admitted into the NAP, and she wished to remain in the NAP. When defendants would not provide her with due process and simply terminated her from that program, she mitigated damages in a different program at a different university.  (*See* ¶ 117, *supra*).

119.  Admitted.  (*See* Plaintiff's Exhibit 30A; Doc. 90, 15-16 of 112). In Ms. Borrell's September 27, 2012 email to defendant Ficca, she asked to appeal her termination from the NAP.  She requested both a review process and a review panel hearing, which were part of her rights under Bloomsburg University's Department of Nursing, Master of Science in Nursing Student Handbook (Doc. 89, 51-56 of 56, Doc. 90, 1-4 of 112; Plaintiff's Exhibit 16).

120.  Admitted.  Dr. Marande instructed Ficca not to have any communications with Ms. Borrell.  (Plaintiff's Exhibit E (Ficca Deposition), 85:16 - 86:4).

121.  Admitted in part.  It is admitted that Ficca testified that Dr. Marande told her that there was no appeal process for Ms. Borrell. According to Ficca, Dr. Marande told her that the reason Ms. Borrell could not grieve her termination was because it was a "non-academic grievance." (Doc. 96, 25 of 96; Plaintiff's Exhibit E (FIcca Deposition), 103:14 - 103:18).  Incredibly, Ficca now takes the position in her legal brief that it was an academic termination.

The truth is that Bloomsburg University had processes for both academic and non-academic grievances.  (Doc. 89, 51-56 of 56, Doc. 90 1-4 of 112; Plaintiff's Exhibits 16, 39).  Further, the NAP itself had a grievance procedure.  (*See* ¶¶ 16, 98, *supra*).  Ficca did not bother to actually determine if there were appeals processes.  (Doc. 96, 8 of 96; Plaintiff's Exhibit E (Ficca Deposition), 86:16 - 86:21).

Regardless of what Marande may have told Ficca, there were multiple grievance procedures in place.  Ms. Borrell was not permitted to utilize any of them.  Further, of course, as a matter of law Ms. Borrell was

64

entitled to due process under the U.S. Constitution, because she was

terminated from a program involving state actors.

122.  Admitted.  (Doc. 90, 7 of 112; Plaintiff's Exhibit 19).  It is further

noted that Ms. Borrell did in fact abide by the policies and procedures of

GMC.  It was GMC and its personnel, including joint employee defendant

Richer, who did not bother to review GMC's Drug and Alcohol Policy.  As

discussed herein, had they reviewed that policy they would have seen that

under the circumstances Ms. Borrell was not required to have a drug test.

(*See* ¶¶ 50, 52, 80, *supra*).  In addition, just because Ficca writes

something in a letter does not make it true or correct.  Finally, we note that

Ficca wrote in her letter that "[t]his situation is a non-academic issue."  This

is contrary to the position defendants take in their summary judgment

briefs.

123.  Admitted in part; disputed in part.  It is admitted that Ficca

stated in her October 19, 2012 letter that Ms. Borrell had violated a GMC

policy.  It is disputed that Ms. Borrell actually violated a GMC policy.  (*See*

¶¶ 50, 52, 80, *supra*).  It is admitted that Ficca stated that Ms. Borrell

cannot provide patient care at GMC.

124.  Admitted.  GMC, in concert with Ficca (*see* Plaintiff's Exhibit 23; Doc. 90, 8 of 112), excluded Ms. Borrell from the clinical portion of the NAP.  However, because Ms. Borrell had not violated GMC's Drug and Alcohol Policy, the exclusion was in violation of that policy and of the Collaboration Agreement.  (Doc. 89, 8-21 of 56; Plaintiff's Exhibit 10). Most significant for purposes of the current lawsuit, defendants did not afford Ms. Borrell due process.  Had they done so, Ms. Borrell could have shown the actual words of the policy and that she had not violated it. Further, defendants' falsehoods about the reason they wanted the drug test (appearance and demeanor changes) would have been revealed.

125.  Admitted.  However, as discussed above, Ms. Borrell should not have been excluded from the clinical portion of the NAP.  Defendants, as state actors and private actors working in a joint program with state actors, should have afforded Ms. Borrell due process in order to contest that termination or exclusion.

126.  Disputed.  That Ficca and Bloomsburg University ceded all authority to GMC and decided not to make their academic or non-academic grievance policies available to Ms. Ficca does not mean that it was correct.  The page from the record to which defendants refer for

support for this proposition merely states that Dr. Marande told Ficca that

there was no process for appeal.  Ficca chose not to look at the

documents to see if Dr. Marande was correct.  Further, the NAP has its

own grievance procedure, which was also denied to Ms. Borrell.  (*See* ¶¶

16, 98, *supra*).

127.   Admitted.  However, there was no violation of GMC's policies.

Further, Bloomsburg University does have control over providing due

process to its students.  In addition, Bloomsburg University is no longer a

defendant (not because it did nothing wrong, but only because of a

jurisdictional issue).  Ficca and Richer both participated in the termination

of Ms. Borrell from the NAP, by their actions, by not actually reviewing the

Geisinger Drug and Alcohol Policy, their signatures on the termination

letter and their not assuring that Ms. Borrell was afforded due process

rights.  GMC may have been the driving force for Ms. Borrell's termination

and denial of due process rights, but Richer and Ficca are responsible for

their own actions and inactions in violating Ms. Borrell's Constitutional

rights.

DYLLER LAW FIRM

s/ Barry H. Dyller

Attorney ID No.: 65084
Attorney for Plaintiff
Gettysburg House
88 North Franklin Street
Wilkes-Barre, PA 18701
(570) 829-4860