**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA BORRELL,

    Plaintiff,

       v.

BLOOMSBURG UNIVERSITY,
GEISINGER MEDICAL CENTER, and
ARTHUR F. RICHER and MICHELLE
FICCA in their individual and official
capacities,

    Defendants.

CIVIL ACTION NO. 3:CV-12-2123

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are three motions: Plaintiff Angela Borrell's ("Borrell") Motion for Partial Summary Judgment, (Doc. 86); Defendant Michelle Ficca's ("Dr. Ficca") Motion for Summary Judgment, (Doc. 114); and Defendants Geisinger Medical Center ("Geisinger") and Arthur Richer's ("Richer") Motion for Summary Judgment, (Doc. 116).[1] Borrell was dismissed as a student from Bloomsburg University ("Bloomsburg") and Geisinger's collaborative Nurse Anesthesia Program (the "NAP") in September 2012 after she refused to submit to a drug test. Shortly thereafter, Borrell commenced this action asserting, among others claims, deprivation of her equal protection and due process rights. With discovery now complete, Borrell seeks summary judgment as to liability on her procedural due process liberty and property interest claims, while Defendants move for summary judgment on all claims.

Because Borrell fails to present any evidence that she was treated differently from an individual that was "alike in all relevant aspects," Defendants will be granted summary judgment on the "class of one" equal protection claim. Furthermore, since Defendants did

---

[1]    Where appropriate, Dr. Ficca, Richer, and Geisinger will be referred to collectively as "Defendants."

not make public any false statements in relation to Borrell's dismissal from the NAP, Defendants' motion for summary judgment on the due process liberty interest claim will be granted.  Conversely, because Defendants deprived Borrell of a property interest while acting under color of state law when they dismissed her from the NAP without due process, her motion for summary judgment as to liability on the procedural due process deprivation of property interest claim will be granted.

## I. Factual Background

### A.      The Nurse Anesthesia Program

In 2006, Richer was instructed by Geisinger's[2] Executive Leadership Team to explore options with universities in order to create a joint or collaborative accreditation program. (Doc. 115, *Defendants' Statement of Material Facts*, "*Defs.' SMF*," ¶ 1; Doc. 139, *Plaintiff's Counterstatement of Facts*, "*Plf.'s CSF*," ¶ 1.)  The following year, Geisinger decided to form a collaborative program, known as the Nurse Anesthesia Program (the "NAP"), with Bloomsburg, an educational institution of the System of Higher Education of the Commonwealth of Pennsylvania that provides a Masters of Science degree accredited by the Commission of Collegiate Nursing Education in the area of nursing for graduates of accredited programs. (*Defs.' SMF*, ¶¶ 2-3; *Plf.'s CSF*, ¶¶ 2-3.)  The NAP was designed to be distinct from Geisinger's previous programs for registered nurses. (*Defs.' SMF*, ¶ 4; *Plf.'s CSF*, ¶ 4.)  Under the NAP, students in the program are given the opportunity to perform hands-on work at Geisinger under the supervision of Certified Registered Nurse Anesthetists. (*Defs.' SMF*, ¶ 5; *Plf.'s CSF*, ¶ 5.)

In August 2007, Geisinger and Bloomburg entered into the "Collaboration Agreement for Nurse Anesthesia Education" (the "Agreement"). (*Plf.'s Ex.* 10.)  As set forth in the

---

[2]      Geisinger is a legal entity owned by the Geisinger Health System. (*Defs.' SMF*, ¶ 36; *Plf.'s CSF*, ¶ 36.)

Agreement, Bloomsburg "wishes to collaborate with Geisinger to support the Academic Training portion of the Program and provide the Program educational expertise and facilities," and Geisinger "wishes to collaborate with University to support the Clinical Training portion of the Program and provide the Program clinical expertise and facilities." (*Id*.) The Agreement provides that "none of the provisions of this Agreement are intended to create nor shall be deemed or construed to create any relationship between the parties other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement." (*Id*. at ¶ 9.7.)

The parties' duties and responsibilities are enumerated in the Agreement. For example, students that complete the Clinical Training portion of the NAP receive a Certificate of Completion from Geisinger, while Bloomsburg provides a MS Degree in Nursing to students that successfully complete the program. (*Id*. at ¶ 2.1) Both parties were also required to assist with meeting the necessary criteria for accreditation standards. (*Id*. at ¶ 2.2.) The Agreement further provides that "[b]oth parties shall:" (1) "develop a joint Admissions Committee to finalize admission criteria and recommend admission of Students into the Program;" (2) "designate at least three (3) representatives to serve on an advisory council for the program;" (3) "establish and mutually agree upon the number of Students that will be allowed to participate in the Program for each class;" (4) "develop and approve the curricula for Students while they are participating in the Clinical Training at Geisinger;" and (5) "develop guidelines for the Clinical Training portion of the Program with incorporation into University's Department of Nursing Graduate Student Handbook and based on University academic policies." (*Id*. at ¶ 2.2.) The Agreement also requires both parties to promote and market the NAP. (*Id*. at ¶ 2.6.) Bloomsburg further agreed to "advise Students that Students will, while participating in the Clinical Training portion of the Program, be expected to adhere to all applicable policies and standards of Geisinger,"

including Geisinger's Drug and Alcohol Policy. (*Id*. at ¶ 2.8.)  And, "[s]ubject to the terms of this Agreement, Geisinger shall have sole authority and control over all aspects of Clinical Training provided to Students pursuant to this Agreement including, without limitation, designation of patients and facilities." (*Id*. at ¶ 2.4.)  Similarly, the Agreement provides that Geisinger may exclude a Student from participation in the Clinical Training if "(i) the Student's performance is unsatisfactory to Geisinger; (ii) the Student fails to comply with applicable policies and standards of Geisinger; or (iii) the Student's health status may prevent attendance and successful completion of the Clinical Training portion of the Program.  Geisinger will notify University in the event a student is excluded." (*Id*. at ¶ 8.2.)

As to compensation, Bloomsburg is required to pay Geisinger "at the beginning of each semester, at the rate of 50% of the billed tuition and related fees." (*Id*. at ¶ 5.1.) Bloomsburg is also obligated to hire "the Program Director as a full-time tenure track graduate faculty member of the Department of Nursing." (*Id*.)  "Program Director" is defined as:

> the individual interviewed, approved and employed by both University and Geisinger to oversee the Program and serve as the liaison between Geisinger and University relative to the Program.  As an employee of both Geisinger and University, Program Director shall be entitled to any benefits or entitlements associated with such employment with each party in accordance with each party's policies. . . .

(*Id*. at ¶ 1.4.)

The Agreement provides that the NAP is approximately thirty-three (33) months in duration. (*Id*. at ¶ 2.2.)  Approximately twenty-three (23) to twenty-five (25) months are dedicated to the Clinical Training portion of the program. (*Id*.)  During the Clinical Training portion of the NAP, the students work with and under the supervision of Geisinger employees. (*Defs.' SMF*, ¶ 41; *Plfs. CSF*, ¶ 41.)  Geisinger owns the buildings in which it operates. (*Defs.' SMF*, ¶ 37; *Plfs. CSF*, ¶ 37.)

Geisinger and Bloomsburg have joint employees. (Doc. 88, *Plaintiff's Statement of*

*Material Facts*, "*Plf.'s SMF*," ¶¶ 10-11; Doc. 132, *Defendants' Counterstatement of Facts*, "*Defs.' CSF*," ¶¶ 10-11.)  Defendant Richer worked as the Interim Program Director from 2008 until 2010 solely as a Geisinger employee. (*Defs.' SMF*, ¶ 23; *Plfs. CSF*, ¶ 23.)  In 2010, once students arrived to begin the clinical training in the NAP, Richer became a joint employee of Bloomsburg and Geisinger. (*Richer Dep.*, 375:10-13; *Plf.'s Ex.* 11.)  Richer was the Director of the NAP at that time. (*Plf.'s SMF*, ¶ 10; *Defs.' CSF*, ¶ 10.)  Richer's pay did not change after he became a joint employee of Bloomsburg and Geisinger, as he continued to receive a yearly salary of $190,000.00. (*Defs.' SMF*, ¶ 26; *Plfs. CSF*, ¶ 26.)  However, Bloomsburg began paying approximately twenty-five percent (25%) of Richer's salary, in the annual amount of $45,225.97. (*Defs.' SMF*, ¶ 27; *Plfs. CSF*, ¶ 27.)  Prior to becoming a joint employee of Bloomsburg and Geisinger, Richer worked exclusively for Geisinger. (*Defs.' SMF*, ¶ 28; *Plfs. CSF*, ¶ 28.)

Other joint Bloomsburg-Geisinger employees were Brenda Wands ("Dr. Wands") and Debra Minzola ("Minzola"). (*Plf.'s SMF*, ¶ 11; *Defs.' CSF*, ¶ 11.)  Dr. Wands was the assistant Program Director, (*Dr. Wands Dep.*, 16:1-6, 17:3-8), and Minzola is now the assistant Program Director. (*Minzola Dep.*, 11:4-7.)

The NAP makes up only a small percentage of Geisinger's annual budget. (*Defs.' SMF*, ¶ 53; *Plfs. CSF*, ¶ 53.)  For example, in 2012, Geisinger's overall budget was $65,485,379, while its annual investment in the NAP is approximately $870,979. (*Defs.' SMF*, ¶¶ 54-55; *Plfs. CSF*, ¶ 54-55.)  And, while Geisinger indicates that its net loss on its investment in the NAP is approximately $749,979 per year, (*Defs.' SMF*, ¶ 56), Geisinger leadership desired to develop the NAP "as a source of recruitment for future nurse anesthetists to staff the Geisinger entities." (*Richer Dep.*, 56:16-19.)

**B.      Bloomsburg and Geisinger Policies and Procedures**

Bloomsburg's Department of Nursing prepared a Graduate Student Handbook for

its students seeking a Master of Science in Nursing. (*Plf.'s Ex.* 16.)  Specifically, the Departmental Code of Academic and Professional Conduct indicates that it applies "to all student activities on University owned property, any location affiliated with Bloomsburg University, or in the community at large." (*Id*. at 67.)  Under the Alcohol and Substance Abuse Policy, students are required to "comply with the drug and alcohol policies and drug testing procedures as required by agencies affiliated with the Department of Nursing." (*Id*. at 70.) The Alcohol and Substance Abuse Policy further states: "[d]epartmental sanctions will be rendered for a student in the nursing program who . . . refuses to comply with affiliated agencies drug and alcohol policies and drug screening policies and procedures." (*Id*.)  The Handbook also sets forth a "review process" which is to "be initiated for a student in the nursing program who has a suspected violation of university, department, clinical agency alcohol/substance use and abuse policies . . . ." (*Id*.)

Section V of the Geisinger Health System/Bloomsburg University of Pennsylvania Nurse Anesthesia Program Administrative Manual is entitled the "Student Nurse Anesthetist Handbook." (Doc. 82, 122.)  The purpose of the Student Nurse Anesthetist Handbook is to provide a "guide for students intended to promote student understanding of the [NAP]-Related policies, procedures and academic/clinical issues." (*Id*. at 123.) Among the various policies and procedures set forth in the Nurse Anesthesia Program Administrative Manual is the "Grievance Procedure," which defines a grievance as "a complaint by a student concerning the clinical experiences, didactic evaluation, and/or disciplinary action during the Student's period of enrollment in the Clinical Core Course portion of the Program." (*Id*. at 194.) The Administrative Manual also contains a "Code of Conduct/Discipline" policy, which provides that the NAP and Geisinger have established rules and regulations, and that "in the event there is a violation of one of these rules, we are committed to being reasonable in an attempt to correct the offense." (*Id*. at 196.)  Under the Code of Conduct/Discipline

policy, the "Faculty Organization" is the agency responsible for the discipline of students, except in minor instances. (*Id*.)  This policy further enumerates offenses which are cause for immediate suspension and/or expulsion, one of which is the "unauthorized use, possession or distribution of controlled substances." (*Id*.)  The policy provides that it is "the student's right to initiate a grievance in the event that there is a disagreement with the decision of the Faculty Organization.  Please refer to the Grievance Policy." (*Id*.)

Geisinger also has a Drug and Alcohol Policy for purposes of outlining "Geisinger Health System standards and procedures for dealing with Alcohol and Drug use or abuse by employees, . . ." (*Plf.'s Ex.* 13, 1.)  Students are considered to be "Geisinger Health System Employee[s]" under the Drug and Alcohol Policy. (*Id*. at 2.)  The Drug and Alcohol Policy provides that no Geisinger Health System Employees "may use, possess, transport, promote or sell Alcohol, or any Drug or Drug Paraphernalia while performing work for Geisinger . . ., while on Geisinger Health System Premises, . . ." (*Id*. at 5.)  Furthermore, Geisinger Health System Employees are prohibited from reporting to work or remaining on duty while under the influence of or impaired by alcohol or any drug. (*Id*.)  Geisinger Health System Employees are obligated under the Drug and Alcohol Policy to comply with substance abuse testing procedures.  Those procedures provide that "[s]uch tests may be administered upon reasonable suspicion of substance abuse, (this may include situations on a case by case basis where HR is made aware of alleged drug/alcohol abuse and deems it as reasonable cause to test the employee) . . . ." (*Id*. at 6.).  And, "[a]ny Geisinger Health System Employee who refuses to cooperate in any aspect of the Drug and/or Alcohol testing process described in this Policy shall be subject to disciplinary action, including termination, for a first refusal or any subsequent refusal." (*Id*. at 4.)

**C.**    **Borrell's Enrollment, Participation, and Termination from the NAP**

Borrell applied for entrance into the NAP for the class beginning Fall 2011. (*Plf.'s Ex.*

7

74.)  Borrell was accepted into the NAP by letter dated December 10, 2010. (*Id*.)  The acceptance letter was signed by Dr. Ficca as Graduate Coordinator and Assistant Chairperson[3] and Richer as Interim Program Director on joint Bloomsburg-Geisinger letterhead. (*Id*.)  The only program within Bloomsburg that Borrell applied for and was accepted by was the NAP. (*Plf.'s Ex*. 75, ¶ 7.)  Borrell ultimately started in the NAP in 2011, (*Borrell Dep.*, 43:13), and her clinical course work began at Geisinger in May 2012. (*Id*. at 59:8-10.)  While a student in the NAP, Borrell paid her tuition, maintained her GPA at approximately 3.63-3.69, and performed her clinical work appropriately. (*Plf.'s SMF*, ¶ 15; *Defs.' CSF*, ¶ 15.)

Shortly after Borrell's class (the class of 2014) began their clinical work, Dr. Wands noticed that Borrell would show up to class looking disheveled, tired, and moody. (*Dr. Wands Decl.*, ¶ 6.)  However, Dr. Wands never documented her observations. (*Dr. Wands Dep.*, 83:8-22.)  Richer also noticed that Borrell appeared disheveled on a few occasions, but, like Dr. Wands, he never documented these observations. (*Richer Dep.*, 103:1-23.)

On the evening of September 20, 2012, Monica Masemer ("Masemer"), a student in the class of 2013, alerted Dr. Wands that a student would be coming forward about one of the registered nurses in the class of 2014. (*Defs.' SMF*, ¶ 67; *Plfs. CSF*, ¶ 67.)  Masemer knew through Justin Young ("Young"), also a student in the class of 2013, that either Lindsey Reilly ("Reilly") or Young would come forward regarding Borrell having a potential drug problem. (*Defs.' SMF*, ¶ 68; *Plfs. CSF*, ¶ 68.)  Reilly had previously spoken with Young, her mentor, about her concern that Borrell was having issues with drug use. (*Defs.' SMF*, ¶ 69; *Plfs. CSF*, ¶ 69.)  Young spoke of that conversation with Masemer, who then communicated with Dr. Wands. (*Defs.' SMF*, ¶ 71; *Plfs. CSF*, ¶ 71.)

---

[3]    Since 2011, Dr. Ficca has been the Chairperson of the Department of Nursing at Bloomsburg. (*Defs.' SMF*, ¶ 29; *Plf.'s CSF*, ¶ 29.)

The next day, Friday, September 21, 2012, Reilly met with Dr. Wands. (*Defs.' SMF*, ¶ 72; *Plfs. CSF*, ¶ 72.)  Reilly informed Dr. Wands that she witnessed Borrell use cocaine once in July 2012. (*Reilly Dep.*, 9:12-18, 47:13-14.)  Reilly also informed Dr. Wands that Borrell acted erratically the previous weekend when they were in New York City. (*Id*. at 46:22-47:17.)  According to Borrell, Reilly reported this story because the two had gotten into an argument while they were in New York City. (*Borrell Dep.*, 156:17-24.)

The same day, Dr. Wands reported what she learned from Reilly to Dr. Ficca and Richer. (*Dr. Wands Decl.*, ¶ 18.) Dr. Wands spoke with Dr. Ficca and Richer at Bloomsburg while the three were preparing to start the interview process for the next class of anesthesia students. (*Dr. Ficca Dep.*, 50:7-51:11.) Dr. Wands stated that she had contact with students who reported to her that they had witnessed Borrell using cocaine and that she acted inappropriately on a weekend trip to New York. (*Id*. at 51:13-18.)

On Monday, September 24, 2012, Borrell reported as usual to her clinical assignment at Geisinger at 6:00 a.m. (*Plf.'s SMF*, ¶ 44; *Defs.' CSF*, ¶ 44.)  Under the supervision of a certified registered nurse anesthetist, Borrell performed work, including administering anesthesia, on a patient or patients for three to five hours. (*Id*.)

Also that morning, Dr. Wands, Richer, and Dr. Ficca met with Susan Hallick ("Hallick"), Geisinger's Executive Vice President, System Chief Nursing Officer, to discuss Reilly's report of Borrell's use of cocaine. (*Defs.' SMF*, ¶ 77; *Plfs. CSF*, ¶ 77.)  Hallick is "responsible for ensuring that any matters of significance occurring in the NAP are handled consistently with GMC and Geisinger Health System's overall policies, procedures, and practices." (*Hallick Decl.*, ¶ 7.)  The meeting took place in Hallick's office which was located at Geisinger. (*Ficca Dep.*, 61:6-9.)  At that meeting, it was decided that Richer should contact Brion Lieberman ("Lieberman"), Geisinger's Director of Human Resources, (*Lieberman Dep.*, 5:8), for further guidance. (*Ficca Dep.*, 63:18-19.)  It was also decided at

that meeting that Borrell needed to be taken out of the clinical area and drug tested. (*Richer Dep.*, 90:17-19.)  Richer then met with Lieberman and Dr. Wands in his office at Geisinger to discuss the allegation that a student had witnessed Borrell using cocaine. (*Lieberman Dep.*, 41:1-19.)

Thereafter, Richer asked Minzola to get Borrell out of clinical and bring her to his office. (*Minzola Dep.*, 19:25-20:12.) Borrell was instructed to change out of her scrubs and bring her personal effects. (*Richer Dep.*, 116:20-22.)

Beginning at 11:15 a.m., Richer and Lieberman met with Borrell for approximately one hour in Richer's office. (*Defs.' SMF*, ¶ 81; *Plfs. CSF*, ¶ 81.)  Richer indicated to Borrell that there were concerns about changes in her appearance and demeanor, as well as suspicions of drug use, and that they wanted her to take a drug test. (*Richer Dep.*, 117:6-18.) Richer and Lieberman, however, did not inform Borrell that they had a report that she had been witnessed using cocaine. (*Plf.'s SMF*, ¶ 54; *Defs.' CSF*, ¶ 54.)   According to Richer, Borrell became verbal, "saying a bunch of things," and asking for an explanation as to what was meant by her appearance and demeanor changing. (*Richer Dep.*, 117:16-118:22.) Borrell stated that she believed she was being discriminated against and that she had been under a lot of stress. (*Id.* at 118:9-22.)  And, when Richer explained that they wanted her to take a drug test, Borrell indicated that she did not know if she was willing to submit to one. (*Id.* at 118:23-25.)  Borrell was then permitted to call her mother at her request. (*Id.* at 119:8-14.)

Borrell stated that she was refusing to take the drug test because she did not want her record to show that she submitted to a drug/urine screen. (*Defs.' SMF*, ¶ 91; *Plfs. CSF*, ¶ 91.) Although Lieberman told Borrell that the results would be kept confidential, she did not believe him. (*Defs.' SMF*, ¶ 92; *Plfs. CSF*, ¶ 92.) Borrell was adamant that she would not submit to a drug test that day, but she expressed to Richer and Lieberman that she

might be willing to submit to the drug test another day after she had time to think about it. (*Defs.' SMF*, ¶ 93; *Plfs. CSF*, ¶ 93.)  Lieberman informed Borrell that testing at a later date was not an option, (*Lieberman Dep.*, 88:14-18.)  And, while Richer maintains that Borrell was made aware that refusal to take a drug test could result in "consequence[s], up to and including termination from the program," (*Richer Dep.*, 121:10-14), Borrell denies that he ever indicated that she could be terminated at that meeting. (*Borrell Dep.*, 172:8-10.) Rather, Borrell testified that she was only told that she would "face consequences" if she did not submit to the drug test. (*Borrell Dep.*, 192:11-15.)  Ultimately, Borrell refused to take the drug test.  (*Defs.' SMF*, ¶ 95; *Plfs. CSF*, ¶ 95.)  Following the meeting, Borrell contacted multiple classmates and her sister to tell them about the meeting and that she refused to take a drug test. (*Defs.' SMF*, ¶¶ 107-108; *Plfs. CSF*, ¶¶ 107-108.)  Borrell also contacted Dr. Robert Marande ("Dr. Marande"), the Dean of the College of Science and Technology at Bloomburg, about the request to take a drug test and her refusal. (*Defs.' SMF*, ¶ 109; *Plfs. CSF*, ¶ 109.)

That evening, a draft letter to Borrell was sent by email from Lieberman to Richer indicating that she was not to "report back to the program until further notice," and that she would be contacted in the near future to discuss the next steps. (*Plf.'s Ex.* 41.)  However, Richer testified that by the end of business on Monday, September 24, 2012, it was decided that Borrell would be terminated from the program. (*Richer Dep.*, 161:13-21.)

The next day, Tuesday, September 25, 2012, a draft letter informing Borrell of her termination from the NAP was circulated by email between Lieberman, Dr. Ficca, Richer, Dr. Wands, Minzola, and Brenda Webb. (*Plf.'s Ex.* 41.)  Lieberman, Dr. Ficca, Richer, and Dr. Wands all provided comments and suggestions as to the contents of the letter. (*Id.*) Richer subsequently sent an email to Ficca and Lieberman entitled "Final copy . . . font reduced so that the letter fits on GHS/BUP stationary." (*Id.*)

By letter dated September 25, 2012, Borrell was informed of her termination from the NAP. (*Plf.'s Ex.* 23.) The letter is on joint Bloomsburg University-Geisinger letterhead. (*Id.*) The letter is signed by Richer as Director of the NAP, and he indicates in the letter that Borrell had been informed that she "would be required to cooperate with a drug test as a condition of the Nurse Anesthesia Program." (*Id.*) The letter further states: "[a]s a result of your refusal to comply with the drug test, you are terminated from the Nurse Anesthesia Program effective September 25, 2012." (*Id.*) The letter is also signed by Dr. Ficca, indicating that she "reviewed the above information and agree[d] with the decision to terminate Angela Borrell from the Nurse Anesthesia Program." (*Id.*) Noted on the letter as enclosures are both the Bloomsburg University Department of Nursing Student Handbook pages 67 and 70-74, *i.e.*, the Departmental Code of Academic and Professional Conduct, as well as the Geisinger Drug and Alcohol Policy. (*Id.*)

Borrell attempted to contact Richer and others at both Geisinger and Bloomsburg on September 25, 2012 to state her willingness to submit to a drug test. (*Plf.'s SMF*, ¶ 63; *Defs.' CSF*, ¶ 63; *Plf.'s Ex.* 25.) In particular, Borrell, at the instruction of the Dean at Bloomsburg, emailed Richer indicating her willingness to comply with the drug test request. (*Plf.'s Ex.* 25.) Richer forwarded that email, stating that if Borrell "grieves her dismissal, I believe we are going to be forced to share other information regarding her witnessed use of cocaine." (*Plf.'s Ex.* 41.) Lieberman responded by noting that "we will need to provide the information that was available to us to a review board if she grieves." (*Id.*) Despite Borrell's request, however, she was not permitted to take a drug test at that point. (*Plf.'s SMF*, ¶ 64; *Defs.' CSF*, ¶ 64.)

The next morning, Wednesday, September 26, 2012, Richer sent Hallick an email to update her on what had developed over the previous twenty-four hours. (*Plf.'s Ex.* 27.) Richer informed Hallick that he had meetings with Dr. Marande, Dr. Ficca, and Lieberman.

(*Id.*)  Dr. Ficca had explained the situation to Dr. Marande, and Dr. Marande supported the decision to terminate Borrell from the program. (*Id.*)  Richer also informed Hallick that Borrell contacted Bob Gates, Dean of Graduate Studies, and stated that "she wanted to file 'a non-academic grievance,' a process which does not exist." (*Id.*)  Richer further indicated to Hallick that Borrell's access identification badge had been suspended and that they would take further steps once she received her termination letter. (*Id.*)

On September 27, 2012, Borrell sent Dr. Ficca an email indicating that she wished to appeal her termination from the NAP and requesting the review process take place and a review panel hearing. (*Plf.'s Ex.* 30A.)  Borrell stated in her letter that she was never informed by Lieberman or Richer that she would be terminated from the program. (*Id.*)  She also indicated that she attempted to contact Richer the morning after she refused to submit to a drug test, but she did not receive a response. (*Id.*)  Thus, she concluded by "asking for a formal meeting and a formal review process of this decision." (*Id.*)

Borrell also contacted a few of her classmates and informed them she was terminated from the NAP. (*Defs.' SMF*, ¶ 114; *Plfs. CSF*, ¶ 114.)  In addition, Borrell contacted Dr. Marande about her dismissal from the NAP. (*Defs.' SMF*, ¶ 115; *Plfs. CSF*, ¶ 115.)  Dr. Marande instructed Borrell that if she wanted to get the issue resolved, she should contact Geisinger's Human Resources Department. (*Defs.' SMF*, ¶ 116; *Plfs. CSF*, ¶ 116.)  Dr. Marande informed Borrell about other graduate options that were available to her because she could not complete the clinical requirement of the NAP. (*Defs.' SMF*, ¶ 117; *Plfs. CSF*, ¶ 117.)  Borrell did not want to hear about those options. (*Dr. Marande Dep.*, 33:12-15.)  However, for Borrell to have pursued one of these other graduate options, she would have needed to apply for that specific program, such as the nurse practitioner program or the community health program. (*Dr. Ficca Dep.*, 89:29-90:4.)

On Monday, October 1, 2012, Richer sent an email to Lieberman to inform him that

Borrell decided to grieve her termination. (*Plf.'s Ex.* 28.)  Richer indicated that he had a meeting scheduled with Dr. Ficca, and, also, that Dr. Ficca had spoken to the Graduate School Dean and as far as he was concerned, her termination was a "'non-academic grievance' of which they do not have a process to deal with . . . ." (*Id.*)

On October 2, 2012, Richer emailed Hallick and Lieberman, informing them that "Bloomsburg University has determined that the student's termination cannot be grieved since it is a 'non-academic' grievance," and that "the contract between Geisinger and Bloomsburg indicated that the university abides by or agrees to support Geisinger's drug and alcohol policy," and the decision to refuse a drug test was in violation of that policy. (*Plf.'s Ex.* 29.)  By letter dated October 3, 2012 to Richer and Dr. Ficca, Borrell's former counsel demanded an immediate review process/hearing and reinstatement to the NAP. (*Plf.'s Ex.* 31.)

On October 4, 2012, Dr. Ficca sent an email to Lieberman and Richer attaching a draft letter responding to Borrell's letter sent on September 27, 2012. (*Plf.'s Ex.* 32.)  The draft letter stated that because Borrell refused to submit to the drug test, she was "no longer eligible to complete your clinical experiences at Geisinger and, thus, you are unable to complete the requirements of the nurse anesthesia options of the MSN." (*Id.*)  The draft letter further provided that as part of the Department of Nursing's affiliation agreements with health care institutions, students are required to comply with the policies of the affiliated institutions. (*Id.*) And, the draft letter indicated: "[t]his situation is a non-academic issue and does not qualify for the grievance procedure at Bloomsburg University." (*Id.*)

Dr. Ficca responded to Borrell by letter dated October 19, 2012. (*Plf.'s Ex.* 19.)  That letter, on Bloomsburg University letterhead, states:

> Dear Ms. Borrell:
>
> As part of the Department of Nursing's affiliation agreements with health care institutions, students and faculty are required to abide by policies and

procedures of the affiliating institutions.  Because you refused to participate in a drug screening test when required on September 24, 2012, you violated the contractual relationship we have with Geisinger Medical Center and as a result, you cannot provide patient care at Geisinger Medical Center as a student in the nurse anesthesia option of the MSN program.  This situation is a non-academic issue.

(*Id*.)

On November 8, 2012, Richer sent an email to the NCBRNA (the National Board of Certification and Recertification for Nurse Anesthetists). (*Plf.'s Ex.* 33.)  The email signature block identifies Richer as "Program Director, Geisinger Health System/Bloomsburg University of PA Nurse Anesthesia Program." (*Id*.)  Attached to that email was a completed 2012 Change of Student Status Form for Borrell. (*Id*.)  That form identifies Borrell's date of termination, and provides the following explanation for termination: "[s]tudent terminated for failure to comply with a request to submit to a drug test." (*Id*.)  Also attached to the Change of Student Status Form was a copy of the September 25, 2012 letter to Borrell informing her that she was dismissed from the NAP. (*Id*.)

**D.    Procedural History**

Based on the foregoing events, Borrell commenced this action against Dr. Ficca, Bloomsburg, Richer, and Geisinger by filing a Complaint and Motion for Preliminary Injunction and Temporary Restraining Order on October 24, 2012. (Docs. 1; 2.)  After multiple requests to continue the preliminary injunction hearing were granted, (Docs. 10; 13; 15), Borrell voluntarily dismissed the request for preliminary injunctive relief. (Docs. 16; 18.)

On February 19, 2013, Borrell, through newly retained counsel, filed her Amended Complaint. (Doc. 21.)  The Amended Complaint set forth claims for violations of Borrell's due process and equal protection rights, as well as state law breach of contract claims. (*Id*.)  Dr. Ficca, Bloomsburg, Richer, and Geisinger moved to dismiss the Amended Complaint. (Docs. 29; 32.)

By Memorandum and Order dated June 28, 2013, the motions to dismiss were

15

granted in part and denied in part. *See Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390 (M.D. Pa. 2013).  The claims against Bloomsburg, Dr. Ficca in her official capacity, and Richer in his official capacity as an employee of Bloomsburg were dismissed with prejudice on Eleventh Amendment grounds. *See id*. at 399-400.  The breach of contract claims against Dr. Ficca, Richer, and Geisinger were also dismissed with prejudice for failure to state a claim upon which relief could be granted. *See id*. at 407-09.  Borrell was permitted, however, to proceed with her due process and equal protection claims against Geisinger, Dr. Ficca in her individual capacity, and Richer in his individual capacity. *See id*. at 410.

The action proceeded to discovery, and following the close of discovery, the parties filed the instant motions for summary judgment.  Borrell seeks partial summary judgment as to liability on her procedural due process claims in Count I of the Amended Complaint. (Doc. 86.)  Conversely, Richer and Geisinger seek summary judgment on both the due process claims in Count I and the equal protection claim in Count II of the Amended Complaint. (Doc. 116.)  Dr. Ficca likewise requests summary judgment in her favor on both Counts I and II of the Amended Complaint. (Doc. 114.)  The parties' motions for summary judgment have been fully briefed and are ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the

applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

Where cross-motions for summary judgment are filed, as is the case here, the summary judgment standard remains the same. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). Of course, when presented with cross motions for summary judgment, the Court must consider the motions separately, *see Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994), and view the evidence presented for each motion in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

### III. Discussion

Borrell's claims against Dr. Ficca, Richer, and Geisinger are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, . . ." 42 U.S.C. § 1983. "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting

under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998)). In this case, Borrell asserts procedural due process claims for: (1) deprivation of a property interest in the continuation of her course of study; and (2) deprivation of a liberty interest in reputation.  Borrell also asserts a "class of one" equal protection claim.

As indicated, all parties move for summary judgment on the procedural due process claims, while only Defendants seek summary judgment on the equal protection claim.  In addition, Richer and Geisinger contend as a threshold matter that they are entitled to summary judgment because they were not acting under color of state law.  I will first address the color of state law issue.  I will then proceed to consider, in the following order, Borrell's equal protection claim, her deprivation of liberty interest claim, and her deprivation of property interest claim.

At the outset, however, I note that while the parties' submissions address in detail the meaning of the terms of the policies and procedures in the record, *i.e.*, the Department of Nursing Graduate Student Handbook, the Drug and Alcohol Policy, and the Nurse Anesthesia Program Administrative Manual, and whether they were followed in this case, the matter before me for resolution is not Defendants' compliance (or lack thereof) with these policies and procedures. *See, e.g., Le v. Univ. of Med. & Dentistry of N.J.*, 379 F. App'x 171, 175 (3d Cir. 2010) ("A school's failure to follow its own policies is not, in itself, a violation of due process. . . . So long as the procedural protections actually provided were sufficient and fairly administered, due process is satisfied.").  While the policies and procedures in the record provide relevant background and context underlying the dispute at bar, because the claims here are brought pursuant to § 1983, at issue is whether Defendants, in terminating Borrell from the NAP, violated her procedural due process and

equal protection rights.

## A.      Under Color of State Law

To prevail on her § 1983 claims, Borrell must demonstrate that she was deprived of a federal constitutional or statutory right by an individual acting under color of state law. *See Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009).[4]  Richer and Geisinger both dispute that they acted under color of state law. (Doc. 117, 4-13.)

There is no "simple line" between state and private actors. *Brentwood Acad. v. Tenn. Second Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001). And, "[a]lthough little is straightforward in determining whether a private actor has acted 'under color of state law,' one directive emerges clearly from the Supreme Court's jurisprudence: the facts are crucial." *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 234 (3d Cir. 2001) (en banc); *see also Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (the state actor "inquiry is fact-specific").

In considering Supreme Court precedent, the Third Circuit has noted that state action cases can be broadly divided into two factual categories.  "The first category involves an activity that is significantly encouraged by the state or in which the state acts as a joint participant." *Leshko v. Servis*, 423 F.3d 337, 340 (3d Cir. 2005) (citations and emphasis omitted).  The second category "involves an actor that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." *Id*. (citations and emphasis omitted).  The Third Circuit has thus articulated "three broad tests" to determine if a private defendant is a state actor: (1) whether the defendant exercised powers that are "traditionally the exclusive prerogative of the state;" (2) whether the defendant acted "with the help of or in concert with state officials;" or (3) whether the

---

[4]      Actions "under color of law" are considered the equivalent of "state action" under the Fourteenth Amendment. *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005).

"state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity[.]" *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).  And, regardless of which test applies, "the basic question" is whether Geisinger and Richer's conduct "can be fairly attributed to the state." *Crissman*, 289 F.3d at 239.

To determine whether actions that allegedly caused the deprivation of a right are fairly attributable to the state, the Supreme Court has set forth a two-part approach:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.  Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

In their brief in opposition to Borrell's motion for summary judgment, Richer and Geisinger argue that Borrell fails to satisfy the first *Lugar* prong because she was dismissed pursuant to the Drug and Alcohol Policy, which they characterize as a "private rule of conduct." (Doc. 131, 6-7.)  However, as explained in detail below, Borrell was deprived of her due process rights by, among others, Richer, a joint Bloomsburg-Geisinger employee, *i.e.*, a person for whom the state is responsible. *See, e.g., Cruz v. Donnelly*, 727 F.2d 79, 81 (3d Cir. 1984) (finding first *Lugar* prong satisfied where the alleged deprivation of constitutional rights occurred by borough police officers).

Moreover, there is evidence in the record that, for students participating in the NAP, Bloomsburg adopted the Drug and Alcohol Policy. *Cf. Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 923 (9th Cir. 2011) (plaintiff failed to offer evidence that the private defendants "were enforcing a DOC or governmental policy prohibiting him from consulting with a rabbi or possessing a Torah or calendar, or that Defendants' internal policy was adopted by the DOC.").  In the Collaboration Agreement, Bloomsburg agreed to advise

students in the NAP that they were "expected to adhere to all applicable policies and standards of Geisinger," including the Drug and Alcohol Policy. (*Plf.'s Ex.* 10.) Additionally, Bloomsburg's Department of Nursing Graduate Student Handbook specifically states: "[s]tudents will comply with the drug and alcohol policies and drug testing procedures as required by agencies affiliated with the Department of Nursing." (*Plf.'s Ex.* 16, 70.) And, the Department of Nursing Graduate Student Handbook provides that departmental sanctions will be rendered for a student in the nursing program who "refuses to comply with affiliated agencies drug and alcohol policies and drug screening policies and procedures." (*Id.*) Borrell therefore satisfies *Lugar*'s first prong. As to the second prong, Borrell relies on the joint action and entwinement tests to establish state action.

> **1.    Geisinger acted under color of state law.**

The Supreme Court has held that private activity may be deemed state action when "a private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood Acad.*, 531 U.S. at 296, 121 S. Ct. 924 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)). And, the Third Circuit has indicated that the "joint action test" is an appropriate means by which to examine a private entity's contractual relationship with the state. *See Cahill v. Live Nation*, 512 F. App'x 227, 230 (3d Cir. 2013) (citing *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012)). "The Supreme Court's language requiring joint action or action in concert suggests that some sort of common purpose or intent must be shown." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 195 (3d Cir. 2005) (citation omitted). "This requirement can be satisfied either 'by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" *Tsao*, 698 F.3d at 1140 (quoting *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002)); *Harvey*, 421 F.3d at 195 (joint action requires that "the private actor at least be a willful participant in joint activity with the

state or its agents.").[5]

Under the facts and circumstances of this case, Geisinger acted under color of state law.  Here, the NAP was a collaboration between Bloomsburg and Geisinger. (*Plf.'s Ex.* 10.)  As part of this collaboration, Bloomsburg provided the academic education, while Geisinger provided the clinical education to students in the program. (*Id*.)  For students to finish the program, both the academic and clinical components needed to be completed. (*Id*.)

Bloomsburg and Geisinger jointly participated in operating the NAP.  For example, both parties assisted with meeting the accreditation standards for the program.   The admissions criteria for entrance into the NAP was developed jointly by Bloomsburg and Geisinger.  For each class entering the NAP, Bloomsburg and Geisinger mutually agree as to the size of the class.  Also indicative of joint activity in this case is that "[b]oth parties shall develop and approve the curricula for Students while they are participating in Clinical Training at Geisinger." (*Id*. at ¶ 2.2.)  The guidelines for the Clinical Training portion of the program were to be developed by both parties and then incorporated into the Department of Nursing Graduate Student Handbook.

Likewise, the parties were both obligated to jointly promote and market the NAP.  As part of this obligation, promotional and marketing material is subject to the review and approval of both parties, and the parties equally share the expenses of the promotional and marketing materials and services.  Bloomsburg and Geisinger also share the tuition and fees due from students in the NAP, and Bloomsburg is obligated to pay Geisinger, at the beginning of each semester, at the rate of fifty percent (50%) of the billed tuition and related fees.  Bloomsburg and Geisinger, in addition, have joint employees, and, at least with

---

[5]     Thus, Geisinger is incorrect in asserting that Borrell must prove a conspiracy to satisfy the "joint action test." (Doc. 150, 15.)  As stated in the text, the "joint action test" can be satisfied by proof of a conspiracy or by demonstrating willful participation in joint activity with the state.

respect to the Program Director, they both pay a portion of his salary.

In view of this evidence, Geisinger was a willful participant in joint activity, the NAP, with Bloomsburg. And, while the Third Circuit has indicated that "not every partnership or venture with state will result in a finding of state action," the relationship in this case suffices to establish action that is "fairly attributable to the state." *Crissman*, 289 F.3d at 245 n.18. As detailed, with respect to the operations of the NAP, both Bloomsburg and Geisinger have obligations and responsibilities, many of which are shared between the two jointly. In that regard, multiple individuals have been employed jointly by Bloomsburg and Geisinger, including Richer, Dr. Wands, and Minzola. Moreover, Bloomsburg and Geisinger mutually benefit from the program. Geisinger obtained "a source of recruitment for future nurse anesthetists to staff the Geisinger entities," (*Richer Dep.*, 56:16-19), while Bloomsburg obtained access to a clinical facility and clinical training to support its academic and educational expertise.

Borrell's termination from the NAP is also fairly attributable to the state. Borrell was dismissed from the collaborative NAP by Richer, an employee of both Bloomsburg and Geisinger. (*Plf.'s Ex.* 23.) Borrell was informed of her dismissal from the NAP by letter on joint Bloomsburg-Geisinger stationary. That letter reflects Dr. Ficca's agreement with the decision to terminate Borrell from the NAP. And, the letter dismissing Borrell from the NAP involved the input of Bloomsburg, Geisinger, and joint Bloomsburg-Geisinger employees. (*Plf.'s Ex.* 41.) Thus, because Bloomsburg and Geisinger jointly participated in terminating Borrell from the NAP, Geisinger is a state actor for that activity.[6]

---

[6]     In its brief in support of its motion for summary judgment, Geisinger contends: "[s]imply put, one joint program with one state university cannot convert all of Geisinger Health system to a state actor." (Doc. 117, 11.) Nothing in this opinion suggests that all of Geisinger Health System is a state actor. Rather, as recognized by the Third Circuit in *Leshko*, this case involves a specific activity, *i.e.*, the collaborative NAP and Borrell's dismissal from that program, and whether

**2.      Richer acted under color of state law.**

Although Richer acknowledges that he was jointly employed by both Bloomsburg and Geisinger, (*Plf.'s SMF*, ¶ 10; *Defs.' CSF*, ¶ 10), he contends that Borrell is nevertheless unable to show that his "relationship with the state transforms him into a state actor." (Doc. 117, 11.)  In his brief in support of his motion for summary judgment, Richer contends that "[w]ithin the NAP, [he] was not subject to any Bloomsburg University employee's supervision . . . ." (*Id*. at 12.)  Richer also argues that he was not a state actor despite his relationship with Bloomsburg because: (1) Geisinger paid the majority of his salary; (2) his salary did not increase once he became a joint Bloomsburg-Geisinger employee; and (3) he was subject to Geisinger's policies and supervision regarding the clinical aspect of the NAP. (*Id*. at 12.)

There is no genuine issue of material fact that Richer acted under color of state law. According to the Supreme Court, "state employment is generally sufficient to render the defendant a state actor." *Lugar v. Edmondson Oil, Inc.*, 457 U.S. 922, 935 n.18, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).  "Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50, 108 S. Ct. 2250, 101 L. Ed. 2d 2250 (1988) (citations omitted).  And, whether an individual is a state actor depends on his function while working for the state, "not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of law." *Id*. at 56, 108 S. Ct. 2250 (noting that the fact that the physician's employment contract in that case "did not require him to work exclusively

Geisinger is a state actor for that activity. *See Leshko*, 423 F.3d at 340.  And, even in those cases which focus on the actor and not the activity, the Third Circuit made clear that "a successful showing under one of the Supreme Court's actor-centered cases" does not make "a private individual or entity an all-purpose state actor." *Id*. at 340 n.2.

for the prison make him any less a state actor than if he performed those duties as a full-time, permanent member of the state prison medical staff.").

Here, Richer acted under color of state law in regard to his participation in the NAP and the dismissal of Borrell from that program. Richer was a "full-time employee of Bloomsburg University." (*Richer Dep.*, 20:22-23.) At the times relevant to this action, Richer served as "Program Director," which was defined as "an employee of both Geisinger and University." (*Plf.'s Ex.* 10.) Thus, Bloomsburg and Geisinger, on their own, designated Richer as a joint employee. Among other responsibilities, Richer, as "Program Director," was required to "oversee the Program and serve as the liaison between Geisinger and University relative to the Program." (*Id.*) Richer was also required to "coordinate[ ] all academic and clinical activities for students in the Program," and to "plan[ ], direct[ ], and administer[ ] the School of Nurse Anesthesia in collaboration with the Chairperson, Department of Nursing at Bloomsburg University of PA." (Doc. 82, 114.) Richer's responsibilities also included planning and designing the curriculum, and planning "all instructional activities of the program to include classroom and clinical instruction by qualified faculty." (*Id.*) The Program Director was also tasked with developing and maintaining policies and procedures consistent with the mission statement of the program. (*Id.*) In view of his functions and responsibilities as Program Director of the NAP, Richer was acting under color of state law in regard to his joint employment with Bloomsburg and Geisinger.

Moreover, Richer terminated Borrell in his capacity as a joint Bloomsburg-Geisinger employee. Following Reilly's report of Borrell's purported drug use, Richer communicated with Bloomsburg employees, *i.e.*, Dr. Ficca, joint Bloomsburg-Geisinger employees, *i.e.*, Dr. Wands, and Geisinger employees, *i.e.*, Hallick and Lieberman, before Borrell was requested to submit to a drug test. After Borrell declined to take a drug test, Richer communicated

with these same individuals discussing her dismissal from the NAP.  On September 25, 2012, the day after Borrell refused to submit to a drug test, Richer completed a "Statement of Violation of the Departmental Code of Academic and Professional Conduct Agreement." (*Plf.'s Ex.* 18.)  By letter that same day, Borrell was terminated from the NAP. (*Plf.'s Ex.* 23.) Richer signed that letter, which was on joint Bloomsburg-Geisinger letterhead, as "Director, Nurse Anesthesia Program." (*Id*.)  Similarly, in Richer's notification to the NBCRNA about Borrell's dismissal from the NAP, his communication designated him as "Program Director, Geisinger Health System/Bloomsburg University of PA." (*Plf.'s Ex.* 33.)  Richer dismissed Borrell from the NAP while acting as Program Director, *i.e.*, as a joint employee of Geisinger and Bloomsburg.  His action is properly attributable to the state, and he acted under color of state law for purposes of § 1983.

## B.     Equal Protection

Borrell contends that her equal protection rights were violated in relation to her dismissal from the NAP.  Although Borrell originally asserted this claim against Dr. Ficca, Richer, and Geisinger, she has withdrawn her equal protection claim as to Dr. Ficca. (Doc. 138, 20.)  Thus, at issue is whether Richer and Geisinger are entitled to summary judgment on the equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Borrell's equal protection claim is based on a "class of one" theory.  The Supreme Court, in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), outlined this theory of equal protection.  Under a "class of one" claim, a plaintiff asserts that "he has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Id*. at 564, 120 S. Ct. 1073.  To recover on a "class of one" equal

protection claim, Borrell "must, 'at the very least,' establish 'that (1) the defendant[s] treated [her] differently from others similarly situated, (2) the defendant[s] did so intentionally, and (3) there was no rational basis for the difference in treatment.'" *Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 825 (3d Cir. 2009) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)).

Among other arguments advanced by Richer and Geisinger, they contend that no reasonable person could conclude that Borrell was treated worse than a similarly situated nurse. (Doc. 117, 16-20.)[7]  According to Richer and Geisinger, Borrell's comparator must be "nearly identical," and she is unable to "provide evidence of other nurses who refused to take a drug test and were not terminated." (*Id*. at 18.)  In that regard, Richer and Geisinger note that the record contains evidence that in the last few years, only four registered nurses employed by Geisinger have refused a drug test, and each one was subsequently terminated. (*Id*. at 20-21.)

In opposition, Borrell argues that she has identified two comparators.  The first comparator relates to Richer and Geisinger's involvement with a nurse anesthesia program with a different university in 1985. (Doc. 137, 13.)  A student in that program was caught stealing narcotics from Geisinger, but was nonetheless permitted to remain in the program. (*Id*.) That student also had a change in performance, failed to perform at the level expected of a student with that experience, and there were complaints about the attitudes and skills of that student. (*Richer Dep.*, 248:11-251:4.)  Borrell argues, however, that while there are some differences between herself and that comparator, they are not fatal to her "class of one" claim because they demonstrate "that the person whose actions were far worse and

---

[7]     Richer and Geisinger also argue that, "as a threshold matter," Borrell's "class of one" claim fails since it is not actionable in the graduate school context. (Doc. 117, 14-16.)  I need not address this issue because Borrell is unable to establish that she was treated differently than a "similarly situated" individual.

far more dangerous was treated far better than Ms. Borrell." (Doc. 137, 13-14.)

The second comparator identified by Borrell is Elizabeth Peterman ("Peterman"), who was a student in the NAP.  There were efforts in 2010 by Richer and Geisinger to dismiss Peterman from the NAP for unsuitability. (*Id*. at 14.)   In response to the charges of unsuitability, Peterman was provided with: (1) the opportunity to submit evidence to refute the claim; (2) information about the procedures related to the dismissal from the program; (3) a meeting so she could learn what was stated against her and to explain herself; and (4) the option to have a representative at that meeting. (*Id*. at 15.)  In addition, Peterman attended a meeting with Richer and Lieberman. And, during that meeting, they were honest with Peterman about why she was being charged with unsuitability and they did not withhold information from her. (*Id*. at 15-16.)   Although Peterman lost the initial hearing, she appealed and was reinstated to the NAP. (*Id*. at 16-17.)   Borrell argues that she was similarly situated to Peterman but nevertheless treated differently.   Borrell acknowledges that the stated reasons for termination were different, but this distinction, she contends, is immaterial because she and Peterman were both in the NAP and their terminations involved the same parties and non-parties. (*Id*. at 17.)   And, unlike Peterman who was afforded ample procedural safeguards, Borrell was denied notice, a hearing, and any other protections. (*Id*.)  Thus, she concludes that there is sufficient evidence to survive summary judgment on her equal protection claim.

"Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quotation marks and citation omitted).  But, "the law in the Third Circuit does not require [the plaintiff] to show that the [comparators] are identical in all relevant respects but only that they are alike." *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp. 2d 616, 628 (W.D. Pa. 2012) (citing *Startzell*, 533 F.3d at 203).  The Third Circuit's recent non-

precedential decision in *Spiker v Whittaker*, 553 F. App'x 275 (3d Cir. 2014) is instructive on the required similarity between a plaintiff and his or her comparator to be "similarly situated" for a "class of one" claim.  In *Spiker*, the plaintiff pled guilty to two crimes and was required to register as a sex offender. *See id*. at 276-77.  Twenty-three days after his guilty plea, the plaintiff was arrested for failing to register as a sex offender.  *See id*. at 277.  He registered that same day.  *See id*.  The plaintiff was subsequently arrested and charged with failing to comply with the registration requirement, but he was acquitted of that charge.  The plaintiff then filed a civil rights action asserting, among other claims, a "class of one" equal protection claim.  *See id*.  According to the plaintiff, "twenty other unregistered sex offenders were not arrested or prosecuted- they were simply prompted to register." *Id*. at 280.  The Third Circuit rejected the plaintiff's claim because he failed to show the comparators were similarly situated. *Id*. at 280-81.  The court noted that nineteen of his comparators were convicted of different crimes, and the only comparator that was convicted of one of the same crimes as the plaintiff registered thirteen days sooner. *Id*.  Thus, the Third Circuit concluded that the plaintiff failed to establish that he was unreasonably discriminated against and that the equal protection claim failed. *See id*. at 281.

In view of the degree of similarity required between a plaintiff and his or her comparator to make out a "class of one" claim, I agree with Richer and Geisinger that Borrell fails to demonstrate that either of her comparators are "alike in all relevant aspects." With respect to the first comparator cited by Borrell, that student was involved in a different program with a different university.  That student admitted that he had a drug problem and sought treatment after he was confronted about stealing narcotics.  Upon completion of substance abuse counseling, that student was permitted to return to the program.  Borrell, on the other hand, was dismissed for failure to submit to a drug test, and her drug use or non-use is not at issue in this litigation.  Thus, the only respect in which Borrell is similar to

this comparator is that they were both students in nursing programs involving Geisinger and Richer.  That, however, is too broad to satisfy the similarly situated requirement for a "class of one" claim.

Borrell is also not like her second comparator, Peterman, in all relevant aspects. Whereas Peterman's termination proceedings followed from a charge of unsuitability, Borrell was subject to termination from the NAP for failure to submit to a drug test.  Thus, even though Borrell and Peterman were both students in the NAP facing termination from the program, these similarities do not render Borrell and Peterman "similarly situated" for purposes of a "class of one" claim.

Rather, to be "similarly situated," Borrell would need to demonstrate that she was treated differently from another student who also refused to submit to a drug test.  Or, at the least, Borrell would need to identify an individual that was treated more favorably than her despite refusing to comply with a NAP policy upon request.  Borrell has not identified such a comparator in this case.  Moreover, the record demonstrates that in the last few years, four registered nurses employed by Geisinger have refused a drug test.  These nurses were all subsequently terminated. (*Defs.' SMF*, ¶ 51; *Plf.'s CSF*, ¶ 51.)  Thus, because Borrell fails to demonstrate that Richer and Geisinger treated her differently from others "similarly situated," she is unable to establish a "class of one" claim.  Richer and Geisinger are entitled to summary judgment on the equal protection claim.

## C.    Procedural Due Process

Borrell also asserts that her procedural due process rights were violated with regard to her termination from the NAP.  Borrell contends that she was deprived of both liberty and property interests without due process of law.

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that a state shall not "deprive any person of life, liberty, or property, without due

process of law; . . ." U.S. Const. amend. XIV, § 1.  To establish a procedural due process claim under § 1983, Borrell must prove (1) a deprivation of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty, or property, and (2) that the procedures available did not provide due process of law. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).

All parties seek summary judgment on both Borrell's procedural due process deprivation of property interest claim and deprivation of liberty interest claim, *i.e.*, her stigma-plus claim.  The stigma-plus claim will be addressed first.

### 1.    Liberty Interest Claim

Borrell asserts that she was deprived of her liberty interest in reputation in violation of the Due Process Clause when she was terminated from the NAP.  The Supreme Court held in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971) that an individual has a protectable interest in reputation.  "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id*. at 437, 91 S.Ct. 507.  Courts "subsequently clarified, however, that 'reputation alone is not an interest protected by the Due Process Clause.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quoting *Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1371 (3d Cir. 1993)).  "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest." *Id*. (citing *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)).  "This has been referred to as the 'stigma-plus' test." *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008).

To satisfy the "plus" prong of the stigma-plus test, a plaintiff must demonstrate an "alteration or extinguishment of 'a right or status previously recognized by state law.'" *Hill*,

455 F.3d at 237 (quoting *Paul v. Davis*, 424 U.S. 693, 711, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)).  A constitutionally protected property interest can qualify as a sufficient "plus." *Dee*, 549 F.3d at 234.  Because Borrell had a protected property interest in the continuation in her course of study in the NAP as described in detail below, she has established the "plus" prong of her stigma-plus claim.

"In order to satisfy the 'stigma' prong, a plaintiff must show (1) that the stigmatizing statement was made publically, and (2) that the statement was substantially and materially false." *Kocher v. Larksville Borough*, 548 F. App'x 813, 820 (3d Cir. 2013) (citing Hill, 455 F.3d at 236); *Ersek v. Twp. of Springfield*, 102 F.3d 79, 83-84 (3d Cir. 1996) ("For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve a publication that is substantially and materially false."). Because the "stigma" prong requires that the publication must be false, "[a] truthful statement that damages one's reputation simply does not trigger any constitutional concerns." *McCarthy v. Darman*, No. 07-3958, 2009 WL 1812788, at *10 (E.D. Pa. June 24, 2009), *aff'd*, 372 F. App'x 346, 351 (3d Cir. 2010).

The stigmatizing statements in this case, according to Borrell, were made public in the email sent by Richer attaching the 2012 Change of Student Status Form and supporting documentation to the NBCRNA. (*Plf.'s Ex.* 33.)[8]  In her brief in support of her motion for summary judgment, Borrell acknowledges that "technically, each individual statement in Plaintiff's Exhibit 33 is true." (Doc. 87, 12.)   Borrell nevertheless argues that the "implications" in that exhibit and the "facts omitted" from it render it materially false. (*Id*. at 12-13.) Borrell goes on to state that "literal truth does not make defendants' statements to

---

[8]      In her Amended Complaint, Borrell also alleged that Defendants deprived her of her liberty interest by falsely publicizing that she used controlled substances. Borrell has since abandoned any claim putting her use or non-use of drugs at issue.

the NBCRNA to be true." (*Id*. at 14.)

Dr. Ficca, on the other hand, argues that because Richer's notification to the NBCRNA was "substantially true," Borrell is unable to satisfy the "stigma" prong. (Doc. 130, 89.)  Richer and Geisinger likewise argue that the notification to the NBCRNA does not evidence any false statements.

Defendants' motions for summary judgment on the liberty interest claim will be granted and Borrell's motion will be denied because Borrell is unable to establish the "stigma" prong of the claim.  Richer's communication to the NBCRNA indicates that: (1) Borrell was terminated for failure to comply with a request to submit to a drug test; (2) the test was requested as a result of concerns regarding changes in her appearance and demeanor; (3) Borrell was told that she was required to cooperate with a drug test as a condition of the NAP; and (4) Borrell was informed that returning at a later time to submit to a drug test was not an option. (*Plf.'s Ex.* 33.)  Although Borrell argues that this communication failed to disclose, among other information, that she was not required to take a test under the terms of the Drug and Alcohol Policy, there is nothing stated in the documentation sent to the NBCRNA that was not true.  Indeed, Borrell concedes that all of the statements contained in those documents are "technically" true.  As such, these "statements do not show a stigma because they were not false." *McCarthy*, 372 F. App'x at 351 (publication on the internet of borough meeting minutes was not stigmatizing because the plaintiff was suspended and the defendants were engaged in an on-going investigation).  Defendants are therefore entitled to summary judgment on the stigma-plus claim.

### 2.    Property Interest Claim

Borrell also sets forth a due process claim based on the contention that she was deprived of her property interest in the continuation of her course of study without due

process of law when she was terminated from the NAP.  All parties seeks summary judgment on this claim.

> **a.   Borrell had a property interest in the continuation of her study in the NAP.**

For purposes of procedural due process, courts looks to state law to determine whether a property interest exists. *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L. Ed. 2d 548 (1972) ("Property interests are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.")).  As I stated in denying Defendants' motion to dismiss Borrell's procedural due process property interest claim, "[c]ourts in the Third Circuit have repeatedly recognized that a graduate student has a property interest protected by procedural due process in the continuation of his or her course of study under Pennsylvania law." *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013) (citing *Coulter v. East Stroudsburg Univ.*, No. 10-CV-0877, 2010 WL 1816632, at *2 (M.D. Pa. May 5, 2010); *Manning v. Temple Univ.*, No. Civ. A. 03-4012, 2004 WL 3019230, at *8 (E.D. Pa. Dec. 30, 2004); *Stoller v. College of Medicine*, 562 F. Supp. 403, 412 (M.D. Pa. 1983); *Ross v. Pennsylvania State Univ.*, 445 F. Supp. 147, 153 (M.D. Pa. 1978)); *see also Abernathy v. Indiana Univ. of Pa.*, No. 12-1119, 2013 WL 3200519, at *1 (W.D. Pa. June 18, 2013) ("the Court disagrees with Defendants' argument that Plaintiff cannot state a 42 U.S.C. § 1983 claim predicated on a Fourteenth Amendment due process violation when he was dismissed from the IUP graduate program in which he was enrolled because he has not demonstrated that he has a property interest in his education protected by the Fourteenth Amendment, nor that he was denied any process that may have been due."); *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 10–2042, 2011 WL 4549609 (E.D. Pa. Sept. 30, 2011) *aff'd sub nom. Osei v. Temple Univ.*,581 F. App'x 86 (3d Cir.

2013).  Accordingly, I held that Borrell had a protected property interest in the continuation of her course of study in the NAP under Pennsylvania law. *See Borrell*, 955 F. Supp. 2d at 402-03.

Defendants urge that I revisit this holding in light of evidence obtained during discovery.  Richer and Geisinger argue that any due process right Borrell had in her graduate education was limited solely to the degree at issue, and only Bloomsburg could award that degree. (Doc. 117, 23-25.)  Geisinger and Richer define Borrell's property right too narrowly.  Indeed, this Court in *Ross* held that the student at issue in that case "had a property interest in the continuation of his education as a graduate student in the *ceramics program* at Penn State." *Ross*, 445 F. Supp. at 153 (emphasis added); *see also Borrell*, 955 F. Supp. 2d at 403 ("Borrell had a property interest in her continued participation in the Nurse Anesthesia Program."); *Osei*, 2011 WL 4549609, at *7 (student's interest is in "pursuing or continuing an education").  Furthermore, this argument essentially repeats Geisinger's claim that it did not act under color of state law.  But, as stated, Geisinger is a state actor by virtue of its collaboration and "willful participation in joint activity" with Bloomsburg in the NAP.

Dr. Ficca also asks that I reconsider the finding that Borrell had a protected property interest in the continuation of her study in the NAP.  In that regard, although she contends that additional facts revealed in discovery indicate that the property interest issue should be revisited, she relies on the same premise that I found unconvincing in denying her motion to dismiss: Borrell's termination from the NAP did not impact a property interest because she could have still (theoretically) pursued a MS degree in Nursing from a different Bloomsburg program. (Doc. 119, 5.)  As I previously explained in this litigation, it is irrelevant that Borrell may have been able to pursue a different degree from a Bloomsburg nursing program. *See Borrell*, 955 F. Supp. 2d at 403.  Discovery has only reinforced that

36

Borrell had a property interest in the continuation of her study in the NAP.  Borrell applied and was accepted into the NAP, she enrolled in the program, she participated in the program, and she paid her tuition.  Moreover, according to Dr. Ficca, in order for Borrell to obtain a MS degree from a different nursing program, such as the nurse practitioner program or the community health program, she would have needed to apply for that specific program. (*Dr. Ficca Dep.*, 89:23-90:4.)  Borrell's property interest was in the continuation of her course of study in the NAP.

Lastly, I will briefly address Dr. Ficca's argument that Borrell does not have a property interest pursuant to this Court's statement in *Ross* that graduate students have "a reasonable expectation based on statements of policy by [the university] and the experience of former students that if [they] perform[ ] the required work in a satisfactory manner and pay[ ] [their] fees [they] will receive the degree [they] seek[ ]." *Ross v. Pennsylvania State Univ.*, 445 F. Supp. 147, 153 (M.D. Pa. 1978).  In view of this passage, Dr. Ficca contends that Borrell, as a result of her refusal to submit to a drug test, "could not perform the work required because she could no longer provide patient care at GMC and therefore she could not complete the required clinical training." (Doc. 119, 8.)  Thus, Dr. Ficca concludes that "because plaintiff could not perform the work required for the NAP, she does not have a property interest in obtaining that degree." (*Id*.)  Or, as she states in her reply brief in further support of her motion for summary judgment, "[t]he threshold requirement in order to establish a property interest to a graduate degree is to be able to perform the required work, which Borrell could not do." (Doc. 149, 15.)

Dr. Ficca's argument is flawed.  Borrell enrolled in the NAP in 2011, and there is nothing in the record suggesting that Borrell was unable to perform the required work in the NAP at that time, or at any point thereafter, up and until September 24, 2012.  As such, it is unclear what Dr. Ficca means when she states that Borrell was unable to satisfy the

"threshold requirement" of performing the required work when she complied with the program's requirements for over one year.  Thus, Dr. Ficca appears to suggest that Borrell had a property interest while she performed satisfactorily in the NAP, here from 2011 until September 24, 2012.  But, as of September 24, 2012, the point in which Borrell refused to submit to a drug test, Dr. Ficca implies that this interest was somehow extinguished and Borrell no longer had a viable property interest.[9]  This premise is inconsistent with the concept of procedural due process and the analysis of such claims. *Cf. Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) ("A procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute due process of law.")  Here, because Borrell had a property interest in the continuation of her course of study once she became a student in the NAP, the question becomes whether the procedures afforded Borrell in relation to the deprivation of that interest satisfied the requirements of the Due Process Clause of the Fourteenth Amendment.

      **b.**      **Borrell's termination from the NAP was a disciplinary dismissal.**

Since Borrell had a protected property interest in the continuation of her education in the NAP, "the question then becomes what process is due to protect it." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct.

---

[9]      Dr. Ficca's submissions could also be interpreted as suggesting that because Borrell was unable to meet the program's requirements in September 2012, she never had a property interest in the continuation of her course of study.  However, this position ignores the salient fact that Borrell participated in the NAP and satisfied the program's requirements for well over a year before she refused to submit to a drug test.  And, since the possibility always exists that a student will be unable to perform the required work or meet the requirements of a course of study (for any of a variety of reasons) during the pendency of the course or program, accepting Dr. Ficca's position would be the equivalent of finding that a graduate student does not have a protected property interest in the continuation of his or her course of study.  Pennsylvania law, however, holds otherwise.

2593, 33 L. Ed. 2d 484 (1972)).   In this case, the amount of process due depends on whether Borrell's dismissal from the NAP was "academic" or "disciplinary."

The Supreme Court addressed the due process rights of students in state operated universities in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978), and *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985).   In *Horowitz*, the Supreme Court distinguished between academic and disciplinary dismissals from educational institutions. *See Horowitz*, 435 U.S. at 89-90, 98 S. Ct. 948.   The Court concluded that the dismissal of the medical student in that case was academic and not disciplinary because it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." *Id*.   An academic dismissal, according to the Court:

> is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision.   Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id*. at 90, 98 S. Ct. 948.   The *Horowitz* Court further stated that the determination of whether the student would "make a good doctor" could take into account personal attributes of the student, in that case her personal hygeine and ability to keep a clinical schedule. *Id*. at 91 n.6, 98 S. Ct. 948.

The *Horowitz* Court explained that disciplinary dismissals, conversely, involve "the violation by a student of valid rules of conduct" or "disruptive and insubordinate behavior." *Horowitz*, 98 S. Ct. 86, 90, 98 S. Ct. 948.   As a result, "[t]here is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals," *id*. at 88 n.4, 98 S. Ct. 948, and the difference between the two "calls for less stringent procedural requirements in the case of an academic dismissal." *Id*. at 86, 98 S. Ct. 948.

39

The parties dispute whether Borrell's dismissal from the NAP was academic or disciplinary.  Whereas Defendants classify Borrell's dismissal as academic because she could not fulfill the clinical requirement necessary to complete the NAP, Borrell contends that her dismissal was disciplinary and Defendants always treated her dismissal as "non-academic."

There is no bright-line test for determining whether a dismissal is academic or disciplinary in nature. *See Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 874 (E.D. Mich. 2012).  And, "the mere fact that faculty base their decision on a student's conduct rather than test results is insufficient to establish that the decision was disciplinary rather than academic." *Simmons v. Wayne Cnty. Cmty. Coll.*, No. 11-14936, 2014 WL 764632, at *5 (E.D. Mich. Feb. 24, 2014); *Ku v. State of Tenn.*, 322 F.3d 431, 436 (6th Cir. 2003) ("there can also be no doubt that in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria.").  Instead, "federal courts have found an academic dismissal where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on at least partially subjective appraisal of those qualities." *Allahverdi v. Regents of the Univ. of N.M.*, No. 05-277, 2006 WL 1313807, at *11-14 (D.N.M. Apr. 25, 2006) (citing *Horowitz*, 435 U.S. at 91 n. 6, 98 S. Ct. 948; *Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005); *Hennessy v. City of Melrose*, 194 F.3d 237, 242-43, 251 (1st Cir. 1999); *Firester v. Board of Governors of Wayne State Univ.*, No. 89-1772, 1990 WL 99493, at *2-3 (6th Cir. July 18, 1990)).  Disciplinary dismissals, in comparison, "are objective in nature and relate to rules of conduct rather than a student's professional abilities." *Id*. at *14. Accordingly, "an academic institution imposes a disciplinary dismissal in the more limited situation where a student has violated the rules of conduct that the educational institution has set forth and is based on an objective appraisal of the student's conduct." *Id*.  This is in accord with the

40

Third Circuit's decision in *Mauriello*, where the court stated that it had "no difficulty" in finding a student's dismissal from a doctoral program to be academic and not disciplinary because "it was not a case of her being compelled by rule, order, or law of the school to do something and not having done it getting discharged.  This is not a case of somebody being disruptive in her misconduct, . . . ." *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir. 1986) (internal alteration omitted).  Rather, the dismissal was academic because "[t]he focus of the University's inquiry was on the quality of the plaintiff's research and her dedication to academic pursuits, not misconduct." *Id*.

In light of this authority, Borrell's dismissal from the NAP was disciplinary and not academic in nature.  First, the decision to dismiss Borrell from the NAP was not based on any subjective evaluations.  Defendants did not focus their inquiry on Borrell's academic abilities, her personal qualities, or whether she could succeed as a nurse anesthetist.  Rather, Borrell's dismissal is better characterized as a product of misconduct.  Specifically, Borrell, according to Defendants, was required to submit to a drug test when it was requested on September 24, 2012.  When she refused to submit to a drug test, she was terminated from NAP.  Thus, pursuant to the reasoning in *Mauriello*, Borrell was dismissed because she was obligated by rule of the program to take a drug test, and having not submitted to a drug test, she was dismissed from the NAP.[10]

Second, the characterization of Borrell's termination from the NAP immediately following her dismissal by Bloomsburg, Geisinger, and joint Bloomsburg-Geisinger employees supports a finding that her dismissal was disciplinary in nature.  For example, on Wednesday, September 26, 2012, the day after she was terminated from the NAP,

---

[10]     And, as discussed, the Drug and Alcohol Policy was adopted as a rule for students in the program. (*Plf.'s Ex.* 16, 70 ("[s]tudents will comply with the drug and alcohol policies and drug testing procedures as required by agencies affiliated with the Department of Nursing.").)

Richer informed Hallick that Borrell "wanted to file 'a non-academic grievance', a process which does not exist." (*Plf.'s Ex.* 27.)   Richer emailed Lieberman on October 1, 2012, instructing him that Borrell's attempt to grieve her termination from the program was a "'non-academic' grievance of which they do not have a process to deal with." (*Plf.'s Ex.* 28.)  By email to Hallick and Lieberman on October 2, 2012, Richer again stated that Borrell could not grieve her termination because it was "non-academic." (*Plf.'s Ex.* 29.)  Dr. Ficca sent an email on October 4, 2012 to Lieberman and Richer.  Attached to that email was a draft letter to Borrell, which stated, in pertinent part, that "[t]his situation is a non-academic issue and does not qualify for the grievance process at Bloomsburg University." (*Plf.'s Ex.* 32.)  And, by letter to Borrell dated October 19, 2012, Dr. Ficca stated: "This situation is a non-academic issue." (*Plf.'s Ex.* 19.)  Likewise, Dr. Marande testified that Borrell's particular case involved a "non-academic issue." (*Dr. Marande Dep.*, 68:2-6.)  Thus, Defendants' own admissions indicate that Borrell was not dismissed from the NAP for academic reasons.

Third, while Dr. Ficca claims that the dismissal was academic because Borrell "simply could not fulfill the particular curriculum requirements of a degree program" following her refusal to submit to a drug test (Doc. 130, 18), Borrell was only unable to complete the requirements of the NAP after she had been terminated from the clinical portion of the program.  As Defendants admit, Borrell's termination "from the clinical portion of the NAP was a termination from the entire NAP." (*Plf.'s SMF*, ¶ 68; *Defs.' CSF*, ¶ 68.)  Borrell's dismissal from the NAP was disciplinary in nature.

### c.      Borrell was dismissed from the NAP without due process of law.

In cases such as this where the property interest at issue is a student's continuation of his or her course of study, the level of due process required depends on whether the dismissal is for academic or disciplinary reasons.  For academic dismissals, the Third Circuit has stated that "courts are generally ill-equipped to review subjective academic appraisals

of educational institutions, and admonished courts to permit university faculties a wide range of discretion in making judgments as to the academic performance of students." *Hankins v. Temple Univ.*, 829 F.2d 437, 444 (3d Cir. 1987) (citations omitted).  As such, "when a student is discharged for academic reasons, an informal faculty evaluation is all that is required." *Id.* at 445 (citing *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 51 (3d Cir. 1986)).  Conversely, with respect to a student's suspension for ten days or less from a public school for disciplinary reasons, the Supreme Court has held that "the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581, 95 S. Ct. 729, 42 L .Ed. 2d 725 (1975) (suspension of high school students).  As such, in those cases, the student is entitled "'to an informal give-and-take'" with the administrative body so the student has "'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Horowitz*, 435 U.S. at 85-86, 98 S. Ct. 948 (quoting *Goss*, 419 U.S. at 584, 95 S. Ct. 729).

The deprivation to which Borrell was subjected in this case, though, was more severe than the ten-day high-school suspension in *Goss*.  And, the *Goss* Court noted that the severity of the deprivation "may require more formal procedures." *Goss*, 419 U.S. at 584, 95 S. Ct. 729; *accord Horowitz*, 435 U.S. at 86 n.3, 98 S. Ct. 948 ("the severity of the deprivation is only one of several factors that must be weighed in deciding the exact due process owed.").  As a result, "those cases considering the adequacy of notice and hearing procedures in the context of graduate student deprivations have dealt with procedural requirements significantly more extensive than those described in *Goss*." *Pugel v. Bd. of Tr. of the Univ. of Ill.*, 378 F.3d 659, 664 (7th Cir. 2004) (citing *Than v. Univ. of Texas Med. Sch. at Houston*, 188 F.3d 633, 635 n.2 (5th Cir. 1999); *Crook v. Baker*, 813 F.2d 88, 97 (6th Cir.1987); *Nash v. Auburn Univ.*, 812 F.2d 655, 660-61 (11th Cir. 1987); *cf. Hall v. Med.*

*Coll. of Ohio at Toledo*, 742 F.2d 299, 308-09 (6th Cir.1984)); *see also Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 440 (8th Cir. 1998) ("procedural due process must be afforded a student on the college campus by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.").   In that regard, when a student is dismissed or expelled for disciplinary reasons, a court should balance the *Mathews* factors to determine if the student is entitled to procedural protections beyond those required under *Goss*. *See Allahverdi*, 2006 WL 1313807, at *11,*19 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)); *see also Le v. Univ. of Med. & Dentistry of N.J.*, 379 F. App'x 171, 174-75 (3d Cir. 2010) (citing *Mathews* and concluding that disciplinary proceedings resulting in the dismissal of student from dental school satisfied due process requirements where the procedure included "a hearing before a panel of students and faculty, the right to present witnesses and evidence, the right to cross examine witnesses, a lay adviser in the room, an attorney outside the hearing room, two levels of appeal (during one of which he was represented by counsel), and the opportunity to submit further evidence after the hearing."). Recently, Judge Brann of this Court emphasized that "[d]isciplinary dismissals must be preceded by, at least, notice to the student of the charges against her, an explanation of evidence underlying the charges, and an opportunity for the student to present her side of the story." *Valentine v. Lock Haven Univ.*, No. 13-523, 2014 WL 3508257, at *7 (M.D. Pa. July 14, 2014) (citing *Palmer v. Merluzzi*, 868 F.2d 90, 93 (3d Cir.1989)).

Defendants contend that Borrell's due process rights were not violated here because she was provided all process due.  Dr. Ficca argues that the only process due in this case was an "informal-give-and-take" between the student and the administrative body, which, Dr. Ficca claims, took place. (Doc. 119, 11-15.)  Specifically, Borrell "was afforded the level of process that she was due because she had informal discussions with GMC and

Bloomsburg before her dismissal from the NAP." (*Id*. at 11.)  Dr. Ficca also contends that post-termination communications between herself and both Dr. Marande and Borrell satisfied Borrell's due process rights. (*Id*. at 13-14.)  In comparison, Richer and Geisinger maintain that Borrell's failure to avail herself of the state procedures provided by Pennsylvania's Administrative Agency Law forecloses her due process claim. (Doc. 117, 25-27.)

Here, I will assume that Borrell was entitled to only notice of the charges against her, an explanation of evidence underlying the charges, and an opportunity to present her side of the story, *i.e.*, the procedures outlined in *Goss*.  And, because both Borrell and Defendants move for summary judgment on the deprivation of property interest claim, I must consider the evidence presented by each in the light most favorable to the non-moving party.  In considering Borrell's motion for partial summary judgment and viewing the evidence in the light most favorable to Dr. Ficca, Richer, and Geisinger, there is no genuine issue that Borrell's dismissal from the NAP occurred without due process of law.

The decision to terminate Borrell from the NAP, according to Richer, was made by the end of business on Monday, September 24, 2012, the day she refused to submit to the drug test. (*Richer Dep.*, 161:13-21.)  The letter terminating Borrell from the NAP was dated September 25, 2012 and indicated that her dismissal was effective that day. (*Plf.'s Ex.* 23.) As a result, Borrell was deprived of her property interest in the continuation of her course of study, at the latest, on September 25, 2012.

Dr. Ficca, however, asserts that prior to Borrell's dismissal on September 25, 2012, an "informal-give-and-take" with the administrative body satisfying Borrell's due process rights took place.  I disagree.

For one, Borrell's discussion with Richer and Lieberman on September 24, 2012 did not satisfy the requirements of due process.  That meeting was called, according to Richer,

45

to address concerns about changes in Borrell's appearance and demeanor and suspicions of drug use, and, also, to inform her that they wanted her to take a drug test. (*Richer Dep.*, 117:6-18.)   After indicating her hesitancy to submit to a drug test that day, the parties discussed the possibility that Borrell could face consequences.  The parties dispute whether termination from the NAP was discussed as a consequence for refusing to submit to a drug test.  But, it is irrelevant whether dismissal was discussed as a potential consequence at that meeting.  The meeting was about Borrell submitting to a drug test under the Drug and Alcohol Policy.[11]   That meeting was not about whether Borrell, at the time, was subject to termination from the NAP, and she had no notice before the meeting of the charges against her.

Furthermore, Dr. Marande's telephone conversation with Borrell on September 24, 2012 did not satisfy the requirements of due process outlined in *Goss* and *Horowitz*.  Borrell spoke with Dr. Marande to inform him that she was requested to take a drug test but she refused. (*Defs.' SMF*, ¶ 109; *Plf.'s CSF*, ¶ 109.)  Borrell also indicated to Dr. Marande at that time that she was now willing to comply with the drug test. (*Defs.' SMF*, ¶ 110; *Plf.'s CSF*, ¶ 110.)  Dr. Marande instructed Borrell to contact Richer and Geisinger personnel to let them know that she was willing to submit to a drug test and that the issue needed to be discussed with the Human Resources Department at Geisinger. (*Defs.' SMF*, ¶ 111; *Plf.'s CSF*, ¶ 111.)  This conversation was not about providing Borrell an opportunity to contest her termination from the NAP.  Instead, it involved Borrell "complain[ing] that it was unfair to ask her to take a drug test." (*Dr. Marande Dep.*, 33:3-4.)  And, other than indicating that she should have complied with the drug test request and that Borrell should take up the

---

[11]     I recognize Borrell's contention that she was not required to submit to a drug test under the terms of the policy.  But, as stated in the text, resolution of whether reasonable suspicion existed to request a drug test is not the issue before me.

issue regarding her willingness to take the test with Geisinger Human Resources, Dr. Marande had nothing else to say about that issue. (*Id*. at 71:19-25.)

Likewise, Borrell's meeting with Richer and Lieberman and her conversation with Dr. Marande on September 24, 2012 also failed to provide her with an opportunity to be heard. Pursuant to *Goss* and *Horowitz*, a student facing a disciplinary dismissal is entitled to an opportunity to present his or her side of the story or to characterize his or her conduct and put it in the proper context.  In this case, Borrell was not afforded any opportunity to put her conduct in the proper context.  Rather, the day after she refused to submit to the drug test, she was terminated from the NAP.  In dismissing her without an opportunity to be heard, Borrell was denied the chance to dispute Geisinger's claim that she was required to submit to a test under the circumstances.  Of course, having already refused to take the test, Borrell likely faced difficulty in convincing Geisinger, Bloomsburg, and joint Bloomsburg-Geisinger officials that she was not required under the circumstances to submit to a drug test.  Nevertheless, had Borrell been afforded the opportunity to be heard, she could have presented her argument that "reasonable suspicion" did not exist to justify the drug test request.  And, had she been afforded this opportunity, Borrell would have had occasion to demonstrate that a disciplinary dismissal from the NAP was not warranted because she did not violate a rule or policy of the program.  However, because she was not given such an opportunity to be heard, Borrell was denied the "informal give-and-take" discussed in *Goss* and *Horowitz*.[12]  As such, the pre-dismissal procedures afforded Borrell did not provide due

---

[12]    Because Borrell was not provided an "informal give-and-take" prior to her dismissal from the NAP, I will not address whether she was entitled to heightened protections beyond those discussed in *Goss*. *See Pugel*, 378 F.3d at 664 ("those cases considering the adequacy of notice and hearing procedures in the context of graduate student deprivations have dealt with procedural requirements significantly more extensive than those described in *Goss*."); *see also Le*, 379 F. App'x at 174-75 (procedures afforded to student in connection with his dismissal from dental school which went beyond those described in *Goss* satisfied the

process of law.

In addition, Defendants contend that the Borrell's due process rights were satisfied in this case based on procedures afforded and/or available to her after September 25, 2012.  In particular, Dr. Ficca contends that the following post-termination events afforded Borrell due process: (1) her conversation with Dr. Marande after learning of her dismissal from the NAP; (2) Borrell's email letter to Dr. Ficca dated September 27, 2012, which requested an appeal of her termination from the NAP; (3) Dr. Ficca's discussions with Dr. Marande in which they determined that there was no appeal process for Borrell's dismissal; and (4) Dr. Ficca's October 19, 2012 letter to Borrell informing her that she could no longer provide care at Geisinger. (Docs. 119, 12-13; 149, 20-22.)  Additionally, Defendants also argue that "Borrell may not advance her procedural due process claim because she failed to avail herself of process afforded to her by the State's Administrative [Agency Law]." (Doc. 117, 25-27 (citing 2 Pa. C.S.A. § 702).)  Citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000), Defendants assert that a due process violation "is not complete when the deprivation occurs; it is not complete unless and until the state fails to provide due process." (Doc. 150, 22-23.)  Thus, by not utilizing available state procedures, Defendants argue that Borrell's due process claim fails as a matter of law.

These arguments fail for the same reason.  In particular, they both hinge on the premise that post-deprivation procedures are sufficient to satisfy Borrell's procedural due process rights.  But, the availability of post-dismissal procedures is not an adequate substitute for constitutionally-mandated pre-deprivation process. *See, e.g., Valentine*, 2014 WL 3508257, at *7.  And, according to the *Goss* Court, "as a general rule notice and hearing should precede removal of the student from school." *Goss*, 419 U.S. at 582, 95 S.

---

requirements of due process).

Ct. 729.[13]  As one district court stated: "[i]mplicit in [school dismissal cases] is that post-dismissal procedure alone is not constitutionally sufficient." *Assenov v. Univ. of Utah*, 553 F. Supp. 2d 1319, 1328 (D. Utah 2008); *see also Barnes v. Zaccari*, 669 F.3d 1295, 1306 (11th Cir. 2012) (*Goss* establishes that student was entitled to notice of charges and a hearing before his removal).  Moreover, the case cited by Defendants recognizes that the state's provision of post-deprivation procedures does not satisfy the requirements of due process when pre-deprivation procedures are constitutionally mandated. *See Alvin*, 227 F.3d at 120 ("if the Constitution requires pre-termination procedures, the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures." (citing *Stana v. Sch. Dist. of Pittsburgh*, 775 F.2d 122, 129 (3d Cir. 1985) (indicating that following *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), there can be no requirement to pursue post-deprivation remedies when pre-deprivation notice or hearing is required for due process))); *see also Stana*, 775 F.2d at 130 ("if the governmental entity could have, but did not, provide predeprivation procedures, a § 1983 action complaining of the lack of procedural due process may be maintained in federal court, notwithstanding the availability of state judicial routes as well."). Thus, because Borrell was entitled to pre-dismissal safeguards, the post-deprivation procedures cited by Defendants did not satisfy Borrell's due process rights.

>    **d.    Geisinger is subject to liability for the deprivation of Borrell's due process rights.**

Next, Geisinger argues that even if Borrell was deprived of her due process rights,

---

[13]    The *Goss* Court recognized, however, that there are "recurring situations in which prior notice and hearing cannot be insisted upon.  Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.  In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Goss*, 419 U.S. at 582, 95 S. Ct. 729.  It has not been advanced that Borrell's case posed such a situation.

it is nonetheless entitled to summary judgment because it is not liable for the constitutional violation at issue.  Specifically, Geisinger contends that Borrell is impermissibly attempting to hold it liable for the acts of its employees on a *respondeat superior* theory.

A private company, such as Geisinger, cannot be held responsible pursuant to § 1983 for the acts of its employees under a theory of *respondeat superior* or vicarious liability. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).  Instead, for Geisinger to be liable under § 1983, Borrell must establish a Geisinger policy or custom, and that the policy caused the constitutional violation alleged.  *See id*. at 584 (citing *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).  A policy is made "when a decision maker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed .2d 452 (1986) (plurality opinion)).  A municipality is liable for the torts of its employees in one of three ways:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

*McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).

In this case, Borrell does not argue that the Drug and Alcohol Policy is itself unconstitutional.  Rather, Borrell argues that Geisinger is subject to liability under § 1983 for the deprivation of her due process rights because: (1) Richer is Geisinger's highest policymaking official for terminating students from the NAP; and (2) Richer's decision to terminate her from the NAP without due process of law was ratified by Geisinger. (Doc. 87, 22.)  Conversely, Geisinger argues that it is not liable under § 1983 because Richer is not

a policymaker, Richer dismissed Borrell from the NAP pursuant to a policy that he did not create, and Borrell applies the incorrect standard for ratification. (Doc. 117, 27-29.)

The Supreme Court in *Pembaur v. City of Cincinnati* noted that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). Thus, "[i]f the decision to adopt [a] particular course of action is properly made by the government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id*. at 481, 106 S. Ct. 1292. And, "where action is directed by those who establish government policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id*. But, the *Pembaur* plurality emphasized that "[t]he fact that a particular official- even a policymaking official- has discretion in the exercise of a particular function does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id*. at 481-83, 106 S. Ct. 1292 (plurality opinion) (internal citation omitted). By way of illustration, the plurality explained:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id*. at 483 n.12, 106 S. Ct. 1292 (plurality opinion).

Two years after the Court issued its decision in *Pembaur*, the Supreme Court

decided *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (plurality opinion). A plurality in *Praprotnik*, citing *Pembaur*, emphasized that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinates departures from them, are the act of the municipality." *Id*. at 127, 108 S. Ct. 915 (emphasis in original); *see also Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990) (same).

Geisinger argues that this reasoning is applicable here, and that this case fits within the hypothetical example discussed by the *Pembaur* plurality. Specifically, Geisinger contends that it is undisputed that its Drug and Alcohol Policy is set by its Human Resources Department and that Richer did not set the Policy, nor does he have control over its contents. (*Defs.' SMF*, ¶ 62; *Plfs. CSF*, ¶ 62.) Rather, Geisinger Human Resources has "authority and responsibility" over the Drug and Alcohol Policy. (*Hallick Decl*., ¶ 16.) And, even though the record indicates that Richer "is the highest decision maker about termination of students from the program," (*Lieberman Dep.*, 78:15-18), Richer was "bound by Geisinger's drug policy, which [he] did not create." (Doc. 131, 21.) Geisinger thus reasons that Richer's "decision to follow the Policy is not a basis for liability." (Doc. 150, 28.)

The fact that Richer did not set the Drug and Alcohol Policy does not end the inquiry, however, because "[a]n employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified his decision." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) (citing *La Verdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003)). For example, in *Pembaur*, the plurality noted that if the policymaker delegates "power to establish final employment policy" to an official, then that official's decisions would represent policy and "could give rise to municipal liability." *Pembaur*, 475 U.S. at 483 n.12, 106 S. Ct. 1292 (plurality opinion). However, "'[s]imply going along with discretionary decisions made by one's subordinates

. . . is not a delegation to them of the authority to make policy.'" *Kelly*, 622 F.3d at 264 (quoting *Praprotnik*, 485 U.S. at 130, 108 S. Ct. 915 (plurality opinion)).  With respect to ratification, the *Praprotnik* plurality emphasized that:

> [w]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127, 108 S. Ct. 915 (emphasis in original); *see also Kelly*, 622 F.3d at 264; *Andrews*, 895 F.2d at 1481.

The evidence of record demonstrates that Richer's decision to terminate Borrell from the NAP without due process of law was ratified by Geisinger's policymakers.  According to Hallick, Geisinger's Human Resources Department "has authority and responsibility over the Drug & Alcohol Policy." (*Hallick Decl.*, ¶ 16.)  Hallick further indicated that she was responsible for ensuring that "any matters of significance in the NAP are handled consistently" with Geisinger's policies. (*Id*. at ¶ 7.)  Hallick and others working in the NAP "are to rely upon and seek guidance from GMC's Human Resources Director when issues of significance arise so that the proper process is followed and GMC's policies, procedures and practices are applied consistently." (*Id*. at ¶ 12.)   With respect to Borrell's termination from the NAP, Hallick worked with Richer to ensure that Geisinger's "policies, practices, and procedures were followed, Human Resources was consulted (which has authority and responsibility over the Drug & Alcohol Policy), and this GMC issue was addressed consistent with system-wide application of the Drug & Alcohol Policy." (*Id*. at ¶ 16.)  In fact, Hallick testified: "[i]n applying GMC's Drug & Alcohol Policy to Ms. Borrell, Richer was in consultation with and obtained approval from me as well as guidance from GMC's Human Resource Director, acting on GMC's behalf." (*Id*. at ¶ 23.)

As such, based on the evidence submitted by Geisinger, the Human Resources

Department, the body with authority over the Drug and Alcohol Policy, consulted with Richer to ensure that the decision to terminate Borrell from the NAP conformed to Geisinger's policies. *See Pembaur*, 475 U.S. at 483 n.12 (plurality opinion) ("if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability."). The purpose of consulting with Human Resources was to ensure consistent system-wide application of the policy, and Richer obtained guidance in applying the Drug and Alcohol Policy to Borrell from Geisinger's Human Resources Director. (*Hallick Decl.*, ¶¶ 16, 23.) In addition, Richer's direct and only supervisor above him at Geisinger was Hallick, (*Richer Dep.*, 37:10-21), and Richer obtained her "approval" in applying the Drug and Alcohol Policy to Borrell. (*Hallick Decl.*, ¶ 23.) Thus, as Richer's application of the Drug and Alcohol Policy occurred with the guidance and consultation of the Human Resources Department, in addition to the approval of his supervisor, Lieberman and Hallick measured his "conduct for conformance" with Geisinger's policy. *Kelly*, 622 F.3d at 264. And, because Richer's decision to dismiss Borrell from the NAP without due process of law was reviewed and approved by the Human Resources Department and Hallick, and the basis of her dismissal from the NAP- refusal to submit to a drug test as required by the policy- was also approved, Geisinger is liable under § 1983 pursuant to the reasoning in *Praprotnik* and *Andrews*. *See Praprotnik*, 485 U.S. at 127, 108 S. Ct. 915 (plurality opinion); *Andrews*, 895 F.2d at 1481 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

Accordingly, in this case, Geisinger's liability under § 1983 is not based on a finding that the policy in question is itself unconstitutional, as there has been no suggestion here that the policy explicitly violates a constitutional right when enforced. Nor is Geisinger subject to liability solely because Richer, a joint Bloomsburg-Geisinger employee, applied

the policy in an unconstitutional manner in dismissing Borrell from the NAP without due process of law.  If that were the case, liability would be impermissibly premised on a theory of *respondeat superior*.   Rather, as explained, Geisinger is liable here because its authorized policymakers with authority and responsibility over the policy ratified the decision to dismiss Borrell from the NAP without the procedural safeguards required by the Due Process Clause.

Geisinger's written summary judgment submissions further reflect that it ratified Richer's decision to terminate Borrell without due process of law.  Among other statements made by Geisinger in its submissions, it asserts that: (1) Geisinger "retained authority through Hallick to measure Richer's conduct for conformance with Geisinger's policies," (Doc. 150, 28 (internal quotation and alteration omitted)); (2) "Richer's application of this policy was then subject to review by both Susan Hallick and Brion Lieberman," (Doc. 117, 29); (3) Richer needed "to confer and consult" with Hallick and Lieberman regarding Borrell's termination, (*Id*. at 12); (4) "Richer's decisions required conferral with GMC's Vice President of Human Resources Brion Lieberman[14] and Chief Nursing Officer Susan Hallick," (Doc. 131, 21); and (5) "she [Hallick], along with Brion Lieberman, *reviewed Richer's decision and approved it*." (*Id*. at 121 (emphasis added).)  These statements are all in accord with the standard for ratification discussed in *Praprotnik* and *Andrews*.

### e.      Richer is not entitled to a "good faith" defense.

Richer also contends that even if a constitutional violation occurred in this case, he is nonetheless entitled to summary judgment pursuant to a "good faith defense."[15]  The United States District Court for the Eastern District of Pennsylvania has explained that:

---

[14]     Lieberman testified that his position was as Human Resources Director. (*Lieberman Dep.*, 5:8.)

[15]     Richer did not seek summary judgment on the basis of qualified immunity, nor did he oppose Borrell's motion on qualified immunity grounds.

> [t]he foundation for the good faith defense lies in *Lugar* where the Court expressed concern for private individuals who innocently make use of seemingly valid state laws that are subsequently held to be unconstitutional. The Court observed that such concerns would best be alleviated by creating a good faith defense, but it declined to rule definitely on the availability of such a defense.

*Egervary v. Rooney*, No. 96-3039, 2000 WL 1160720, at *6 (E.D. Pa. Aug. 15, 2000) (O'Neill, J.) (internal alterations omitted) (quoting *Lugar v. Edmondson Oil, Inc.*, 457 U.S. 922, 942 n.23, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)).  Following *Luger*, in *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1275-78 (3d Cir. 1994), the Third Circuit held that private individuals invoking state attachment laws, which are thereafter found to be unconstitutional, can raise an affirmative defense of good faith.  In that regard, the *Jordan* court ruled that "private defendants should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity," and malice, in this context, meant a "creditor's subjective appreciation that its act deprives the debtor of his constitutional right to due process." *Id*. at 1276 (citation and quotation omitted).

Since the Third Circuit decided *Jordan*, courts have expressed doubt as to its applicability outside the context of state attachment laws. *See, e.g., Pearson v. City of Phila.*, No. 97-1298, 1998 WL 721076, at *2 (E.D. Pa. Oct. 15, 1998) ("To import into Eighth Amendment jurisdprudence a defense predicated on the elements of a common law claim for a wrongful seizure of property and the reasonableness of reliance on a facially valid statute is a leap.  The good faith defense discussed in *Jordan* has yet to be afforded to other than private individuals who in concert with state officials invoke state law in pursuit of a private objective.").  And, a number of district courts in this Circuit have concluded that, assuming a good faith defense is available, summary judgment on that defense is not appropriate because it involves inquiry into an individual defendant's state of mind. *See, e.g., Morgan-Mapp v. George W. Hill Corr. Facility*, No. 07-2949, 2008 WL 4211699, at *15

(E.D. Pa. Sept. 12, 2008) ("Without deciding whether a 'good faith' defense is available in this context, it is clear that 'good faith' requires a subjective inquiry into the Individual Prison Defendants' state of mind, making summary judgment on that defense inappropriate."); *Wolfe v. Horn*, 130 F. Supp. 2d 648, 659 (E.D. Pa. 2001) ("assuming the 'good-faith' defense applies in this context, the defendants' subjective state of mind cannot be evaluated without weighing the evidence and determining credibility."); *Egervary*, 2000 WL 1160720, at *6 (denying summary judgment on the good faith defense but allowing defendants to assert the defense at trial); *but see Doby v. DeCrescenzo*, No. 94-3991, 1996 WL 510095, at *21 (E.D. Pa. Sept. 9, 1996) (granting defendants' motion for summary judgment on § 1983 claims against private individual defendant based on good faith defense).

Assuming that the good faith defense articulated by the Third Circuit in *Jordan* applies to claims such as those brought in this action, that defense is not applicable in this case. As explained in *Jordan*, "good faith is a defense available to private persons who act under color of law." *Jordan*, 20 F.3d at 1276. Because Richer was jointly employed by both Geisinger and Bloomsburg, and in the absence of authority that an individual jointly employed by the state and a private entity can avail himself or herself of the good faith defense discussed in *Jordan*, that defense is not available in this case. Rather, Richer's defense on immunity grounds would be governed by the standard for qualified immunity. *Cf. Filarsky v. Delia*, - - - U.S. - - -, 132 S. Ct. 1657, 1660-61, 1665, 182 L. Ed. 2d 662 (2012) (attorney retained to assist in conducting official investigation of wrongdoing was entitled to qualified immunity even though he worked for "the government on something other than a permanent or full-time basis" because "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis."). However, since Richer did not raise qualified

immunity in his summary judgment submissions, I will refrain from addressing whether Richer is entitled to qualified immunity in this case.

### f.    Dr. Ficca is not entitled to qualified immunity.

Dr. Ficca contends that even if her conduct deprived Borrell of her constitutional rights, she should be afforded qualified immunity.  Qualified immunity applies to procedural due process claims. *See, e.g., Schmidt v. Creedon*, 639 F.3d 587, 598-99 (3d Cir. 2011).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "A defendant has the burden to establish that he is entitled to qualified immunity." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004).  The Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  "Thus, we ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).  Courts may address the two *Saucier* prongs in any order, at their discretion. *Pearson*, 555 U.S. at 236, 129 S. Ct. 808.

The first prong of *Saucier* is satisfied because Borrell has demonstrated that Dr. Ficca deprived of her of a property interest in the continuation of her course of study without due process of law.  Accordingly, only *Saucier*'s second prong is at issue.

Under the second prong, a legal right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523

(1987); *Doe v. Delie*, 257 F.3d 309, 318 (3d Cir. 2001) ("The issue is whether, given the established law and the information available to Defendants, reasonable prison officials in Defendants' positions could have believed that their conduct was lawful.").  The inquiry under the clearly established prong "focuses on the official's actual situation, [and] the analysis 'must be undertaken in light of the specific context of the case, not as a general proposition . . . .'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151).

A constitutional or statutory duty, however, "is not clearly established simply because of the existence of a broad imperative like the one against 'unreasonable . . . seizures,'" *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011), or the deprivation of life, liberty, or property without due process of law. *See also Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . [T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.  In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed.").  "'If the test of clearly established law were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*.'" *Schneyder*, 653 F.3d at 329 (quoting *Anderson*, 483 U.S. at 639, 107 S. Ct. 3034).  "Thus, the usual rule is that 'the right the official is alleged to have violated must have been clearly established in a more particularized, and hence, more relevant, sense . . . .'" *Id.* (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034).  As such, "the court must define the right allegedly violated at the

appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

Nevertheless, while the Supreme Court "appears to require a relatively high degree of specificity before a rule can be called 'clearly established,' the Court was at pains to emphasize that '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Schneyder*, 653 F.3d at 329 (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034 (citations omitted)).  Rephrased, "there does not have to be precise factual correspondence between the case at issue and a previous case in order for a right to be clearly established . . . ." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (quotations omitted).  Accordingly, "officials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant [official] fair warning that his conduct was unconstitutional." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259-60 (3d Cir. 2010) (citations and quotation omitted).  In determining whether a right was clearly established, the Third Circuit has emphasized that the applicable law must be reviewed "with particular attention to the dates the leading opinions were announced." *Assaf v. Fields*, 178 F.3d 170, 174 (3d Cir. 1999).

In this case, it was clearly established well before September 25, 2012 that, under Pennsylvania law, a graduate student has a property interest in the continuation of his or her course of study. *See, e.g., Coulter*, 2010 WL 1816632, at *2; *Manning*, 2004 WL 3019230, at *8; *Stoller*, 562 F. Supp. at 412; *Ross*, 445 F. Supp. at 153.  Furthermore, it was clearly established by 2012 that a graduate student's dismissal, be it disciplinary or academic, must be accompanied by procedural safeguards. *See Horowitz*, 435 U.S. 78, 98 S. Ct. 948.  And, with regard to disciplinary dismissals, it was established long before September 25, 2012 that, at a minimum, a student was entitled to "'be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence

the authorities have and an opportunity to present his side of the story.'" *Id*. at 85, 98 S. Ct. 948 (quoting *Goss*, 419 U.S. 565, 95 S. Ct. 729).

Nevertheless, Dr. Ficca contends that a reasonable official in her position would not have known that her actions were in violation of Borrell's due process rights.  (Doc. 119, 21-23.)  According to Dr. Ficca, "[t]he decision to dismiss plaintiff from the NAP resulted from a compilation of issues regarding her termination from GMC, who provided the required clinical portion of the NAP." (*Id*. at 22.)  As a result, since Borrell could not complete the clinical portion of the program, she was dismissed from the NAP. (*Id*. at 23.)  Dr. Ficca thus concludes that because the constitutional violation that occurred "resulted from a combination of issues from two separate entities," reasonable officials would not have recognized that they were violating Borrell's constitutional rights. (*Id*.)

Dr. Ficca is not entitled to qualified immunity.  Geisinger and Bloomsburg's collaboration in the NAP does not prevent a finding that Dr. Ficca had fair warning that her conduct was unconstitutional.  In particular, a reasonable official in Dr. Ficca's position, *i.e.*, a chairperson of a department at a state university, would have recognized, using her own words, that a "non-academic" dismissal of a student from a graduate program at a state university implicated the Due Process Clause.  Furthermore, a reasonable official would have also understood that prior to Borrell's disciplinary dismissal from the program, she was entitled, at a minimum, to notice of the charges against her, an explanation of evidence underlying the charges, and an opportunity to present her side of the story.  Yet, none of these protections were afforded to Borrell.  In light of pre-existing law, the unlawfulness of a disciplinary dismissal of a student from a graduate program without any of the attendant procedural safeguards would have been apparent to a reasonable official.  Qualified immunity is not warranted in these circumstances.

**g.     Summary judgment on Borrell's damages claims is not warranted.**

As a final matter, Richer and Geisinger argue that Borrell's remedy in this case is limited to reinstatement to the NAP.  Thus, they argue that they are entitled to summary judgment on all of Borrell's damages claims except for reinstatement. (Doc. 117, 31-33.) In view of the evidence in the record, summary judgment on this issue is not warranted. The remedies available to Borrell for Defendants' deprivation of her procedural due process rights will be determined prior to or at the time of trial.

## IV. Conclusion

For the above stated reasons, Borrell's motion for partial summary judgment will be granted in part and denied in part.  Borrell's motion for summary judgment as to liability on the property interest claim will be granted against all Defendants.  Borrell's motion for partial summary judgment will be denied in all other respects.

Dr. Ficca's motion for summary judgment will be granted in part and denied in part. Summary judgment will be granted in favor of Dr. Ficca on Borrell's stigma-plus and equal protection claims.  In all other respects, Dr. Ficca's motion will be denied.

Geisinger and Richer's motion for summary judgment will be granted in part and denied in part.  Their motion will be granted as to Borrell's stigma-plus and equal protection claims.  Their motion for summary judgment will be denied in all other respects.

An appropriate order follows.


October 21, 2014                                  /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge