**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANGELA BORRELL,

     Plaintiff,

          v.

BLOOMSBURG UNIVERSITY,
GEISINGER MEDICAL CENTER, and
ARTHUR F. RICHER and MICHELLE
FICCA in their individual and official
capacities,

     Defendants.

CASE NO. 3:12-CV-2123

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me are Defendant Dr. Michelle Ficca's ("Dr. Ficca") Post Trial Motions (Doc. 255) and Defendants Geisinger Medical Center ("GMC") and Arthur Richer's ("Mr. Richer") (collectively "Geisinger Defendants") Motion for Judgment as a Matter of Law or New Trial or Remittitur. (Doc. 257) Because Dr. Ficca is not entitled to judgment as a matter of law on Ms. Borrell's due process claim and property interest claim and Dr. Ficca is not entitled to qualified immunity, her motion will be denied. Further, because Plaintiff Angela Borrell ("Ms. Borrell") provided sufficient evidence for an award of compensatory damages, Dr. Ficca's and the Geisinger Defendants' motion for judgment as a matter of law will be denied. And, because the jury's verdict was not against the weight of the evidence, and the evidentiary rulings were not erroneous or prejudicial, the Geisinger Defendants' request for a new trial will be denied. However, because the jury's compensatory and punitive damages awards were excessive in light of the evidence at trial, I will grant the defendants' motions for remittitur, but provide Ms. Borrell the option of a new trial if she does not accept the remittitur.

Also, before me are Ms. Borrell's Motion for Costs and Attorneys' Fees (Doc. 245) and Motion for Leave to File a Supplemental Declaration and Exhibits Concerning Plaintiff's Motion for an Award of Costs and Attorneys' Fees (Doc. 296). Because Ms. Borrell has not demonstrated her entitlement to all fees and costs as requested, her motion for attorneys' fees and costs will be granted in part and denied in part. Further, because the supplemental declaration Ms. Borrell seeks leave to file is not relevant to the motion for attorneys' fees and costs, I will deny Ms. Borrell's motion.

## I. Background

As the parties have already been through a trial, only a brief summary of the facts necessary to the resolution of the instant motions will be provided. The factual background was also set forth in my two prior opinions. *See* (Docs. 49-50); *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390 (M.D. Pa. 2013) (hereinafter *"Borrell I")*; (Docs. 151-152) *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418 (M.D. Pa. 2014)(hereinafter *"Borrell II"*)).

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Ms. Borrell brought this action against Defendants Bloomsburg University[1], GMC, Mr. Richer, and Dr. Ficca alleging that her rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution[2] were violated when she was dismissed from the Bloomsburg

---

[1]

Bloomsburg University was terminated as a defendant on June 28, 2013 because Ms. Borrell's claims against the University were barred by the Eleventh Amendment. *See Borrell I*, 955 F. Supp. 2d at 399-401.

[2]

In her amended complaint, Ms. Borrell asserted the following additional claims: deprivation of her Fourteenth Amendment liberty interests (Doc. 21, ¶102.); violation of the Equal Protection Clause (*Id.* at ¶ 119.); breach of contract against Bloomsburg University, Mr. Richer and Dr. Ficca (*Id.* at ¶ 130.); and, breach of contract against GMC (*Id.* at ¶ 143.).

University and Geisinger joint Nurse Anesthesia Program ("NAP"). On September 24, 2012, Ms. Borrell met with Mr. Richer and GMC's Director of Human Relations, Brion Lieberman ("Mr. Lieberman"), and was asked to take a drug test. She refused and the following day she was sent a letter indicating that she was dismissed from the NAP for refusing the drug test.

Prior to trial, it was determined that the defendants were acting under color of state law when Ms. Borrell was dismissed from the NAP. I also decided that Ms. Borrell had a property interest protected by the Due Process Clause in the continuation of her course of study in the NAP. In other words, before Ms. Borrell was dismissed from the NAP for disciplinary purposes, she was entitled to the procedural due process protections of the Fourteenth Amendment. I granted summary judgment as to liability in Ms. Borrell's favor finding that her dismissal from the NAP occurred without due process of law and that Ms. Borrell had established a violation of her constitutional rights.

On June 22, 2015, a trial on damages commenced. Ms. Borrell sought compensatory as well as punitive damages. On June 30, 2015, a jury found Ms. Borrell would have been dismissed from the NAP regardless of whether or not she received due process (Doc. 236, 1), but also found that Ms. Borrell suffered an injury based on the denial of procedural due process itself and awarded her compensatory damages against Dr. Ficca, Mr. Richer, and GMC in the amount of $ 415,000.00. (*Id.* at 2.) The jury also found that GMC acted maliciously or wantonly in violating Ms. Borrell's rights and awarded $ 1,100,000.00 in punitive damages. (*Id.* at 3.) Thereafter, Dr. Ficca filed post-trial motions for judgment as a matter of law; alteration or amendment of the judgment; or, in the alternative, for a new

trial (Doc. 255), and the Geisinger Defendants[3] also filed a post-trial motions requesting judgment as a matter of law, a new trial or remittitur (Doc. 257). Both motions have been fully briefed and are ripe for disposition.

Ms. Borrell also filed a motion for attorneys' fees and costs, an affidavit, and a brief in support (Docs. 245; 246; 247), and a motion for leave to file a supplemental declaration and a brief in support. (Docs. 296-297). The motion for attorneys' fees and costs has been fully briefed and is now ripe for disposition. Ms. Borrell's motion for leave to file a supplemental declaration and exhibits (Doc. 296) has also been briefed and is ripe for disposition. Both motions will also be addressed herein.

## II. Legal Standards

### A.      Motion for Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law, the moving party must establish that there was no "legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing party] on that issue." Fed.R.Civ.P. 50(a)(1).  In deciding whether to grant a Rule 50(b)motion:

> the trial court must view the evidence in the light most favorable to the nonmoving party, and determine whether the record contains "the minimum quantum of evidence from which a jury might reasonably afford relief." The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury. The court may, however, enter judgment notwithstanding the verdict if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence.

*Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691–92 (3d Cir. 1993), *abrogation on*

---

[3]

The Geisinger Defendants filed a notice of appeal on July 28, 2015 (Doc. 259), but the appeal was stayed pending disposition of the current motions (Doc. 264).

*other grounds recognized by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003) (citations omitted). The question is not whether there is literally no evidence supporting the non-moving party, but whether there is evidence upon which the jury could properly find for the non-moving party. *See Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citing *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

###### B.   Motion for New Trial

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A).  The decision whether to grant a new trial following a jury verdict is within the sound discretion of the trial court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980); *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992). Courts have granted motions for a new trial where: "(1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury." *Todd v. Luzerne Cnty. Children & Youth Servs.*, No. 04-2637, 2011 WL 841429, at *2 (M.D. Pa. Mar. 8, 2011) (citing *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F.Supp. 477, 480 (E.D. Pa. 1992), *aff'd* 983 F.2d 1051 (3d Cir.1992)).  A new trial may also be warranted based 'upon [a] showing that the jury verdict resulted from passion or prejudice.'" *Evans v. Port Authority of New York and New Jersey*, 273 F 3d 346, 352 (3d Cir. 2001)(citations and internal quotations omitted). But, "where the evidence is in conflict, and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial." *See Klein v. Hollings*, 992 F.2d 1285, 1295 (3d

Cir.1993)(citation omitted). "This limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996) (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.3d 171, 211 (3d Cir. 1992)).  Thus, the Third Circuit has indicated that "a District Court reviewing a jury verdict has an 'obligation . . . to uphold the jury's award if there exists a reasonable basis to do so.'" *Evans*, 273 F.3d at 351–352 (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)).

### C.      Motion to Alter or Amend a Judgment

Under Rule 59(e), a party may seek alteration or amendment of the verdict. "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)(citing *Kazan v. Wolinski,* 721 F.2d 911 (3d Cir.1983); *Keystone Floor Products Co., Inc. v. Beattie Manufacturing Co.,* 432 F.Supp. 869 (E.D.Pa.1977)). "A jury verdict which is 'so grossly excessive as to shock the judicial conscience' can be the basis for either a new trial or remittitur" and the "[v]erdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented." *Glass v. Snellbaker,*  2008 WL 4371760, at *6 (D.N.J. Sept. 17, 2008) (Simandle, J.)(citing *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir.1987); *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1038 (3d Cir.1987)).  If appropriate, when considering and fixing a remittitur, the court is to "consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being 'mindful that the determination of that amount may not be precisely calculated.'"

6

*Evans*, 273 F 3d at 352 (citing *Blakely v. Continental Airlines*, *Inc.,* 992 F. Supp. 731, 739 (3d Cir. 1998))(internal citations omitted).

### III. Discussion

**A.     Dr. Ficca's Motion**

**1.     Judgment as a Matter of Law**

Dr. Ficca first asserts that she is entitled to judgment as a matter of law because: Ms. Borrell did not have a protected property interest, *i.e.*, her continuation in the NAP; Ms. Borrell was afforded all the process she was due; Dr. Ficca is entitled to qualified immunity; and, the evidence did not support the jury's award of compensatory damages against her. These arguments will be addressed in turn.

**a.     Protected Property Interest and Due Process[4]**

Dr. Ficca argues she is now entitled to judgment as a matter of law because my determinations at the motion to dismiss and summary judgment stages were erroneous. (Doc. 271, 9.)[5] Ms. Borrell contends that Dr. Ficca failed to seek and, thus, waived reconsideration of my decisions, and that my decisions are the law of the case which cannot, under these circumstances, be disturbed. (Doc. 278, 7-18.) Under the Middle District Local Rules, a litigant may ask a court to reconsider its decision within fourteen days. *See* M.D.Pa. L.R. 7.10. Dr. Ficca did not ask that I reconsider my rulings, but now argues that despite this failure, her current motion is not precluded. (Doc. 291, 4.) Dr. Ficca asserts that a motion for

---

[4]

During trial, Dr. Ficca's motion for judgment as a matter of law with respect to Ms. Borrell's property interest claim was denied. (Trial Tr. June 29, 74:17-19.)

[5]

Unless otherwise indicated, the page number referenced is the pagination assigned by the electronic case filing system, without regard to the parties' assigned page numbers.

reconsideration is not required "in order to renew a party's objection at a subsequent time in the case." (*Id.*)

Dr. Ficca also contends that the law of the case doctrine does not prevent me from revisiting my pre-trial rulings. (Doc. 291, 3.) The law of the case doctrine was outlined by the Third Circuit in *Hamilton v. Leavy*, 322 F.3d 776 (3d Cir. 2003):

> The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation. *In re Continental Airlines, Inc.,* 279 F.3d 226, 232 (3d Cir.2002). We apply the doctrine with the intent that it will promote finality, consistency, and judicial economy. *In re City of Philadelphia Litig.,* 158 F.3d 711, 717–18 (3d Cir.1998). Reconsideration of a previously decided issue may, however, be appropriate in certain circumstances, including when the record contains new evidence. *Id.* at 718; *Bridge v. United States Parole Comm'n,* 981 F.2d 97, 103 (3d Cir.1992). . . . because when the record contains new evidence, "the question has not really been decided earlier and is posed for the first time." *Bridge,* 981 F.2d at 103. But this is so only if the new evidence differs materially from the evidence of record when the issue was first decided and if it provides less support for that decision. *City of Philadelphia Litig.,* 158 F.3d at 720. Accordingly, if the evidence at the two stages of litigation is "substantially similar," or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply. *Id.*

*Id.* at 786-87. The Seventh Circuit also stated that the "law of the case" doctrine did not prevent a court from departing from the standard employed during summary judgment at the trial when the Supreme Court issued a decision during the pendency of the case that provided guidance. *Runyon v. Applied Extrusion Techs.*, *Inc*., 619 F.3d 735, 739 (7th Cir. 2010).

Therefore, "a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou Ann, Inc. v. Quinteros*, 176 F.3d 669,

677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218

(3d Cir.1995)). The plaintiff in *Dean v. Specialized Sec. Response,* 876 F. Supp. 2d 549

(W.D. Pa. 2012) asked for a new trial on the premise that the court's decision on summary

judgment was wrong. Judge Conti described reconsideration of a prior order as follows:

> A motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already rightly or wrongly made. *Williams v. Pittsburgh,* 32 F.Supp.2d 236, 238 (W.D.Pa.1998). Litigants are cautioned to "evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." *Waye v. First Citizen's Nat'l Bank,* 846 F.Supp. 310, 314 n. 3 (M.D.Pa.1994) (internal quotation omitted). Plaintiff did not present the court with any intervening change in the law, with new evidence, or with any clear error or manifest injustice resulting from the court's earlier decision. He raises the same legal issues in his motion for a new trial, which he raised at the summary judgment stage of this litigation, and which the court already addressed. A motion to reconsider is not a vehicle for unending dialogue between litigants and the court on matters already determined.

*Id.* at 559 n. 8. Similarly, in the current case, there is no new material evidence to consider

and there have been no intervening decisions of the Supreme Court raised by Dr. Ficca[6]

impacting the standards applied to the motions to dismiss or for summary judgment,

therefore, those decisions are the law of the case. However, I will briefly address the issues

Dr. Ficca contends were errors of law, but my decisions stand.

---

[6]

Dr. Ficca cites to case law in support of her position; however, the cases cited are not factually or procedurally analogous to the current case. For example, in *Martin v. Port Auth. Transit of Allegheny Cty*., 115 F. App'x 556 (3d Cir. 2004), the Third Circuit stated that a court could reconsider pre-trial rulings both during and after trial, while making evidentiary admissibility determinations. *Id.* at 560. Also, in *Abel v. Dubberly*, 210 F. 3d 1334 (11th Cir. 2000), summary judgment was denied but a later Rule 50 motion was granted on the same grounds and the court stated that Eleventh Circuit precedent "expressly permits consideration of a Rule 50 motion after the denial of summary judgment." *Id.* at 1337. However, the current case presents the converse because I *granted* Ms. Borrell's motion for summary judgment.

### 1.    Protected Property Interest

In regards to her first assignment of error, Dr. Ficca challenges my determination that Ms. "Borrell's property interest was in the continuation of her course of studies in pursuit of the graduate degree she sought from the [NAP]." *Borrell I*, 955 F. Supp. 2d at 403. Dr. Ficca now argues that "no appellate case holds that a student at a Pennsylvania public university has a protected property interest in continuing her education and she contends that the decision of the Third Circuit in *Unger v. Nat'l Residents Matching Program*, 928 F. 2d 1392 (3d Cir. 1991), provides that a graduate student does not, by contract, have a protected property interest in continuing in a graduate program. (Doc. 271, 10-12.) Dr. Ficca contends Ms. "Borrell has failed to establish that the contract between her and the University met" the requirements of *Unger*. (Doc. 271, 12.)

In *Unger*, after the  graduate residency program into which the plaintiff was accepted was discontinued by the university prior to the plaintiff's start date, she brought suit alleging a violation of her procedural due process rights and pendent state law claims. *Unger,* 982. F. 2d at 1394. The court stated that the circumstances of the plaintiff were distinguishable from cases where the "involved universities . . . took academic or disciplinary action against currently attending students," *Id.* at 1397 (citations omitted), and that the plaintiff had only an "abstract type of unilateral expectation" and therefore, she did not have "a property interest in the pursuit and continuance of her graduate medical education", because not every contractual relationship gives a party a "property interest protectible [sic] by procedural due process." *Id.* (citing *Reich v. Beharry*, 883 F. 2d 239 (3d Cir. 1989)).

Ms. Borrell's situation is distinguishable from the plaintiff in *Unger,* who never attended the program. The Court specifically distinguished cases involving currently attending students.

*Id.* at 1397. Ms. Borrell falls into this category.[7]

The cases I previously relied on have not been overturned; thus, there has been no intervening change in the controlling law. I have not been presented with any previously unavailable evidence, and there is no need to correct a clear error of law or fact or to prevent manifest injustice. In moving for summary judgment, Dr. Ficca relied on the same previously rejected argument she presents in the current motion. *See Borrell II*, 63 F. Supp. 3d at 443 ("Dr. Ficca also asks that I reconsider the finding that Borrell had a protected property interest in the continuation of her study in the NAP. ") Regardless of how Dr. Ficca now labels her motion, I will not indulge in an "unending dialogue between litigants and the court on matters already determined." *See Dean,* 876 F. Supp. at 559 n. 8.

## 2.      Process Due

Dr. Ficca next argues that she is entitled to judgment as a matter of law on Ms. Borrell's due process claim because"[t]he facts of this case establish that [Ms.] Borrell was afforded the level of process that she was due from Bloomsburg University and likely received all the process due from GMC." (Doc.271, 16.); *see Borrell II*, 63 F. Supp. 3d at 447-51. She again challenges my summary judgment determinations as erroneous.

---

[7] The also court stated:

> Separate and aside from any contract she may have had with Temple, Unger contends that she has a property interest in the pursuit and continuance of her graduate medical education. Unger cites *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), *Board of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), *Stoller v. College of Medicine,* 562 F.Supp. 403 (M.D.Pa.1983), *aff'd w/o opinion,* 727 F.2d 1101 (3d Cir.1984), and *Ross v. Pennsylvania State Univ.,* 445 F.Supp. 147 (M.D.Pa.1978), in support of her contention that she has a property interest in the pursuit and continuance of her graduate medical education. These cases are inapposite. Each involved universities that took academic or disciplinary action against currently attending students.
> *Unger,* 928 F.2d at 1397.

Notably, Dr. Ficca sought summary judgment on Ms. Borrell's claim based on her characterization of Ms. Borrell's dismissal as academic, rather than disciplinary. (*See* Doc. 119, 16-20.) As discussed in my prior opinion, the characterization of the dismissal dictates the process due. *See Borrell II*, 63 F. Supp. 3d at 445-47. I previously rejected Dr. Ficca's position and determined that the dismissal was disciplinary in nature. See *Borrell II*, 63 F. Supp. 3d at 447. Dr. Ficca did not seek reconsideration, but now reiterates her contention that the dismissal was academic and, therefore, all process that was due was an "informal give and take". (Doc. 271, 15.) Dr. Ficca now argues that in light of the jury's determination that Ms. Borrell would have been dismissed "[i]rrespective of any additional process that would have been afforded to [Ms.] Borrell, . . . she had no means to complete her academic requirements for the NAP," and therefore, the dismissal was academic in nature. (Doc. 271, 18.) However, Dr. Ficca's addition of the jury's determination does not add credence to her already rejected argument. The jury's determination does not convert Ms. Borrell's dismissal from disciplinary to academic. The jury was not asked to decide that question.[8]

Dr. Ficca has failed to present any case law or new evidence that requires a deviation from my prior determination and her arguments again fail to persuade. Ms. Borrell's dismissal was disciplinary in nature as she was dismissed because she failed to comply with Geisinger's policy, not because of academic performance. The fact that she would then be unable to complete the clinical portion of the NAP is the very property interest that Ms. Borrell was denied without due process.[9] Bloomsburg University's affiliation with GMC and the

---

[8]

Dr. Ficca cites to case law outside the Third Circuit to argue that Ms. Borrell's dismissal was academic rather than disciplinary despite my previous determination. (Doc. 271, 14.) However, Dr. Ficca's is again unpersuasive.

[9]

Dr. Ficca also argued this point at trial. (*See* Trial Tr., June 29, 69:24-71:17)("once Ms. Borrell was dismissed from the clinical portion of the program, there was no way she could complete the nurse anesthetist program at Bloomsburg and, therefore, there was no property

reliance on Geisinger's policies does not make it permissive for an individual to receive less process than they are constitutionally due and as I previously decided, Ms. Borrell did not receive the process she was due under the Constitution. Dr. Ficca's motion will be denied.

### b.    Qualified Immunity

In ruling on the cross-motions for summary judgment, I considered Dr. Ficca's arguments in favor of a grant of qualified immunity and I decided that Dr. Ficca was not entitled to qualified immunity. *See Borrell II*, 63 F. Supp. 3d at 456-58. During trial, Dr. Ficca again asked that she be granted qualified immunity. (Trial Tr., June 29, 74:12-19.) Her motion was denied. (*Id*.) Dr. Ficca now renews her request arguing that both Ms. Borrell's property interest in her continuation in the NAP and the amount of process she was due were not and are not clearly established. (Doc. 271, 19-22.) Dr. Ficca contends that "it cannot reasonably be said that 'existing precedent' placed either the existence of a protected property interest, or the nature of the process due in protecting it, 'beyond debate'" and "because the law is unsettled as to due process obligations of public universities when the employer dismisses the student from the clinical program", she is, therefore, entitled to qualified immunity. (Doc. 271, 20.) Dr. Ficca now raises the same arguments as when she moved for summary judgment. In fact, the briefing is almost identical. (*Compare* Doc. 119, 28 and Doc. 271, 22.) Dr. Ficca did not request that I reconsider my summary judgment decision and I  have not been presented with any new facts, evidence or case law necessitating reconsideration. Dr. Ficca is not entitled to qualified immunity and therefore, she is not entitled to judgment as a matter of law and her motion will be denied.

---

interest.")

### 2.    Apportionment of damages[10]

Dr. Ficca next argues that she is entitled to a new trial because the jury was not presented with a verdict slip that allowed for apportionment of compensatory damages among the Geisinger Defendants and herself. (Doc. 271, 27-28.) Dr. Ficca contends that "evidence was presented that any alleged injury attributed to the conduct of the Geisinger Defendants was separate and distinct from the alleged injury caused when Defendant Ficca, arguably, agreed to dismiss [Ms.] Borrell from the NAP without notice or hearing." (Doc. 271, 28.) Further, Dr. Ficca contends that because the jury chose not to award punitive damages against her, the jury distinguished between the defendants and therefore, compensatory damages should have been similarly apportioned. (*Id.*)

Dr. Ficca cites to the following footnote in *Bennis v. Gable*, 823 F.2d 723, 734 n. 14 (3d Cir. 1987) in support of her position:

> We also reject the defendants' contentions that the district court erred in instructing the jury on the proper apportionment of compensatory damages. Apportionment is appropriate whenever "a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which that defendant's conduct has been cause in fact." W. Prosser & W.P. Keeton, The Law of Torts, § 52, at 345 (5th ed. 1984) (cited in *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984)). "[G]eneral evidence as to the proportion in which the causes contributed to the result will be sufficient to support a verdict." *Id.* at 350. . . the harm inflicted by separate torts does not lend itself to definite or satisfactory proof, apportionment may properly be left to the jury's estimate. *See id.* at 348–49 (and cases cited therein).[11]

However, Dr. Ficca's argument is unpersuasive. She is correct that section 1983 liability requires proof that the individual defendant caused damage to the plaintiff. *Rode v.*

---

[10]

Dr. Ficca objected to the verdict form that was presented to the jury. (Trial Tr., June 30, 31:1-3.)

[11]

In *Bennis*, two police officers were demoted after engaging in protected First Amendment activity. 823 F.2d at 726. The jury awarded compensatory damages against the individual defendants based on their respective individual actions. *Id.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). However, it is improper to allocate "damages between the parties for [a] single indivisible injury." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 311 (7th Cir. 2010) (citing *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark,* 39 F.3d 812, 821 (7th Cir.1994)).

Despite Dr. Ficca's contention, the evidence presented at trial did not provide the necessary evidentiary foundation to apportion damages because the jury was not provided a sufficient evidentiary basis to distinguish the denial of due process by Dr. Ficca from the denial of due process by the Geisinger Defendants. The program in which Ms. Borrell was enrolled was a collaborative program between Bloomsburg and GMC, and she was notified of her dismissal by both GMC, through Mr. Richer, and Bloomsburg, by Dr. Ficca. (*See* Trial Tr., June 23, 211:19-212:8.) The jury's determination that compensatory damages were warranted for the emotional distress Ms. Borrell suffered as a result of being denied due process was not the product of separate torts; it was one injury. (*See* Trial Tr. June 30, 31:19-20.) Also, the fact that the jury did not award Ms. Borrell punitive damages against Dr. Ficca does not lead to the conclusion that the amount of compensatory damages should be apportioned. Punitive damages do not only address the injury suffered but also the conduct leading to the injury and, therefore, are distinguishable from the damages Ms. Borrell suffered as a result of the denial of due process itself. The jury reasonably concluded that Dr. Ficca played a role in Ms. Borrell's constitutional injury while also concluding that her conduct did not rise to a level warranting punitive damages. The motion for a new trial based on the verdict slip will be denied.

### B.    Compensatory Damages

Dr. Ficca and the Geisinger Defendants  renew the requests for judgment as a matter of law on the issue of compensatory damages arguing that Ms. Borrell presented insufficient

evidence at trial to support an award of compensatory damages.[12] (Doc. 271, 22; Doc. 258, 9-12.) Pursuant to Federal Rule of Civil Procedure 59, the defendants also request a new trial or for amendment or alteration of the judgment or remittitur, asserting that the "jury's award[] of compensatory damages . . . for the denial of due process itself [is] unprecedented, excessive and literally shock[s] the conscience."[13] (Doc. 271, 26-26; Doc. 258, 21, 32-33.) I will address Dr. Ficca's and the Geisinger Defendants' motions together as both raise substantially the same arguments. Ms. Borrell opposes the requests arguing that the compensatory damages award was supported by substantial evidence and case law, and, therefore,  should not be disturbed. (Doc 278, 21-40; Doc. 279, 5- 22.)

## 1.   Legal Standard

Compensatory or nominal damages are available to a plaintiff who is denied due process of law. In *Carey v. Piphus*, 435 U.S. 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978), the Supreme Court held that an award of damages based on denial of due process under Section 1983 "requir[es] the plaintiff to convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself."*Id*. at 263, 1052.  Accordingly, "[c]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S. Ct.

---

[12]

Both Dr. Ficca and the Geisinger Defendants properly made Rule 50(a) motions during trial.  (*See* Trial Tr., June 29, 60:19-61:5; 63:18-64:2; 65:13-66:12.)

[13]

In her Post Trial Motions, Dr. Ficca requests that I "amend the judgment in Defendant Ficca's favor or in the alternative amend the judgment in the form of a remittitur and reduce the amount of compensatory damages against Defendant Ficca to $ 1.00, or alternatively grant Defendant Ficca a new trial." (Doc. 255, ¶ 14.) However, in her brief, Dr. Ficca fails to more fully detail her request for a new trial specifically on the basis of the compensatory damages award other than based on the verdict slip.

2537, 2543, 91 L. Ed. 2d 249 (1986) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)). But, "a plaintiff must show 'a reasonable probability rather than a mere possibility that damages due to emotional distress were in fact incurred [as a result of an unlawful act].'" *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002) (citing *Spence,* 806 F.2d at 1201). The Supreme Court elaborated on the standard for distress damages stating:

> We use the term "distress" to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury.

*Carey*, 435 U.S. at 267 n. 20 (citing *Gertz*, 418 U.S. at 350, 94 S.Ct. at 3012. ). However, "[i]f there is no evidence of actual injury, then [a] plaintiff who suffers a violation of their procedural due process rights should be able to recover nominal damages of one (1) dollar." *Dee v. Borough of Dunmore*, 2010 WL 1626908, at *6 (M.D. Pa. Apr. 21, 2010), aff'd, 474 F. App'x 85 (3d Cir. 2012) (citing *Carey*, 435 U.S. at 267, 98 S. Ct. 1042.).

### a.     Judgment as a Matter of Law

Turning first to the requests for judgment as a matter of law, Dr. Ficca asserts that Ms. Borrell "presented no facts at trial that established that Defendant Ficca caused her compensatory damages and [Ms. Borrell] testified that it was not Defendant Ficca who denied her a hearing", thus, "[a]s a matter of law, Defendant Ficca cannot be the cause of any of Plaintiff's damages." (Doc. 255, ¶ 12.) The Geisinger Defendants argue entitlement to judgment as a matter of law "because there is insufficient evidence that [Ms.] Borrell suffered any injuries resulting from the denial of due process itself." (Doc. 257, ¶ 5(a).)

Defendants' renewed motions for judgment as a matter of law asserting there was insufficient evidence to support compensatory damages must be denied. As I stated in ruling on the Rule 50(a) motions during trial, there was a prior determination that Ms. Borrell did not

receive the process she was due. (Trial Tr., June 29, 66:22-67:3.) Even if there was insufficient evidence to warrant a compensatory damages award, Ms. Borrell would still be entitled to nominal damages based on the denial of procedural due process, thereby making judgment as a matter of law for defendants inappropriate. *See* (Trial Tr., June 30, 17:14-23.); *Dee,* 2010 WL 1626908 at *4 (citing *Carey,* 435 U.S. at 267.); *see also Farrar v. Hobby*, 506 U.S. 103, 112, 113 S. Ct. 566, 573, 121 L. Ed. 2d 494 (1992) *("Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury."). Therefore, the motions for judgment as a matter of law will be denied.

Dr. Ficca additionally argues causation and contends there was no evidence presented "at trial that any emotional distress [Ms. Borrell] may have experience[d] related to the denial of due process was caused by Defendant Ficca." (Doc. 271, 25.) To the contrary, the evidence presented could have led a reasonable jury to conclude that Dr. Ficca played a role in causing Ms. Borrell emotional distress in failing to provide due process. Dr. Ficca was involved in a discussion about Ms. Borrell on September 24, 2012 prior to the meeting between Ms. Borrell, Mr. Richer and Mr. Lieberman. (*Id.* at 141:20-25; 142:24-143:1.) When Ms. Borrell was dismissed, Dr. Ficca agreed and signed the letter informing Ms. Borrell of her dismissal from the NAP, *Borrell II*, 63 F. Supp. 3d at 436 ("Borrell was informed of her dismissal from the NAP by letter on joint Bloomsburg–Geisinger stationary. That letter reflects Dr. Ficca's agreement with the decision to terminate Borrell from the NAP."); *(see also* Trial Tr., June 24, 146:19-22.), and Dr. Ficca provided the pages enclosed with the letter from the Bloomsburg University nursing handbook detailing a review process, thinking at the time that Ms. Borrell could take advantage of the review process. (*Id.* at 143:18-23.)

Testimony was also presented that Ms. Borrell wrote Dr. Ficca in an attempt to obtain the process described on the sheets enclosed with the letter. (Trial Tr., June 25, 83:4-5.) Ms.

Borrell testified:

> That's why I wrote then Michelle a personal letter myself asking for the review panel hearing, because I just wanted to know like the facts of everything and let them hear my side of the story and how I was upset and confused and taken aback by what they were saying, and I just felt like something wasn't right, and that's why I refused to take the test and not because I was hiding something.
>
> I just wanted like the opportunity to explain myself and let them hear my side of the story and try to reconsider what they were doing to me.

(*Id.* at 83:4-13.) However, when asked if she ever received a hearing, Ms. Borrell testified: "No, nobody would talk to me about anything. I never was offered any process. I couldn't even get them to pick up their telephone, let alone give me a review panel hearing."(*Id.* at 85:6-8.) It was not until several weeks later that Dr. Ficca responded to Ms. Borrell by sending her a letter addressing the contractual relationship between Bloomsburg and Geisinger and her violation of Geisinger's policy, while not offering Ms. Borrell any due process. (*Id.* at 96:6-20.) There was evidence at trial for the jury to conclude that Dr. Ficca was involved in the failure to provide Ms. Borrell due process and therefore, her motion for judgment as a matter of law will be denied.

### b.    New Trial/Remittitur

Next, I will address the defendants' remaining motions that assert there was insufficient evidence to support the jury's compensatory damages award. (Doc. 255, ¶ 9; Doc. 257, ¶ 6(a); ¶ 7; Doc. 258, 9-12; Doc. 271, 16-21.) The jury was asked to determine whether Ms. Borrell would have been dismissed from the NAP even if she had been provided the required procedural due process. (Doc. 236, 1.) They answered in the affirmative, thereby, awarding what the jury deemed to be "the amount of compensatory damages [to] fairly compensate Ms. Borrell for the injuries she suffered as a result of the denial of due process itself." (*Id.*) The defendants disagree with the jury's award.

The defendants argue that the "evidence in this case simply did not support that [Ms.]

Borrell suffered an *actual* injury arising from the denial of due process itself." (Doc. 271, 24;Doc. 258, 10.) Dr. Ficca and the Geisinger Defendants contend that the testimony presented by Ms. Borrell primarily dealt with her dismissal from the NAP and, therefore, was insufficient to demonstrate injuries attributable to the denial of due process itself. (Doc. 271, 24; Doc. 258, 10.) Specifically, Dr. Ficca argues that the evidence regarding the denial of due process included only "conclusory and self-serving testimony" directly tied to the denial of due process that does not suffice to show actual injury and such testimony has repeatedly been deemed an insufficient demonstration of emotional distress by the Third Circuit Court of Appeals. (Doc. 271, 24 (citing *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108 (3d Cir. 1988); *Spence*, 806 F.2d 1198)[14] Similarly, the Geisinger Defendants argue that Ms. Borrell's statements "circle back to– and [are] indistinguishable from – [Ms.] Borrell's anger that she was not told all of the reasons for the drug test when it was requested", despite the fact that a statement of reasons is not required. (Doc. 258, 11.)[15] Both cite to testimony of Ms. Borrell,

---

[14]

In *Gunby*, the only testimony regarding emotional distress was that the plaintiff stated that he "had been done wrong", "had been treated unfairly", and he "was very upset."  840 F.2d at 1121-22. In *Spence*, the Third Circuit affirmed remittitur of emotional distress damages when evidence presented through the plaintiff's testimony was that she was "depressed and humiliated . . . and that she had lost her motive to be creative." 806 F.2d at 1201.

[15]

Relying on language from *Fraternal Order of Police Lodge No. 5 v. Tucker,* 868 F. 2d 74, 81 n. 6 (3d Cir. 1989), the Geisinger Defendants assert that Ms. Borrell's trial testimony was limited to her distress based on not being given information on why the drug test was requested, thus, insufficient to warrant compensatory damages for a lack of due process. (Doc. 258, 11.) In *Tucker*, the court stated that it was unnecessary to reveal the facts giving rise to the request to take a drug test. *Id.* at 81 n. 6. However, the issue the court was considering was the constitutionality of the process provided to police officers before they were dismissed for failing to take a drug test. In this case, the issue of process had been decided leaving the jury to determine the damages suffered as a result of the lack of due process. *Tucker* is unhelpful to the Geisinger Defendants because even if Ms. Borrell was not entitled to know the reason why a drug test was requested, she was entitled to present her side of the story. The Geisinger Defendant's attempt to argue that Ms. Borrell only suffered distress because she was not told why a drug test was requested ignores much of the testimony at trial.

Ms. Borrell's mother, and Ms. Borrell's friend to argue that Ms. Borrell failed to prove an actual injury or that any testimony regarding emotional distress was attributable to Ms. Borrell's dismissal from the NAP, not the lack of due process.  (Doc. 271, 24-25; Doc. 258, 10-11.)

Both Dr. Ficca and the Geisinger Defendants contend the inappropriateness of the compensatory damages award in this case is further shown by Ms. Borrell's failure to produce evidence that she suffered any financial distress or loss of reputation, or that she suffered lasting emotional distress or emotional distress requiring medication. (Doc. 258, 11, 33; Doc. 271, 24.) The Geisinger Defendants also assert that Ms. Borrell did "not allege that she knew that GMC's actions were somehow Constitutionally deficient" and therefore, any distress could not be deemed attributable to the lack of due process.[16] (Doc. 258, 12.)

In opposition, Ms. Borrell sets forth numerous citations to her testimony that she argues demonstrate the extent of the injury suffered as a result of the denial of due process and that provide validation for the jury's award. (Doc. 278, 21-40;Doc. 279, 5-22.) Ms. Borrell also contends that a reasonable jury could have considered that her injuries were ongoing from September 25, 2012 to the date of the commencement of the trial, June 22, 2015, because it was the position of defendants that the jury was seated for Ms. Borrell's due process hearing. (Doc. 278, 31; Doc. 279, 15.) Ms. Borrell further counters that the defendants are trivializing her testimony and "all of the testimony about non-economic damages should be read through the lens of Ms. Borrell's testimony that not having the opportunity to tell her side of the story, to have at least a chance of fairness, is what hurts the most." (Doc. 278, 21 n. 5; Doc. 279, 6 n. 3.)

---

[16]

In its briefing, the Geisinger Defendants take the position that the fact that Ms. Borrell was crying or emotional before she received notice she was terminated is not actionable because due process would not have been immediately available (Doc. 258, 11.), and that this case is only about pre-termination due process, and not post-termination due process. (Doc. 293, 7.)

As reviewed below, a new trial will not be granted because there was evidence from which a reasonable jury could conclude that Ms. Borrell actually suffered emotional distress because of the denial of procedural due process itself. Therefore,  compensatory damages were warranted. However, while remaining respectful of the jury's determination, I do agree with Dr. Ficca and the Geisinger Defendants that the award of $ 415,000.00 in compensatory damages was excessive in light of the evidence presented, and, therefore, a remittitur is appropriate. The Third Circuit has provided the following guidance on remittitur:

> 'In general, the determination of compensatory damages is within the province of the jury and is entitled to great deference.' *Spence v. Bd. of Educ.,* 806 F.2d 1198, 1204 (3d Cir.1986). However, "[t]he district judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Id.* at 1201. Remittitur is utilized when the trial judge finds that a decision of the jury is excessive or clearly unsupported by the evidence. *Id.*; *see also Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979). The reduction may not be less than the maximum amount that does not "shock the judicial conscience." *Evans v. Port Auth. of N.Y. & N.J.,* 273 F.3d 346, 355 (3d Cir.2001).

*Dee v. Borough of Dunmore*, 474 Fed. App'x 85, 87 (3d Cir. 2012).

### 1.    Trial Testimony

#### a.    *Ms. Borrell*

Ms. Borrell presented evidence at trial with regard to the lack of due process and how she was impacted by it. Ms. Borrell testified as follows:

> Q: Were you ever given any opportunity to tell your side of the story or to, you know, have a chance to get back?

> A: No. And that's what hurt the most, because they always stressed that how they were there to help students and support you, and they understand - - like they would say in the beginning, they understand that rumors get spread in the O.R. So if a nurse anesthetist ever said something about you they would sit down and talk to you, get your side of the story.
> And then when this was all happening to me they didn't even learn what had happened, that they really got a report from someone. They never sat down with me and talked to me about it. They just basically like took me and threw me out like trash, like I was nothing to them and my life was nothing, and that's what hurts the most.

(Trial Tr., June 25, 73: 11-25.)

> Q: What are you talking about when you say that's what hurt the most?
>
> A. Basically that they have no consideration and no respect for me or my life or being truthful and honest with me.

(*Id.* at 74:14-17.) Further, when asked if she was "able to carry on with [her] normal life and have fun and enjoy" herself, Ms. Borrell responded:

> A: I still carry on and enjoy my life. It doesn't take away when I sit and think about what happened to me. I can't sit and cry everyday. I can't sit in a corner so I grieve differently. If I can go out and have a drink with friends or if I can go out and smile with somebody I will do that. But it doesn't take away the hurt I feel inside.

(*Id.* at 139:10-17.) Following inquiry that she was in fact in a better place after the birth of her baby, a new job and boyfriend, Ms. Borrell responded: "[t]o make this situation any less because I had a baby who is beautiful and makes me happy makes this right, and makes me hurt any less about this situation, that's not correct." (*Id.* at 140:21-24.)  Ms. Borrell presented testimony of a lasting impact on her and a change in her personality and demeanor, stating that she felt as though a part of her had been killed and "that she will never be the same from what happened." (*Id.* at 97:4-7.)

Ms. Borrell also testified specifically about her attempts to obtain due process. She testified she called Mr. Richer's personal cell phone, left messages for him, and sent him an email to obtain some type of due process; but Mr. Richer never responded. (*Id.* at 69:20-23; 73:4-10.) Thereafter, Ms. Borrell received pages of the nursing handbook describing a review process (*Id.* at 82:22-25.), and she "discovered that there was a non-academic grievance policy." (*Id.* at 82:17-21.) She also wrote a letter to Dr. Ficca, addressed above. (*See Id.* at 83:5-13.)

Although some of Ms. Borrell's testimony did not support damages for the denial of due process itself because it was more appropriately categorized as relating to her dismissal

from the NAP as opposed to the lack of process[17], when viewing the evidence in a light most favorable to Ms. Borrell, sufficient evidence was presented showing that Ms. Borrell suffered actual injury as a result of the denial of due process itself not just from her dismissal from the NAP. Ms. Borrell specifically testified that she felt as though she was thrown out like trash because "no one sat down and talked to her. . ." (Trial Tr., June 25, 73:20-25.), and the jury was able to assess her testimony and see when she was brought to tears while testifying. (*Id.* at 68:8-10.)  Having determined that Ms. Borrell would have been dismissed regardless of whether or not she received any process, the jury could have reasonably concluded that the denial of the opportunity to be heard caused emotional distress, which could have been ongoing until the time of trial because she was never given a hearing or an opportunity to counter the evidence against her. Ms. Borrell presented more than a scintilla of evidence that she experienced emotional distress as a result of the denial of due process itself.

### b.   *Kelly Ann Borrell-Willinsky*

The Defendants also take issue with Ms. Borrell's mother's testimony. Defendants assert that Ms. Borrell's mother's testimony was limited to describing Ms. Borrell's "efforts to contact individuals at GMC and Bloomsburg; but, she did not describe any emotional distress allegedly experienced by [Ms.] Borrell." (Doc. 271, 25; Doc. 258, 11.) Citing to trial testimony, the Defendants argue that "[t]he only other evidence of pre-termination distress [her mother] offered was that Borrell started 'crying . . . uncontrollably' later in the day on September 24,

---

[17]   For example: "They basically stripped from me my dream and my opportunity. Because they took into consideration some girl's lies, and then in turn they created lies of their own, and then they punished me because I questioned them." (Trial Tr., June 25, 97:7-10.)"I was embarrassed. . . .And it's embarrassing to tell people that you're expelled from a program because they thought you were on drugs. It's humiliating to have to explain that to your family and friends." *(Id.* at 97:13-19.)

2012,[18] which the Geisinger Defendants contend "is not actionable because a due process hearing could not have been held by this time", and the remainder of Ms. Borrell's mother's testimony regarding Ms. "Borrell's emotional state concerned the effects of the dismissal from the NAP." (Doc. 258, 11.)

However, the defendants fail to acknowledge several statements by Ms. Borrell-Willinsky that the jury could have considered evidence of Ms. Borrell's emotional distress resulting from the denial of due process. Ms. Borrell-Willinsky testified that the main goal was "to try to get her to the hearing that we thought she deserved in the little manual they have at school. It says that she was due a hearing if anything should go wrong, and she was never allowed to have that hearing. They would not give it to her." (Trial Tr., June 26, 75:5-9.) Ms. Borrell-Willinsky further testified that Ms. Borrell was trying to get someone to speak to her (*Id.* at 76:24-77:6.), and that she told her daughter not to give up, because, in her opinion, her daughter was owed a hearing. (*Id.* at 77:8-10; 78:19-22.) Ms. Borrell-Willinsky testified that her daughter was "devastated" and "hurting", and although she did not specifically state that this was due to the lack of due process, a reasonable jury could have concluded, based on the overall context of the testimony and the time frame being discussed that Ms. Borrell

---

[18] Again, the Geisinger Defendants contend that testimony that Ms. "Borrell cried on September 24, 2012 when asked to take a drug test is not actionable because 'it is not necessary to reveal . . .during an investigation the facts giving rise to the reasonable suspicion; nor does due process require even an informal notice and hearing prior to an order [to] submit to urinalysis.'" (Doc. 258, 11 (citing *Tucker,* 868 F. 2d at 81 n. 6). Upon review of the Geisinger Defendants' cited authority, the Third Circuit stated:

> We emphasize that it is not necessary to reveal to the officer during an investigation the facts giving rise to the reasonable suspicion; nor does due process require even an informal notice and hearing prior to an order that he or she submit to urinalysis. We hold only that a meaningful opportunity to be heard on the underlying charge is required *before the officer can be deprived of his or her employment.*

*Tucker,* 868 F. 2d at 81 n. 6 (emphasis in original). The Geisinger Defendant's contention misses the mark as Ms. Borrell was not provided a meaningful opportunity to be heard.

was "devastated" and "[s]he was hurting" due to the lack of due process. (*Id.* at 77:16-22.)

Ms. Borrell-Willinsky also testified to a lasting change in Ms. Borrell. She stated that Ms. Borrell was a very trusting person before but she is now "very limited to who she trusts." (*Id.* at 80:19-22.) She further stated that the incident affected Ms. Borrell tremendously and that it will be there all of her life stating "[i]t will always be there. It's like - - - . . .the death of something horrible in your life, something that you can't forget, . . ." (Trial Tr., June 26, 81:17-19.) This testimony, when viewed in a light most favorable to Ms. Borrell shows distress caused by the denial of due process itself.

### c.   *Other testimony*

Ms. Borrell also presented testimony from her friend of several years, Tim Colna. (Trial Tr., June 25, 255:14-22.) The Defendants argue that the testimony of Mr. Colna did not reference a denial of due process but rather focused on the change in Ms. Borrell's demeanor because she was dismissed from the NAP. (Doc. 271, 25; Doc. 258, 10. (citing Trial Tr., June 25, 258:15, 20-22.)) Although Mr. Colna testified about Ms. Borrell's lack of a future as a Nurse Anesthetist[19], he also stated that "I don't know if her life improved at all after that happened. After the incident happened her life went down." (*Id*. at 260:1-2.)

---

[19]
Q: Now, in your opinion, Mr. Colna, as her close friend do you think that this ultimately has made an impact on Ms. Borrell that she will live with forever?

A: Absolutely. Her dreams are crushed.

Q: What do you mean by that?

A: Well, hum, she worked hard. And then to have like what happened to her, it was like – she –it was just tough because she thought she was going to live a life – you know, she worked hard and then it got torn down. So she thought she'd never get to that point, that she'll never be able to have the same position that she worked so hard for.

(Trial Tr., June 25, 258:12-22.)

Further, Mr. Colna testified that Ms. Borrell is "a lot different now", in that "[s]he used to be always happy and fun. And since this incident –I was worried about her. I mean she is just a totally different person . . .not happy anymore, she's not sociable. . .it was bad the first year, year or two." (*Id.* at 256:20-25.) He also stated that Ms. Borrell no longer trusted anyone. (*Id.* at 257:2.) Mr. Colna's testimony, when viewed more fully, may also have reasonably led the jury to conclude that Ms. Borrell was injured by the lack of due process.

In opposing defendants' motions, Ms. Borrell cites to testimony from her friends and classmates to support her position. (Doc. 278, 2-28; Doc. 279, 11-12.) Both former classmates, Erika Yagel and Amanda Adams, testified that they were contacted by Ms. Borrell on or after September 24, 2012. Ms. Yagel testified that Ms. Borrell "was very upset, she was crying, very emotional" (Trial Tr., June 24, 12:3.), and Ms. Adams testified that Ms. Borrell was very upset. (Trial Tr., June 25, 8:20.) Also cited by Ms. Borrell was the testimony of her former classmate, Doug Ombongi, who testified that when he spoke to Ms. Borrell following her termination, she was "crying very hard. I mean, very inconsolable." (Trial Tr., June 24, 222:1.) Mr. Ombongi also testified that Ms. Borrell continued to state to him that "[s]he was going to talk to Bloomsburg and maybe the anesthesia program" in an attempt to get back in to the program. (*Id.* at 223:20-224:5.)

Viewing all of the above cited testimony in a light most favorable to Ms. Borrell, there was sufficient evidence to demonstrate she suffered an actual injury due to the denial of due process itself, but an award of $ 415,000.00 was excessive and a remittitur is warranted. As stated above, when fixing a remittitur, it is appropriate, to consider the evidence and awards in other cases.

A remittitur was ordered in the following cases. In *Spence*, the plaintiff, an art teacher, was transferred from one school to another in retaliation for the exercise of her First

Amendment rights. 806 F.2d  at 1199.   The plaintiff testified that the transfer caused her to feel depressed, humiliated, embarrassed, and that she lost her creativity. *Id.* at 1203. The jury awarded compensatory damages. *Id.* at 1199. Following trial, the entire award was ordered remitted but the plaintiff elected to proceed to a new trial that resulted in a defendants' verdict. *Id*. The Third Circuit accepted the district court's "finding that 'the award of damages for emotional distress was wholly speculative given the limited quality and quantity of proof that plaintiff submitted on the issue'", stating that the emotional distress evidence consisted "chiefly of plaintiff's own testimony"  but did not include any testimony that her peers held her in less esteem, she did not suffer physically and did not seek professional psychiatric counseling. " *Id.* at 1201*; see also Gunby,* 840 F.2d  a1120–22 (affirming remittitur of entire $15,000 emotional distress award where only evidence was plaintiff's testimony that he "had been done wrong" and that he was "very upset");

In *Dee v. Borough of Dunmore*, 2010 WL 1626908,(M.D. Pa. Apr. 21, 2010), aff'd, 474 Fed. App'x 85 (3d Cir. 2012), the plaintiff testified he felt humiliated and emotionally devastated and was prescribed additional high blood pressure medication to control his pre-existing condition, after he was transferred to a less prestigious position in retaliation for his speech. *Id*. at *7. The jury awarded the plaintiff $150,000.00 in compensatory damages for the violation of his procedural due process rights.  *Id*. at *1. The award was ordered remitted to $ 50,000.00 because there was no evidence the plaintiff was changed in any lasting way and suffered no other non-economic injury or loss of reputation among his peers. *Id.* at *7-8; *see also Glass*, 2008 WL 4371760 at * 20 (Compensatory damages award of $ 250,000 was ordered remitted to $ 50,000.00 based on the lack of evidence of ongoing emotional injury); *Merritt v. Mackey*, 932 F.2d 1317, 1323 (9th Cir. 1991) (Affirming award of $35,000 in damages as compensation for emotional distress arising from a due process deprivation after

the plaintiff was fired without a pre-termination hearing.); *Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 267 (1st Cir. 1987) (award of $15,000 for compensatory damages deemed reasonable under the circumstances where the plaintiff testified of the emotional and mental distress caused by her abrupt dismissal and later discharge.); *Laje v. R. E. Thomason Gen. Hosp.*, 665 F.2d 724, 728 (5th Cir. 1982) (Award of $ 20,000 upheld where plaintiff and wife both testified that the summary proceedings surrounding the plaintiff's dismissal from employment "caused severe anxiety and distress, and that these feelings were not relieved until after the full hearing" eight months later.)

In *Dee*, I discussed Third Circuit cases where compensatory damages were awarded for violations of substantive rights and the verdicts were upheld based on evidence of emotional distress causing life-long changes:

> In *Gagliardo v. Connaught Laboratories, Inc.,* 311 F.3d 565 (3d Cir.2002), the Third Circuit Court of Appeals considered a jury award including emotional distress damages under plaintiff's claim for discrimination based upon disability. *Gagliardo,* 311 F.3d at 567. The jury found in favor of the plaintiff on her claim that her employer discriminated against her as a result of her Multiple Sclerosis. *Id.* at 568. The jury awarded $1.55 million in damages for emotional distress after hearing evidence that the discrimination had a "worsening effect on her life" and transformed her "from a happy and confident person to one who was withdrawn and indecisive." *Id.* at 573–74. The Third Circuit Court of Appeals affirmed the district court's decision to permit the verdict to stand. *Id.* at 574. The Third Circuit Court of Appeals affirmed a similar verdict in *Bolden v. Southeastern Pennsylvania Transportation Authority,* 21 F.3d 29 (3d Cir.1994).[20] In that case, plaintiff presented evidence that his employer impermissibly terminated him for refusing to take a drug test. *Id.* at 30. During a subsequent trial for damages, the jury awarded $250,001 in compensatory damages for emotional distress and harm to plaintiff's reputation. *Id.* at 31. The district court denied the defendants motion for remittitur, finding that the evidence presented was sufficient. *Id.* The Third Circuit Court of Appeals held that the district court did not abuse its discretion because the jury award was

---

[20]

The Geisinger Defendants rightfully point out that the plaintiff in *Bolden* had been subject to a unconstitutional drug test resulting in emotional distress and harm to reputation. (Doc. 293, 10-11.); *Bolden v. Se. Pennsylvania Transp. Auth.*, 820 F. Supp. 949, 958 (E.D. Pa. 1993), *aff'd*, 21 F.3d 29 (3d Cir. 1994).

supported by testimony from the plaintiff, two of his friends, and his wife and daughter who "testified that he had changed a great deal in the wake of the drug test." *Id.* at 33. The court distinguished its holding in *Spence,* saying that while there was no evidence of damage to the plaintiff's reputation or evidence of physical effects as was the case in *Spence,* in *Bolden* there was evidence of emotional distress beyond the loss of reputation. *Id.*

*Dee*, 2010 WL 1626908, at *7.  Additionally, in *Ridley v. Costco Wholesale Corp.*, 217 F. Appx. 130, 132 (3d Cir. 2007), the plaintiff, an employee of approximately fourteen years, complained that he had been demoted and discriminated against because of his race, but his complaints were deemed unfounded. *Id.* Later, following an incident that raised safety concerns, the plaintiff was demoted and transferred from one store to another much farther from his home, while also receiving a $ 17,000.00 pay cut. *Id.* at 133. The plaintiff complained that he was being retaliated against and later resigned. *Id.* During trial on his Title VII and state law claims, the plaintiff and his wife testified that he was not the same; that he lost sleep and weight, became socially withdrawn, and had a diminished self-worth. *Id.* at 137.  The jury awarded $ 200,000.00 in emotional distress damages and the Third Circuit affirmed. *Id.* The plaintiffs in *Johnston v. School Dist. of Phila.*, 2006 WL 999966, *8 (E.D. Pa. 2006), alleged that they were discriminated against and, following a jury trial, each plaintiff was awarded $ 500,000.00 in non-economic damages for past, present and future mental anguish, pain and suffering, loss of enjoyment of life, and humiliation because of what the jury determined to be unlawful discrimination or retaliation.  The court upheld the verdicts for all four plaintiffs finding that each presented evidence of lasting distress. *Id.* at * 9-14.[21]

---

[21]  The first plaintiff testified, and his daughter corroborated, that his life would never be the same; including a loss of confidence and sleep, stomach issues and headaches, plus prescription medication to treat his anxiety. *Johnson*, 2006 WL 999966 at *9-10. The second plaintiff and his wife testified that he lost enjoyment in life, stopped doing previously pleasurable activities, did not like to socialize anymore and suffered physical effects from his new, more strenuous job. *Id.* at *11. The third plaintiff testified to his need to take sleeping pills and stomach medication following his termination and that it consumed his mind, making him

In *Bogle v. McClure*, 332 F. 3d 1347(11th Cir. 2003), a remitted compensatory damage award of $ 500,000.00 per plaintiff was upheld where the plaintiffs testified to feelings of upset, embarrassment, humiliation and shame, while some became depressed and one was even suicidal, after they were transferred due to their race. *Id.* at 1359*; see also Bach v. First Union National Bank*, 149 Fed. App'x. 354, 363 (6th Cir. 2005) (An award in a Fair Credit Reporting Act case of $ 400,000.00 in compensatory damages was affirmed based on evidence that the plaintiff, who suffered a stroke and needed her granddaughter's help, attempted to get a second mortgage to purchase a nearby home for her granddaughter and was left feeling "'desperate', 'ashamed', 'embarrassed,' and 'damn mad'" when her second mortgage application was denied.)

Clearly, damages for emotional distress are difficult to quantify as evidenced by the varying awards in the above-cited cases, however, in determining an appropriate compensatory damages award, I must keep in mind that the "purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests." *Carey v.* 435 U.S.  at 262, 98 S. Ct. at 1051. The defendants argue that an award of $ 50,000 is the outermost limits of a compensatory damages award. (Doc 258, 33.)The Geisinger Defendants additionally argue that the case law is structured in a way that makes compensatory damages for denials of due process difficult to establish, "to avoid punishing defendants for their justified actions." (Doc. 293, 8.) However, the Geisinger Defendants misinterpret the jury's determination and how it impacts this case. The jury determined that Ms. Borrell would have been dismissed regardless, therefore, it is reasonable to conclude that, the jury credited Ms.

---

reclusive. *Id.* at *12-13. The fourth plaintiff and his wife testified that he lost his sense of dignity and enthusiasm, became quiet and depressed and had elevated blood pressure requiring medication. *Id.* at *13-14.

Borrell's testimony that her distress was caused by the lack of opportunity to tell her side of the story, and the actions by the defendants in denying due process, were not justified. There was no evidence presented that the termination had to be immediate, in fact, there was evidence that Ms. Borrell was in the operating room on the day she met with Mr. Richer and Mr. Lieberman. (*See* Trial Tr., June 23, 208:16-209:4.) There was no evidence that she posed a risk to anyone nor that a hearing would not have been feasible.

Emotional distress damages in excess of $ 50,000 have been upheld in several cases where there was testimony of lasting impacts on the plaintiff, therefore, for the following reasons, a compensatory damages award of $ 250,000.00 is an amount that does not shock the judicial conscience. Ms. Borrell presented evidence that she suffered lasting changes to her personality and her ability to trust others. She testified that she continues to have sadness and feels hurt by the demonstrated lack of consideration for her. This testimony was credited by the jury and it is also reasonable to conclude that the jury considered this to be an ongoing injury following her dismissal in 2012. However, Ms. Borrell did not present evidence that she suffered any physical or emotional conditions requiring medical intervention or that she was held in less esteem by her peers. Therefore, mindful that there is never precision in determining an amount of emotional damages, an award of $ 250,000.00 is appropriate in this case based on the evidence.  But, when reducing a jury's award, the court must also provide the plaintiff the option of a new trial.  *See Hetzel v. Prince William Cty., Va.*, 523 U.S. 208, 211, 118 S. Ct. 1210, 1211 12, 140 L. Ed. 2d 336 (1998). Therefore, Ms. Borrell has the option of remitting $ 165,000.00 in compensatory damages or declining and elected a new trial. Notwithstanding Ms. Borrell's ability to elect a new trial on the issue of compensatory damages, I will grant the defendants' motion for remittitur, but deny Dr. Ficca's motion to remit compensatory damages to $ 1.00.

### C.    Geisinger Defendant's Motion

The Geisinger Defendants filed additional post-trial motions requesting: judgment as a matter of law on the punitive damages award and on Mr. Richer's request for qualified immunity; and for a new trial based on: a jury award that shocks the conscience and is against the weight of the evidence, several evidentiary rulings that were erroneous and inconsistent with substantial justice, and Ms. Borrell's counsel's statements during closing arguments that created a reasonable probability of prejudice. In the alternative, GMC seeks a remittitur of the punitive damages award pursuant to Federal Rule of Civil Procedure 59(e). (Doc. 257, ¶¶ 5-7.) I will first address GMC's motions on punitive damages.

### 1.    Punitive Damages[22]

The jury awarded Ms. Borrell $ 1,100,000.00 in punitive damages against GMC, but declined to impose punitive damages liability on Dr. Ficca or Mr. Richer. (Doc. 236, 3.) GMC now seeks various forms of relief from that award. (Doc. 257) For the following reasons, I will deny GMC's motions for judgment as a matter law, but will order a new trial on the issue of punitive damages if Ms. Borrell does not accept a remittitur of $ 350,000.00, thereby, leaving a punitive damages award of $ 750,000.00.

### a.    Standard

Under Section 1983, punitive damages are available to a plaintiff and "[t]he standard for punitive damages . . . [, as] set by the Supreme Court, . . .does not require 'outrageousness': [rather,] a jury may 'assess punitive damages in [a civil rights  action] when

---

[22]    The Geisinger Defendants incorporate the arguments for judgment as a matter of law with those for a new trial and for remittitur, contending that,  "even if the court determines that a reasonable jury could have awarded compensatory and punitive damages, it may (and should) still find that they are against the clear weight of the evidence and order a new trial." (Doc. 258, 21.) For the reasons set forth, I will not grant the motions for judgment as a matter of law or for a new trial, however, I will grant the motion for a remittitur.

the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 2000) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).   Therefore, "[i]t is sufficient for the plaintiff to show either that the defendant acted . . . with actual knowledge that he was violating a right 'secured by the Constitution and laws,' or that the defendant acted with reckless disregard of whether he was thus violating such a right." *Cochetti v. Desmond,* 572 F.2d 102, 106 (3d Cir. 1978).   In *Whittaker v. Fayette Cty.*, 65 F. App'x 387(3d Cir. 2003), the Third Circuit elaborated

> that the term "reckless indifference" refers to the defendant's knowledge that he "may be acting in violation of federal law." *Riga,* 208 F.3d at 431 (citing *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 537, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)); *see also Miller v. Apartments & Homes,* 646 F.2d 101, 111 (3d Cir.1981) (punitive damages appropriate where defendant acts with reckless disregard as to whether he is violating a federally protected right, or consciously and deliberately disregards consequences of actions). Relying on *Kolstad,* this Court found that the term "reckless" focuses on the defendant's state of mind. *Riga,* 208 F.3d at 431.

*Id.* at 393. The reckless indifference standard is subjective and requires evidence that the defendant acted "in the face of a perceived risk that [his or her] actions [would] violate federal law." *See Swipies v. Kofka*, 419 F.3d 709, 718 (8th Cir. 2005) (citing *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118.)) However,"[t]he law provides that punitive damages cannot be awarded in a section 1983 case unless there is more than a mere violation of a right justifying compensatory damage." *Sallitt v. Stankus*, 720 F. Supp. 2d 645, 649 (M.D. Pa. 2010) (Munley, J.).

### b.    Judgment as a Matter of Law

GMC contends that this is a case where its actions were motivated by legitimate reasons with an absence of flagrant misconduct and therefore, any amount of punitive damages is unwarranted, and certainly,  the  amount of punitive damages awarded in this

case was unreasonable and therefore, judgment as a matter of law in its favor is warranted. (Doc. 258, 17.)

### 1.    Sufficiency of Evidence

With regard to punitive damages, GMC asserts its entitlement to judgment as a matter of law "because there was insufficient evidence that GMC acted maliciously or wantonly, and the award is unreasonable and contrary to applicable law." (Doc. 257, ¶ 5(b).)  At trial, GMC made a Rule 50(a) motion requesting judgment in its favor with regard to punitive damages and asserted that there was "no evidence presented that they [sic] were aware that the [C]onstitution applied to them rightfully or wrongly." (Trial Tr., June 29, 57:25-58:1.) GMC now renews its request for judgment as a matter of law pursuant to Rule 50(b).

Primarily, GMC again argues that no evidence was presented that "GMC knew that dismissing [Ms.] Borrell for violating its policy could violate the Constitution", and there was no evidence suggesting that the GMC "employees[23] knew or may have known 'a hearing was required by the due process clause' in [Ms.] Borrell's case," and "[p]unitive damages are not available absent proof that the defendant knew 'it may be acting in violation of federal law.'" (Doc. 258, 13-14 (citing *Alexander,*  208 F. 3d at 43; *Cochetti*, 572 F.2d at 106; *Swipies*, 419 F. 3d at 718)) Specifically, GMC purports to not have known "it may [have] act[ed] in violation" of Ms. Borrell's constitutional rights, because the Chief Nursing Officer, tasked with "ensur[ing that] all Geisinger's clinical policies are applied consistently," "did not know that collaborating with Bloomsburg required GMC to enforce its policies any differently" and the Director of Human Relations was unaware that Ms. Borrell, as a student, was entitled to a hearing that GMC employees were not entitled to, because NAP students were defined as GMC

---

[23]    These employees are Mr. Richer, the NAP Director; Susan Hallick, the Chief Nursing Officer; and Brion Lieberman, the Director of Human Resources. (Doc. 258, 14 n. 3.)

employees. (Doc. 258, 14-15; 14 n. 4.)[24]

In *Cochetti*, the Third Circuit held that punitive damages, although permissible, were not warranted on the plaintiff's due process claim and granted summary judgment in favor of the defendants. 572 F.2d at 106. The plaintiff alleged he was impermissibly dismissed, without a pre-termination hearing, from his position as a special investigator after an alleged violation of a duty of confidentiality. 572 F.2d at 106. The court reasoned that because the plaintiff failed to allege that the defendants knew a pre-termination hearing was required, while also failing to allege that the defendants had any doubt about the validity of the confidentiality policies, the plaintiff would only be entitled to punitive damages if he showed that "the defendants acted in reckless disregard of whatever civil rights were allegedly infringed." *Id.* The court found that the plaintiff failed to allege reckless disregard for his rights[25] and the defendants were reasonable in believing that a "post-suspension grievance-arbitration proceeding afforded all the due process the law required, and that the confidentiality regulations were valid." *Id.* GMC contends that, like the defendants in *Cochetti*, it also believed in the validity of Geisinger's policy and the Collaboration Agreement and that both promoted patient safety; therefore, punitive damages are not warranted. (Doc. 258, 14.)

GMC also cites to *Morse v. Philadelphia Housing Authority*, 2003 WL 22097784 (E.D.

---

24

GMC also argues "[i]t is difficult to rationalize how GMC acted with requisite knowledge and intent to maliciously or wantonly violate [Ms.] Borrell's Constitutional rights when its primary actor, [Mr. Richer]," was not found to have acted in such a manner and if Mr. "Richer's actions were not tainted by the intent necessary to warrant punitive damages, then neither is GMC's 'ratification' of those actions." (Doc. 258, 14.) However, simply because the jury did not deem Mr. Richer's conduct sufficient to impose punitive damages liability on him does not automatically lead to the conclusion that GMC should also not be liable. Mr. Richer was not the only GMC employee from which the jury heard testimony.

25

Notably, Ms. Borrell alleged reckless disregard in her amended complaint (*See* Doc. 21, ¶ 107.)("The defendants' conduct was recklessly indifference to Ms. Borrell's constitutional rights and therefore warrants the imposition of punitive damages.")

Pa. Aug. 12, 2003), where a plaintiff who was denied a pre-eviction hearing requested punitive damages. *Id.* at * 6. The court denied the plaintiff's request reasoning that the defendant did not act with "reckless disregard for the plaintiff's federal housing rights" because the defendant had a plausible reason for believing that [the] plaintiff would be unlikely to continue to receive housing from" the housing authority. *Id.*

Contrary to GMC's position , there was evidence from which a reasonable jury could conclude that the GMC employees acted in reckless disregard of Ms. Borrell's constitutional rights. Unlike in *Cochetti* and *Morse*, the evidence supports an award of punitive damages in this case because it was reasonable for the jury to conclude that GMC knew that due process was required when an NAP participant was to be terminated, however, no process was provided to Ms. Borrell. There was evidence that a grievance policy existed for both the NAP and Bloomsburg. (Trial Tr., June 24, 32:4-10.) Mr. Lieberman testified that Geisinger employees have a mechanism to challenge a termination but students do not; however, NAP students were also considered employees. (*Id.* at 156:5-10; 190:3-5.) Ms. Hallick's testimony revealed that there was also some type of grievance procedure for Geisinger employees. (*See* Doc. 279-15, 10.) The jury also heard that Mr. Richer knew of a grievance policy that applied to the NAP that was contained in the student manual; and that he drafted both the student manual and the NAP manual.[26] (*Id.* at 31:13-32:5.) Mr. Richer also stated that the manual received by those in the NAP came from Geisinger. (*Id.* at 32:4-5.) Mr. Richer also affirmed that "specific pages of the various review processes available" were included with Ms. Borrell's termination letter. (*Id.* at 76:7-9.)

Ms. Borrell and, later, her attorney, made requests for due process. (*See* Docs. 279-19; 279-20; 279-22; 279-23.) Mr. Lieberman was copied or sent emails by Mr. Richer which

---

[26] Mr. Richer testified the NAP manual was not provided to the students.  (Trial Tr., June 24, 31:13-32:5.)

notified recipient that Ms. Borrell was requesting due process. (*See* Doc. 279-20; Doc. 279-22; Doc. 279-24.) Ms. Hallick was also informed that Ms. Borrell wanted to challenge her termination on September 26, 2012. (Doc. 279-21.)

Based on inclusion of the grievance policy pages in the termination letter and the evidence presented at trial that there were various procedures written into student manuals and handbooks to provide due process to them and also Geisinger employees, the jury could reasonably have concluded that GMC acted with reckless disregard for Ms. Borrell's constitutional rights. Additionally, the jury heard from multiple witnesses that Ms. Borrell requested that she be provided her due process rights but no such process was provided. Based on the record, the jury could have reasonably concluded that GMC acted "in the face of a perceived risk that [its] post-removal actions violated federal law", and that determination was not unreasonable. Therefore, the request for judgment as a matter of law based on a lack of evidentiary support for the punitive damages award will be denied.

### 2. *Gore/Campbell* Factors

I will next consider GMC's position the  amount of punitive damages awarded in this case was unreasonable and therefore, judgment as a matter of law in its favor is warranted. (Doc. 258, 17.) "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 188 (3d Cir. 2007) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513 (2003)). The Supreme Court has set forth the following guideposts to be considered when reviewing a punitive damages award: "the degree of reprehensibility"; "the disparity between the harm or potential harm suffered" and the "punitive damages award"; and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99, 134 L. Ed. 2d 809 (1996). The

Supreme Court further expanded on the guidance provided in *Gore* in *Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521, and stated that courts are instructed:

> to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

(internal citations omitted). I will address the *Gore* and *Campbell* factors and the reasonableness of the award in turn.

### a.   *Reprehensibility*

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell,* 538 U.S. at 419, 123 S. Ct. 1513 (citing *Gore,* 517 U.S., at 575, 116 S.Ct. 1589. )

As to the first two *Campbell* factors,  GMC asserts that Ms. Borrell suffered no physical harm and"GMC's actions were not indifferent or in reckless disregard for the health or safety of others."  (Doc. 258, 16.) Ms. Borrell does not contest these assertions. (*See* Doc. 279, 35.) Therefore, these factors do not support a punitive damages award.

Next, GMC contends Ms. "Borrell did not show any special financial vulnerability or that she was 'targeted" based on financial vulnerability (Doc. 258, 16-17.), but Ms. Borrell argues she was in a financially vulnerable position because she was unable to maintain outside employment while enrolled in NAP,  incurred student loans and relied on credit cards. (Doc. 279, 35 n. 11.) "The infliction of economic injury when done intentionally through affirmative

acts of misconduct or when targeted at a financially vulnerable person may warrant a substantial penalty." *Ojeda- Rodriguez v. Zayas*, 666 F. Supp. 2d 240, 265 (D.P.R. 2009) (citing *Gore,* 517 U.S. at 577, 116 S.Ct. 1589.). Arguably, Ms. Borrell was in a financially vulnerable position because she was an NAP student, unable to seek outside employment. However, this factor is neutral because there is no evidence Ms. Borrell was specifically targeted in order to exploit her financially.

GMC asserts that it "did not act with intentional malice, trickery or deceit," but rather, "simply did not 'kn[o]w such a hearing was required by the due process clause.'" (Doc. 258, 17.) Ms. Borrell makes a point to argue that the "jury was entitled to conclude that GMC's purported lack of knowledge [of constitutional obligations] was false" and argues that GMC lied to Ms. Borrell, terminated her without necessity under Geisinger's drug and alcohol policy and "pretended it was being fair by including due process procedures with the termination letter, but that was simply window dressing on the termination letter." (Doc. 279, 34-35.) Further, Ms. Borrell contends that despite GMC's insistence at trial, Ms. Borrell was not told directly that she would be terminated for failing to take a drug test and if she had, she would have taken the test. (*Id.* at 36.) As discussed above, there was evidence from which the jury could have concluded that GMC knew that a hearing, or at least some type of process, was required when an individual is terminated, whether it be a student or an employee. Further, the various drafts of the termination letter do not state that Ms. Borrell was told she would be terminated based on her refusal to take a drug test, just that she would be subject to "disciplinary action." (*Compare* Docs. 279-16; 279-17; 279-18.)  Additionally, the fact that enclosed with the letter were pages describing a review process,[27] purportedly available to

---

[27]

GMC contends that the pages were included by Dr. Ficca and not GMC and therefore, are not appropriately considered in the punitive damages analysis. (Doc. 293, 17.) However, Ms. Borrell was terminated by GMC and Bloomsburg and included with the termination letter

a student such as Ms. Borrell, and a copy of a Drug and Alcohol policy that did not mandate termination, could have led the jury to view GMC's actions as done with intentional malice, trickery or deceit.  This factor weighs in favor of Ms. Borrell.

GMC argues its conduct was isolated as it never before had to enforce its Policy against an NAP participant. (Doc. 258, 17.)  However, the conduct of GMC was not limited to a single encounter or a single day;[28] the "saga" as Mr. Richer[29] deemed it, carried on for several weeks. (*See* Doc. 279-22.) There was evidence that GMC continued to fail to provide due process despite being sent a letter on October 3, 2012, by Ms. Borrell's attorney at the time, demanding various review procedures and a warning that refusal to provide such deprived her "of her Fourteenth Amendment Due Process rights." (Doc. 279, 34 (citing Doc. 270-23.)) However, GMC contends that an after-the-fact letter cannot "retroactively impute knowledge to GMC's actors at the time of their decision." (Doc. 293, 18.) GMC also argues that the letter was addressed to Bloomsburg, not GMC, and therefore not fairly considered with regard to its knowledge of the violation of due process. (*Id.*) Also, as Ms. Borrell contends, presently "GMC refuses to acknowledge its violation of Ms. Borrell's constitutional

---

was Geisinger's Drug and Alcohol Policy which all defendants contend required termination, despite its lack of such a mandate. Therefore, the pages are appropriately considered.

[28]

I am well aware of the Third Circuit's statement in *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 232 (3d Cir. 2005), that the repeated actions of a defendant with regard to the one plaintiff are relevant, although less forceful, than repeated actions involving multiple individuals. However, in *CGB Occupational Therapy,* 499 F.3d 184, the Third Circuit clarified that "[r]epeated misconduct is probative of reprehensibility when the tortfeasor knows or suspects that his pattern of behavior is unlawful, regardless of whether that knowledge stems from a special legal relationship with the victim. While the weight to be given the factor may vary, its relevance remains." *Id.* at 191 n. 3.

[29]

GMC contends this cannot be considered because the jury refused to impose punitive damages liability on Mr. Richer. (Doc. 293, 16.) However, as stated, simply because the jury determined that Mr. Richer's individual conduct did not warrant the imposition of punitive damages, the jury was not precluded from considering his actions in conjunction with the other GMC employees.

rights or that it has constitutional obligations with respect to its collaboration with Bloomsburg University." (Doc. 279, 36.)  The conduct in this case may have been limited to one student, but it was not an isolated incident; it involved repeated actions denying due process after leading Ms. Borrell to believe she had some type of recourse. This factor favors Ms. Borrell.

b.    *Disparity and Civil Penalties*

GMC states and reiterates that it does not believe that the ratio of compensatory to punitive damages is an appropriate factor for consideration "because the compensatory damages award itself is unsupported by the record." (Doc. 258, 18; Doc. 293, 20.) Ms. Borrell argues that there is a lack of disparity between the actual or potential harm suffered, *i.e.* the compensatory damages award, and the punitive damages award because there is a 2.65 to 1 ratio between the awards and similar ratios have been upheld. (Doc. 279, 37.) "Although the Supreme Court has not adopted, or, for that matter, prohibited a particular mathematical ratio of punitive to compensatory damages, it has indicated that 'an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'" *In re Bayside Prison Litig.,* 331 F. App'x 987, 993 (3d Cir. 2009) (citing *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)*; Willow Inn,* 399 F.3d at 233). With regard to disparity, because I will order a remittitur on compensatory damages and for the reasons discussed below, I will order a remittitur of the punitive damages award to $750,000.00, the resulting ratio will be 3:1 which is not so disparate as to be unreasonable.

Civil penalties were not a possibility in this case as agreed by both parties. (*See* Doc. 279, 38.)

### 3.    **Reasonableness**

GMC's position is that the award in this case falls in to the unreasonable category in light of the following Third Circuit decisions. (Doc. 258, 17-18.) In *Dee v. Borough of Dunmore,* 474 F. App'x 85, 86 (3d Cir. 2012)*,* the plaintiff was suspended without a hearing from his

position as assistant fire chief due to concerns about a lack of training. The plaintiff was reinstated and despite the confidential nature of the personnel action, notice of the suspension was published in the local newspaper. *Id.* The plaintiff brought suit alleging a violation of his procedural due process rights and the jury awarded punitive damages in the amount of $1,000.00 against each defendant. *Id.* at 87. Following trial, the punitive damages awards were vacated as the evidence at trial did not  show that the defendants had any animus against the plaintiff and their actions were not done with an evil motive; rather, at worst, the defendants were negligent in failing to provide the plaintiff with a hearing prior to his suspension. *Id.* at 89-90.

In  *Carroll v. Clifford Twp*., 21 F. Supp. 3d 398 (M.D. Pa. 2014), aff'd, 625 F. App'x 43 (3d Cir. 2015) (Mannion, J.), the plaintiff submitted an application to the township and its supervisors for signature in order to permit him to become a member of the Fraternal Order of Police.  *Id.* at 400. The application was never signed and the township police department disbanded. *Id*. The plaintiff brought suit and the jury determined that the plaintiff's First Amendment right to freedom of association was interfered with and awarded $ 1.00 in damages. *Id.* The jury's punitive damages award of $ 15,000.00 against the individual supervisor defendants was dismissed because the evidence demonstrated that the defendants, who refrained from signing the application until they were able to speak to the township solicitor, did not act with the required state of mind or degree of reprehensibility for an award of punitive damages, *i.e.,* the trial record lacked evidence of "malice, intent to harm, deceit or recklessness at play on the part of the individual defendants." *Id.* at 402-403.

In response, Ms. Borrell argues that relevant case law supports the jury's punitive damages award in this case. In *Bogle v. McClure*, 332 F. 3d 1347 (11th Cir. 2003),the Eleventh Circuit affirmed punitive damages awards of $ 2,000,000.00 to each of seven plaintiffs who a jury found were discriminated against due to race. *Id.* at 1360. The evidence at trial showed

that the defendants "knew it was a violation of federal law to transfer people on the basis of race" and were warned that their conduct could be potentially problematic. *Id.* In reviewing the case, the Eleventh Circuit stated that the defendants' intentional discrimination was more than a mere accident and therefore, the punitive damages award was upheld. *Id.* at 1361. Ms. Borrell also cites to *CGB Occupational Therapy,* 499 F.3d 184, where the district court reduced a punitive damages award from $ 30,000,000.00 to $ 2,000,000.00 on the plaintiff's tortuous interference with contractual relations claim. *Id.* at 186. The Third Circuit further reduced the award to $ 750,000.00 finding persuasive that the harm was economic rather than physical, the conduct was not the product of indifference or reckless disregard for the health and safety of others, and also because of the compensatory damages award in the amount of $ 109,000.00. *Id.* at 191-193.

Turning back to the current case, there was evidence from which the jury could reasonably have concluded punitive damages were warranted based on recklessness or deceit and not simply based on the conduct that warranted compensatory damages. Ms. Borrell was not told the basis for why a drug test was requested and Mr. Richer, when asked, stated that the request had nothing to do with Ms. Reilly. (Trial Tr., June 25, 65:5-7.) There was testimony at trial that Mr. Lieberman requested that Brenda Wands and Mr. Richer document any concerns they may have had about Ms. Borrell after the fact because no documentation existed as of September 24, 2012. (Trial Tr., June 24, 176:14-19.) There was also evidence at trial that the Mr. Richer expressed that Ms. Borrell's drug use concerns would have to be introduced if a grievance hearing were to be held and also commented that he was sorry about the "on-going saga." (Doc. 279-20; Doc. 279-22.) Further, as Ms. Borrell references at several points in her brief, the testimony at trial demonstrated that Ms. Hallick and Ms. Wands purportedly did not know that it was decided that GMC failed to provide constitutionally mandated due process (*See* Doc. 279, 36-37.), in addition to testimony from

Ms. Hallick that no changes had been made to Geisinger's policy since 2012. (Doc. 220-1, 151: 3-10.) The jury was able to consider the conduct of GMC and it is clear that the jury considered the conduct sufficiently culpable to warrant a punitive damages award. However, I will order a remittitur as an award of $ 1,100,000.00 is excessive based on the testimony and evidence presented. The subject conduct did not involve a disregard for the health and safety or others, nor were there any allegations regarding physical harm.

Therefore, in light of the purposes of punitive damages, *i.e.,* to punish a defendant for a malicious or wanton violation of the plaintiff's federal rights, or to deter the defendant and others like the defendant from doing similar things in the future, or both, an award of $ 750,000.00 is an award appropriate to both punish and deter similar future actions. Therefore, Ms. Borrell is to remit $ 350,000.00 of the amount awarded or elect a new trial on the issue of punitive damages. An award of $ 750,000.00 would be an award three times that of the remitted compensatory damages award. Such a multiplier is within reason and supported by the testimony in this case.

### c.    New Trial

GMC also argues that Ms. Borrell's entitlement to punitive damages is against the great weight of the evidence, therefore, it contends that a miscarriage of justice has occurred, mandating a new trial. (Doc. 258, 21.) "Where a new trial is sought on the grounds that the jury's verdict was against the weight of the evidence, the court may grant the motion 'only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Reynolds v. Univ. of Pennsylvania*, 684 F. Supp. 2d 621, 627 (E.D. Pa. 2010), aff'd, 483 F. App'x 726 (3d Cir. 2012)(citing *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991). "This high standard provides due respect for the jury's primary function as factfinder." *Reynolds* 684 F. Supp. 2d at 627(citing *Otos Tech., Co., Ltd. v. OGK America, Inc.*, No. 03–1979, 2007 WL

2374995, at *3 (D.N.J. Aug. 13, 2007);  *Hurley v. Atlantic City Police Dep't.*, 933 F.Supp. 396, 403 (D.N.J.1996)). As demonstrated by the foregoing discussion, the verdict is not against the weight of the evidence and therefore, if Ms. Borrell accepts the remittitur, a new trial is not warranted on the issue of punitive damages.

## 2.    Qualified Immunity

Mr. Richer requested that he be granted qualified immunity during trial arguing that a reasonable officer in his position would not have known that his conduct was unlawful, and, therefore, "it would [not] have been clear to him that there was some type of constitutional implication or deprivation in his situation." (Trial Tr., June 29, 75:2-4.) I denied Mr. Richer's request. (*Id.* at 75:22-23.)  Mr. Richer now renews his motion and asserts, that although not raised at summary judgment (Doc. 258, 19.)[30] Ms. Borrell contends that Mr. Richer has waived the defense of qualified immunity because I decided liability prior to trial when ruling on the motions for summary judgment and it would be fundamentally unfair to permit Mr. Richer to raise the defense of qualified immunity following a liability determination. (Doc. 279, 41.) Mr. Richer argues that he did not waive the defense as it was pled as an affirmative defense in his answer and also that he properly raised the issue at trial. (Doc. 258, 19-20; Doc. 293, 21-22.)

Mr. Richer asserts he has the ability to raise the issue of qualified immunity "at any point in the proceeding, including at trial." (Doc. 258, 19.) Qualified immunity can in fact be raised during trial. (*See* Doc. 258, 19 (citing *Adamo v.* Dillon, 900 F. Supp. 2d 499 (M.D. Pa. 2012) (Rambo, J.) ( *Adams v. City of Philadelphia,* 1996 WL 138092 (E.D. Pa. 1996)). However, the fact that the defense can be raised at trial in certain circumstances does not end the inquiry.

While it is true that the defense of qualified immunity is not necessarily waived when not raised at the motion to dismiss or summary judgment stages, this case is different.

---

[30] See *Borrell II*, 63 F. Supp 3d at 455 n. 15.

"[Q]ualified immunity protects government officials 'from *liability* for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))(emphasis added). The question at trial for the jury to decide was not whether Mr. Richer had violated Ms. Borrell's constitutional right to due process; that issue was decided in Ms. Borrell's favor at the summary judgment stage. The issue the jury was to decide was what amount of damages Ms. Borrell was entitled to receive based on the denial of due process. Mr. Richer waived the defense of qualified immunity by failing to raise it before liability was determined, therefore, his motion for judgment as a matter of law will be denied.

### 3.    Evidentiary Rulings

The Geisinger Defendants argue entitlement to a new trial and urge that error should now be found in "certain rulings that affected [its] substantial rights." (Doc. 258, 22.) Specifically, the Geisinger Defendants contend that "[b]efore and during trial, [Ms.] Borrell moved to exclude certain evidence that was probative to the Geisinger Defendants' motivations for their actions and other NAP nurses' understanding of the consequences for refusing to take drug tests, [and] bear respectively on punitive and compensatory damages." (*Id*.) As addressed below, because I find that the rulings were not erroneous, or, if erroneous, not prejudicial, I will deny the Geisinger Defendants' motion for a new trial based on error.

### a.    Legal Standards

When a motion for new trial is predicated on a ruling that initially rested within the discretion of the trial court, such as an evidentiary ruling, the district court's latitude is broad. *See, e.g., Klein*, 992 F.2d at 1290 (citing *Bhaya v. Washington Elec.Corp.,* 922 F.2d 184, 187(3d Cir. 1990)). "[A] District Court must first determine whether an error was made, and must then determine 'whether that error was so prejudicial that refusal to grant a new trial

would be inconsistent with substantial justice.'" *Jackson v. City of Pittsburgh*, 2011 WL 3443951, at *8 (W.D. Pa. Aug. 8, 2011) (citations omitted). "With respect to the determination of prejudice under the second prong, 'a new trial must be granted unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights.'" *Reynolds*, 684 F. Supp. 2d at 627 (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601-02 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990); *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 928 (3d Cir.1985)).

### a.    Other Nurses' refusals to take drug tests

The Geisinger Defendants contend the first prejudicial evidentiary error was the exclusion of evidence that "GMC terminated four other nurses who refused to take drug tests." (Doc. 258, 22.) This evidence was excluded after the filing of a motion *in limine* by Ms. Borrell and the Geisinger Defendants opposition thereto. (Docs. 159; 161; 181; 184.) I ruled that the evidence was to be excluded because "their terminations are not probative of whether [Ms.] Borrell would have been dismissed even if she was afforded the procedural protections required by the Due Process Clause." (Doc. 207, 5.)

The Geisinger Defendants now argue that this evidence "would have shown how GMC believed it was treating [Ms.] Borrell fairly and consistently with the process it uses when *any* nurse refuses to take a drug test because of the gravity of such a refusal." (Doc. 258, 23.) Further, "[w]ithout evidence regarding other nurses who refused to take drug tests, the jury could not fairly judge GMC's state of mind on the seriousness of Borrell's refusal, the need for consistency in applying its Policy across a highly-regulated environment, and the reasons why refusing a drug test was 'non-grievable'". (Doc. 258, 24.)

"In the context of a decision to admit or exclude evidence under Federal Rule of Evidence 403, an abuse of discretion exists where that decision is shown to be 'arbitrary and irrational.'" *Supinski v. United Parcel Serv., Inc.*, 2012 WL 2905381, at *8 (M.D. Pa. July 16,

2012) (citing *Winters v. Marina Dist. Dev. Co.*, 317 F. App'x 286, 288 (3d Cir.2009); *Bhaya*, 922 F.2d at 187 (3d Cir.1990)). The exclusion of evidence of the other nurses' terminations was neither arbitrary nor irrational. How GMC applied its policies to other nurses is not relevant to the denial of process Ms. Borrell was due. Additionally, the Geisinger Defendants' contention that the jury's determination that Ms. Borrell would have been dismissed regardless of process makes the evidence relevant because there is nothing to suggest that the outcome for the other nurses would have been different if they had been provided process, is without merit. (*See* Doc. 258, 23.) Even if both Ms. Borrell and nurses would have been dismissed regardless of process, the evidence was sufficient to establish the core claim that Defendants did not provide Ms. Borrell the process she was due.

The exclusion of the evidence was not in error because the fate of other nurses is not relevant and, even if relevant, would have been unfairly prejudicial to Ms. Borrell because it could confuse the issues for the jury. The Third Circuit has recognized that "a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. That is, evidence may be excluded if its probative value is not worth the problems that its admission may cause . . . ." *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002).

Further, I disagree that the jury was unable to assess GMC's state of mind with regard to Ms. Borrell without testimony on other nurses' dismissals. The jury heard that the collaboration between GMC and Bloomsburg did not lead GMC to believe it was to apply its policies differently. (Doc. 220-1, 152:8-12.) Mr. Lieberman also testified that "I work for Geisinger, it's a private employer, I'm familiar with administering policies and was not aware of-was not aware of any constitutional rights." (Trial Tr., June 24, 196:13-16.) I find it necessary to comment that the Geisinger Defendants' insistence on the importance of the application of its policy for refusing to take a drug test is not the issue in this case. The jury

found that Ms. Borrell's termination would have been warranted. The Geisinger Defendants, however, fail to recognize that if the policy called for dismissal, the Constitution required that they provide notice of the reasons and an opportunity to be heard. That did not happen. The exclusion of the evidence was not erroneous and the request for a new trial will be denied.

### b. NAP students who would have taken a drug test under similar circumstances

The Geisinger Defendants' second assignment of prejudicial evidentiary error was exclusion of "evidence that other NAP nurses in [Ms.] Borrell's situation would have taken the drug test." (Doc. 258, 24.) The Geisinger Defendants contend exclusion was improper "because it is highly relevant to compensatory and punitive damages", and the "evidence would have shown: (1) what was reasonably expected of the NAP students, (2) drug testing is a professional obligation of a licensed nurse, [and] (3) drug testing is for staff and patient safety." (*Id*.)[31] Further, the Geisinger Defendants argue the exclusion was clearly prejudicial because the jury should have been able to weigh this evidence against a finding that GMC acted with malice "because it shows that reasonable NAP students would not have expected a hearing after refusing to take a drug test," while speaking to the context and motivations behind the decision to dismiss Ms. Borrell. (Doc. 293, 23-24.) Exclusion purportedly allowed Ms. Borrell to "create the false impression that even though her dismissal was justified, it was aberrant and unexpected" (Doc. 258. 25.)

This evidence was also the subject of a motion *in limine*. (Doc. 158) I ruled that the evidence was irrelevant and was to be excluded because hypothetical "[o]ther students'

---

[31]

Ms. Borrell contends that the Geisinger Defendants failed to advance the same relevancy arguments when opposing her pretrial motion *in limine,* thereby amounting to a waiver. (Doc. 279, 45.) The Geisinger Defendants argue that no waiver occurred as similar arguments were raised both in opposing Ms. Borrell's motion *in limine,* as well as during trial, and Ms. Borrell fails to support her position with case law. (Doc. 293, 23-24.) I will not address this issue in more depth as the exclusion of the evidence was not in error.

willingness to initially submit to a drug test and/or what they would have done. . . has no bearing on whether additional process would have changed the outcome for [Ms.] Borrell." (Doc. 207, 4.) Additionally, I stated whether or not other students would have taken the test is not relevant to the issue of punitive damages. (*Id.*)

The evidence is not relevant and, therefore, it was not error to exclude it. This is further supported by the jury's determination that Ms. Borrell would have been dismissed regardless of process. I disagree with the Geisinger Defendants that the jury was not provided the appropriate context in order to make a punitive damages determination. The context of this case was limited to the actions by GMC with regard to Ms. Borrell, not with regard to hypothetical students. It is clear the jury understood the severity of Ms. Borrell's failure to take a drug test, however, they also determined that even in light of that failure, GMC's failure to provide due process was done in a way that maliciously or wantonly violated Ms. Borrell's constitutional rights. The exclusion of this evidence was not erroneous and it was not only not relevant, but would have been unfairly prejudicial to Ms. Borrell.

### c.    CRNA training video

Next, the Geisinger Defendants contend that it was prejudicial error to exclude a training video about an anesthesiologist with a substance abuse problem that was shown to the NAP students during orientation because "it is highly relevant to the parties' state of mind and punitive damages." (Doc. 258, 25.) It was argued at trial that the video was relevant under Federal Rule of Evidence Rule 401 because "it goes to the mind set of whether or not a nurse should be taking a test, whether or not in terms of the hearing, the policy for whether or not there's been reasonable substance abuse or use, how that term is defined." (Trial Tr., June 22, 6:20-25.) The Geisinger Defendants now argue that the video, if admitted "would have contextualized GMC's motives for enforcing its Policy by showing how easily non-enforcement could undo GMC's attempts to encourage compliance and avoid similar tragedies", "show why

GMC has a zero tolerance Policy", and why it requires "all nurses to take drug tests when it determines reasonable suspicion exists." (Doc. 258, 25.) Without the video, "the jury lacked key information about GMC's perspective" and was not permitted to weigh the video as an indicator of GMC's state of mind." (Doc. 258, 26.)

The video was excluded as not relevant. (Trial Tr., June 22, 7:15-16.) The video continues to lack relevance. A video regarding the dangers of addiction does not explain or provide context for why GMC failed to provide Ms. Borrell due process. As I stated, GMC has every right to enforce its policy, but enforcement had to be achieved within constitutional parameters. It was not error to exclude the video as irrelevant.[32] I fail to see how a training video about an unrelated doctor who had a substance abuse problem explains *"why* GMC acted the way that it did" in failing to provide Ms. Borrell due process. (Doc. 293, 24.) (emphasis in original). Moreover, Geisinger Defendants' position seems to suggest that the failure to take a drug test obviates the need to due process.

### d.    Susan Hallick's testimony[33]

The Geisinger Defendants take issue with the exclusion of certain parts of the Chief Nursing Officer Susan Hallick's videotaped trial deposition, arguing that the jury was "provided a lopsided view of [Ms.] Hallick and was left "without critical facts that informed GMC's actions with regard to [Ms.] Borrell", "result[ing] in substantial injustice to GMC" and warranting a new trial. (Doc. 258, 26.) Discussed below are the three areas of testimony the Geisinger

---

[32]    The Geisinger Defendants argue in reply that Ms. "Borrell is estopped from arguing the video is irrelevant because she repeatedly attacked Lindsey Reilly's motivations for reporting [Ms.] Borrell's cocaine use as well as GMC's motivations for reacting to Reilly's report instead of interrogating her" and "[t]he video helps explain (i.e., is relevant to) both. . . " (Doc. 293, 24.) I fail to follow the Geisinger Defendants' reasoning.

[33]    Ms. Hallick's testimony was offered through a video trial deposition. (*See* Doc. 220-1) The parties submitted the respective positions on the objections raised during the deposition. (Docs. 220-221) I ruled on the objections on June 23, 2015. (*See* Trial Tr., June 23, 3:2-6.)

Defendants argue should have been played to the jury. (Doc. 258, 26.)

### 1.      Licensing requirements and illegal activity

First, the Geisinger Defendants argue that the exclusion of Ms. Hallick's testimony on "the character requirements for becoming a CRNA" and about "how 'illegal activity' can impact nursing licensing" was error because the testimony was relevant to damages and state of mind. (Doc. 271, 39.)[34] Ms. Borrell continues to assert that the evidence is not relevant, and the fact that the jury found that Ms. Borrell would not have been maintained in the program regardless of process, makes her ability to become a CRNA moot. (Doc. 279, 47.) The Geisinger Defendants reply the fact that "GMC investigates even *anonymous* reports of drug use by nurses shows that GMC had even more reason to act upon Ms. Reilly's report without interrogating Ms. Reilly or violating her confidentiality, both which decisions Borrell continues to make relevant in the parade of terribles allegedly justifying punitive damages." (Doc. 293, 25.) (emphasis in original).

The objection to the testimony was that is was not relevant. (Doc. 220, 2.) The objection was sustained. (Trial Tr., June 23, 5:24-25:1.) I fail to now see how the requested testimony

---

[34]

According to the Geisinger Defendants' reply, Ms. Borrell made this testimony "relevant by fussing over GMC's verification that she never diverted drugs" and that she "mischaracterized the verification as an attempt to 'find some other negative information about Ms. Borrell' in the weeks after the dismissal." (Doc. 293, 25.) The Geisinger Defendants contend that "[w]ithout [Ms.] Hallick's explanation of GMC's requirements for reporting illegal activity, GMC was unable to explain why it needed to verify [Ms.] Borrell's non-involvement in drug diversion." (*Id.*) The Geisinger Defendants failed to argue this basis in their opening brief, and I note that the argument was not raised in response to objections made during the deposition. (*See* Doc. 221, 3.)

Regardless, Mr. Lieberman was asked by counsel to expand on the reasons for requesting drug testing and addressed drug diversion, stating: "And then there is what we call drug diversion, Geisinger has a lot of different drugs, narcotic drugs that could go missing. Because our employees are responsible for them. And if drugs go missing and we can't adjudicate, find out where they are, we'll test the people who had access to the drugs. Those are the main reasons." (Trial Tr., June 24, 193:12-17.) This testimony provides context. Therefore, even if the evidence was erroneously excluded, the error was harmless.

is relevant to the issues at trial. Despite the Geisinger Defendants' insistence, the issue is not whether it was right or wrong to ask Ms. Borrell to take a drug test. The issue is the fact that she was dismissed from the program for not taking a drug test and without being provided any due process. Whether or not the request was warranted is not relevant to Ms. Borrell's damages, nor to the state of mind of the defendants with regard to the process she was constitutionally due. The jury found that Ms. Borrell would have been dismissed from the program regardless of the process provided; therefore, the exclusion of the testimony was not erroneous. The possible contextual relevance of issues of illegality and character was decided by the jury when they found Ms. Borrell would have been dismissed regardless of process.

## 2. GMC consistently applied its process

Next, the Geisinger Defendants contend that it was error to exclude the following testimony of Ms. Hallick because it was relevant to punitive damages and GMC's motives: (1) Ms. Hallick "was involved in reviewing decisions to drug test nurses" (citing Doc. 220-1, 33:4-6.); (2) "GMC applied its processes for drug testing nurses consistently" (citing Doc. 220-1, 43:11-15; 44:11-25); (3) "no other nurses, regardless of student or non-student status, has been able to treat patients at GMC after refusing to take a drug test" (citing Doc. 220-1, 33:4-6.); and (4) "the refusal to take a drug test at GMC results in termination." (citing Doc. 220-1, 33:4-6.) (Doc. 258, 27.) The Geisinger Defendants argued the relevance of the testimony prior to trial. (Doc. 221, 4-6, 8.) Currently, the Geisinger Defendants argue that it was erroneous to conclude that in the face of a due process violation "GMC's intent and motive did not matter" because a "defendant's reasonable belief in the validity of its policy, . . . is highly relevant to punitive damages," and exclusion of this evidence purportedly "prevented the jury from properly assessing GMC's motives, resulting in substantial injustice." (Doc. 258, 27-28.) Ms. Borrell counters that it is of no moment that GMC followed its policies because those policies were unconstitutional (Doc. 279, 48. ), but the Geisinger Defendants reply that "[t]he punitive

damages analysis presupposes a constitutional violation . . . [so] [t]he question is whether GMC knew it was violating [Ms.] Borrell's Constitutional rights" and "[t]he fact that GMC applied its policy consistently tends to show that it believed *its policy* and not the Constitution applied to [Ms.] Borrell as a nurse in its private medical facility." (Doc. 293, 26.)

The Geisinger Defendants and Ms. Borrell reference *Cochetti*, 572 F. 2d 102. (Doc. 258, 28; Doc. 279, 28; Doc. 293, 26.) As discussed above, the defendants in *Cochetti* were unaware of any problems with their confidentiality policy and believed "that the post-suspension grievance-arbitration proceeding provided all the due process the law required" therefore, there was no evidence that they were aware that they violated the plaintiff's rights. 572 F. 2d at 106. The current case differs from *Cochetti.*

As I stated previously, when ruling on the motions *in limine* and *supra* herein, GMC nurses were not entitled to the same constitutional due process protections as graduate students like Ms. Borrell. The Geisinger Defendants' reliance on *Cochetti* does not support their argument.  Despite belief in the policy's validity, evidence of the application of a policy in the same way to nurses who are not entitled to the same protections is not relevant and it would only tend to confuse the jury. The jury determined that Ms. Borrell would have been dismissed regardless of process; the testimony would only have again stated that GMC did not provide process to anyone and as that applied to Ms. Borrell that was unconstitutional.

The exclusion of evidence of consistent application of GMC's policy was not in error. The jury had the opportunity to assess GMC's motives through other testimony that demonstrated consistent enforcement as well as GMC's insistence that Geisinger's policy, not the Constitution, controlled. Ms. Hallick testified that no matter the circumstances, when asked, a registered nurse at GMC, needs to take a drug test. (Doc. 220-1, 47:22-48:9.) Further, Ms. Hallick and Mr. Lieberman both stated that they did not believe that the Constitution applied to GMC. (*See* Doc. 220-1, 149:22-150:1, 152:8-12; Trial Tr., June 24, 196:10-16.) The

exclusion of Ms. Hallick's these parts of Ms. Hallick's testimony was not in error.

### 3.      NAP's net worth and lack of profit

Third, the Geisinger Defendants contend that the exclusion of Ms. Hallick's testimony that the NAP does not make any money was error as this evidence is highly relevant for punitive damages. (Doc. 258, 28.)[35] According to the Geisinger Defendants, based on my prior ruling that GMC was a state actor only for purposes of its involvement with NAP, only the financial information of the NAP was relevant. (Doc. 258, 28.) It was purportedly also error to introduce evidence regarding the financials of Geisinger Health Systems, which is comprised of numerous hospitals beyond just GMC, because the scope of damages should not exceed the scope of liability, and the information provided should have been limited to GMC's involvement with the NAP and the NAP's budget; but, instead the jury was "given highly misleading and prejudicial information about finances which were not at issue." (Doc. 258, 29.) The permitted consideration of all of GMC's finances purportedly amounts to "bad law and substantial injustice for a non-profit hospital." (Doc. 258, 29.)

In a motion *in limine*, the Geisinger Defendants requested exclusion of the overall financials of Geisinger Health System and argued that there was no basis to pierce Geisinger Health System's corporate veil. (Doc. 198, 10.) Further, it was argued that admission of

---

[35] The Geisinger Defendants raise two separate issues: asserting first that the error was the exclusion of Ms. Hallick's testimony that the NAP does not make any money (Doc. 258, 28); then contending that "the court's ruling that all of GMC's finances could be considered for damages" was in error. (*Id.* at 29.) In reply, the Geisinger Defendants fail to mention Ms. Hallick's excluded testimony and argue that the it was erroneous to admit the overall financials because the Policy did not pierce the corporate veil, and second, that the ruling improperly shifted the burden to GMC to prove it is a separate entity from its third party company. (Doc. 293, 27.) Since the Geisinger Defendants' argument that my ruling on the admissibility of Geisinger Health Systems' assets "improperly shifted the burden to GMC to prove it is a separate entity from its third party parent" is being presented for the first time in reply and the Geisinger Defendants fail to cite any authority to support their position, I will not address this argument more fully.(Doc. 293, 27.)

evidence of Geisinger Health System's assets would "improperly extend liability to an entity that is not even a named defendant." (*Id.*) I deferred ruling on this motion until trial. (Doc. 208) At trial, the Geisinger Defendants argued that the Drug and Alcohol Policy stated that Geisinger Health System was the parent company, comprised of separate legal entities, and GMC was one of those separate legal entities. (Trial Tr., June 24, 246:23-248:3.)  I ruled that no basis had been provided to separate the NAP from GMC and declined to allow testimony that NAP was not a revenue source for Geisinger. (Trial Tr., June 23, 10:9-12:3.) The Geisinger Defendants indicated that testimony would be presented regarding the different entities of Geisinger Health System (Trial Tr., June 24, 247:25-248:19.), and I stated that any evidence could be presented to separate out the legal entities, thereby, leaving it to the to jury to make a determination. (*Id.* at 248:15-19.) However, the Geisinger Defendants did not present such a witness; further, Geisinger's own statistics do not separate the assets of the subsidiaries. (*See* Doc. 204-11, 54-57.) I am, however, mindful that, although sometimes relevant to a punitive damages assessment, a parent company's assets should not be admitted into evidence absent the naming of that parent company as a party. *See St. Croix Renaissance Grp., LLLP v. St. Croix Alumina, LLC*, 2010 WL 4723897, at *2 (D.V.I. Nov. 18, 2010)*;  Herman v. Hess Oil Virgin Islands Corp.*, 379 F. Supp. 1268, 1277 (D.V.I. 1974), aff'd, 524 F.2d 767 (3d Cir. 1975). And, because Geisinger Health System Foundation or Geisinger Health System was not a party in the current case, it was error to allow the assets of Geisinger Health System to be presented to the jury. Notwithstanding, the error was not so prejudicial as to affect GMC's substantial rights.  The punitive damages award, whether as awarded in the amount of $ 1,100,000.00, or $ 750,000.00 as remitted, does not unfairly punish GMC and is not unreasonable.

It was not, however, error to exclude evidence that the NAP made no profits from the collaborative program because it would have been confusing to the jury and would have been

unfairly prejudicial to Ms. Borrell. The Geisinger Defendants have argued countless times that their actions were appropriately taken as a private company. However, Geisinger entered into the collaborative agreement for the NAP as an entity. It cannot now attempt to segregate that piece of Geisinger when it is expedient to do so without providing evidence that such a division exists.

Because it cannot reasonably be said that substantial injustice resulted from the inclusion of Geisinger Health System's overall financials and it was not erroneous to exclude of Ms. Hallick's testimony on the NAP's lack of profits, a new trial is not warranted.

> **e.    Borrell's ability to obtain due process and potential reinstatement from this court**

The Geisinger Defendants contend that it was error to exclude evidence that Ms. Borrell hired an attorney and, initially sought, but later abandoned, a motion for a preliminary injunction. (Doc. 258, 29.) Being unable to present such testimony purportedly did not allow the Geisinger Defendants the opportunity to show good reasons for not communicating with Ms. Borrell directly, and while casting doubt on Ms. Borrell's injury resulting from the lack of a hearing. (Doc. 258, 29.) Ms. Borrell contends that the issue of whether or not she could have obtained injunctive relief was not an issue for the jury and even if the evidence was relevant to mitigation, economic damages for failure to be reinstated were not awarded by the jury. (Doc. 279, 51.) The Geisinger Defendants reply, that "[i]f the denial of due process was so damaging to [Ms.] Borrell, why did she abandon her opportunity for a hearing (and reinstatement) for a lawsuit on damages." (Doc. 293, 28.) It is also the Geisinger Defendants' contention that Ms. Borrell fails to "cite or offer any evidence suggesting she could not return to the NAP in 2013" and "[a]t minimum, she raises a question of *fact* regarding her damages, which was appropriate for trial." (Doc. 293, 28.) (emphasis in original).

At trial, the Geisinger Defendants sought to introduce evidence regarding Ms. Borrell's

withdrawn motion for a preliminary injunction. (Trial Tr., June 22, 9:23-11:7.) The issue was again raised at the conclusion of trial in the context of mitigation evidence and the Geisinger Defendants contended that because the evidence was not allowed, it was not "able to put on evidence about [Ms. Borrell] being able to seek reinstatement back in September 2012." (Trial Tr., June 30, 34:6-35:4.)

As I stated at trial, it was not clear how the evidence would be relevant to mitigation. (Trial Tr., June 30, 35:2-4.) Additionally, I agree that the presentation of the elements necessary for obtaining injunctive relief was not for the jury. Such testimony would certainly confuse the issues. The Third Circuit has "held that evidence may properly be excluded where 'its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issue.'" *Reynolds,* 684 F. Supp. 2d at 632 (*citing Blancha v. Raymark Indus.,* 972 F.2d 507, 516 (3d Cir.1992)) (citation omitted). The introduction of evidence about the request for a preliminary injunction certainly would fall into this category. Exclusion of such testimony was not in error.

This conclusion is bolstered by the fact that the jury did not award Ms. Borrell economic damages to compensate her for her dismissal from the NAP; only for the denial of due process itself. The jury determined Ms. Borrell would have been dismissed from the NAP regardless. Therefore, the issue is moot even if conceivably relevant to mitigation evidence and the Geisinger Defendants' request for a new trial on this basis will be denied.

###### f.    Requiring Mr. Richer to read Borrell's hearsay statements about her refusal to take the drug test

The final evidentiary issue the Geisinger Defendants raise is the purported erroneous ruling that the jury was to be shown, and Mr. Richer was asked to read, an email he received from Ms. Borrell. (Doc. 258, 30.) The Geisinger Defendants contend that allowing introduction of the email without adequately accounting for and considering prejudice to the Geisinger

Defendants under Federal Rule of Evidence 403, resulted in "substantial injustice" for the Geisinger Defendants" as the "email was self-serving, post-hoc hearsay about [Ms.] Borrell's meeting with [Mr.] Richer". (Doc. 258, 30.) Ms. Borrell counters that the email was not offered for the truth of the matter asserted but rather "was offered to show that Ms. Borrell attempted to communicate with defendants to try to be reinstated into the NAP, and that [Mr.] Richer refused to respond or communicate with her" and it was relevant to show the "immediate absence of due process, . . .the events leading to increasing distress for Ms. Borrell, and . . . [Mr.] Richer's and GMC's callousness." (Doc. 279, 51-52.) In reply, the Geisinger Defendants contend that Ms. Borrell admitted the email "as evidence of an 'attempt to communicate'" and "she offered it *exactly for what it asserts*", *i.e.,* that she made a call. (Doc. 293, 29) (emphasis in original). Further, the Geisinger Defendants argue "[a]t best, the email contains cumulative evidence, which was available through its author (Borrell) and not appropriately admitted through its recipient (Richer) for the obvious purpose of inflaming the jury." (Doc. 293, 29.)

Under Federal Rules of Evidence 801(c), hearsay is a statement made outside of the courtroom that a party offers to prove the truth of the matter asserted. "When a person's knowledge or state of mind is at issue, evidence that he has heard or read a statement may be relevant and it lies beyond reach of a hearsay objection." *Am. Bd. of Internal Med. v. Von Muller*, 2012 WL 2740852, at *11 (E.D. Pa. July 9, 2012), aff'd (Sept. 12, 2013)(citing *Brown v. D.O.C. Pennsylvania,* Civ. A. No. 05–347, 2007 U.S. Dist. LEXIS 49320 at *4 (W.D.Pa. July 9, 2007); *Bowers v. City of Philadelphia,* Civ. A. No. 06–3229, 2008 U.S. Dist. LEXIS 101563 at *17, 2008 WL 5210256 (E.D.Pa. Dec. 12, 2008)). Therefore, "whether a disputed statement is hearsay frequently turns on the purpose for which it is offered,' and '... courts have a responsibility to assess independently whether the ostensible non-hearsay purpose is valid.'" *Von Muller*, 2012 WL 2740852, at *11 (citing *United States v. Sallins,* 993 F.2d 344, 346 (3d Cir.1993)). During trial,  I stated I would allow the introduction of the email because Ms. Borrell

was going to testify. (Trial Tr., June 24, 78:1-10.)

Ms. Borrell offered the email as evidence of her efforts to contact GMC personnel to attempt to get back into the NAP. Mr. Richer was questioned following the introduction of the email and he received and read the email but that he did not respond to Ms. Borrell. (Trial Tr., June 24, 80:8-9.) Therefore, the email was properly introduced to demonstrate that Mr. Richer received and read the email. I do agree that the email should not have been shown or read to the jury by Mr. Richer because Ms. Borrell also testified about the email and about the calls she placed to Mr. Richer (*See* Trial Tr., June 25, 73:9-10; 69:20-23.) however, no specific objection was made when Mr. Richer was asked to read the email. (*See* Trial Tr., June 24, 78:23-80:7.) Currently, the Geisinger Defendants fail to expand on the prejudice that was allegedly suffered as a result of the publishing of the email. Simply stating that the email was admitted through Mr. Richer "for the obvious purpose of inflaming the jury" (Doc. 293, 29.) does not suffice. Even if it was error for Mr. Richer to be required to read the email into evidence, such error was harmless and did not affect the substantial rights of the Geisinger Defendants, therefore, the motion for a new trial will be denied.

### 4.      Ms. Borrell's Counsel's Closing Argument

The Geisinger Defendants request a new trial based on statements made during Ms. Borrell's counsel's closing argument.  (Doc. 258, 30.) According to the Geisinger Defendants, Ms. Borrell's counsel's statements equating punitive damages to damages to send a message about the Constitution's value, about the "relative value of various constitutional amendments", and counsel's questioning of what message an award of nominal damages would send about the importance of the Constitution, were erroneous because "they violate the Supreme Court's ruling that the abstract value of a Constitutional right may not form the basis for Section 1983 damages." (Doc. 258, 30-31.) Further arguing that the statements were "extremely prejudicial because they created the false impression that Defendants (or the jury would) devalue the

Constitution by asking for (or awarding) $ 1, when that is simply the amount of nominal damages available absent *actual injury or malicious intent.*" (Doc. 258, 31.)(emphasis in original) Ms. Borrell contends the Geisinger Defendants waived the ability to request a new trial after failing to object during trial. (Doc. 279, 52-53.) Notwithstanding waiver, Ms. Borrell argues that the Geisinger Defendants take the statements out of context. (*Id.* at 53-54.)

"[A] court may grant a new trial when counsel's closing argument refers to evidence not in the record or other extraneous matter if the court finds there is a "reasonable probability of influencing the verdict." *Price v. Trans Union, L.L.C.,* 839 F. Supp. 2d 785, 806 (E.D. Pa. 2012) (quoting *Ayoub v. Spencer,* 550 F.2d 164, 170 (3d Cir.1977)). "The number of improper remarks, whether they be of law or fact, is important in assessing whether counsel's conduct prejudiced a jury verdict." *Price,* 839 F. Supp. 2d at 806 (citing *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 208 (3d Cir.1992)). However, where a party fails to object to a closing statement at trial, the party waives the "right to move for a new trial on this ground, and the Court will not grant a new trial unless [counsel's] misconduct resulted in a miscarriage of justice." *Price,* 839 F. Supp. 2d at 806 (citing *Wilson v. Vt. Castings, Inc.*, 170 F.3d 391, 395-96 (3d Cir. 1999)). Accordingly, where an objection has been waived, the court reviews for only plain error and "[p]lain errors are those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Noble Biomaterials v. Argentum Med., LLC*, 2011 WL 4458796, at *5 (M.D. Pa. Sept. 23, 2011)(citing *Osei–Afriyie v. Med. Coll. of Pa.,* 937 F.2d 876, 881 (3d Cir.1991); *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

The Geisinger Defendants failed to object to Ms. Borrell's counsel's closing. Therefore, I will review the statements made during closing for plain error. The Geisinger Defendants state there is no controversy that the statements made by Ms. Borrell's counsel "were plainly erroneous under *Memphis Cmty. Sch. Dist. v. Strachura,* 106 S. Ct. 2537, 2543 (1986)", and

'[t]heir effect on the jury and its punitive damages award was noticeable." (Doc. 293, 30-31.) In *Strachura,* the court was reviewing jury instructions on compensatory damages that told jurors to "place a money value on the [constitutional] 'rights' themselves." 106 S. Ct. at 2543. The Supreme Court held that the instructions were erroneous because factors such as "the particular right's importance', "its role in American history", and "its 'significance . . .in the context of activities' in which [the plaintiff] engaged" "focus[ed], not on compensation for provable injury, but on the jury's subjective perception of the importance of constitutional rights as an abstract matter." *Id.* at 2543.

I agree that Ms. Borrell's counsel's statement "What message does that send about the importance of the Constitution?" was improper. However, in this case, unlike in *Strachura*, the jury was properly instructed on compensatory damages and that counsel's closing statements were not evidence. I do not find Ms. Borrell's counsel's remarks to have engendered sufficient prejudice necessitating the grant of a new trial, nor did the statements "seriously affect the fairness, integrity or public reputation of judicial proceedings." Therefore, the Geisinger Defendants' motion for a new trial on this issue will be denied.

**D.    Ms. Borrell's Motion for Attorney's Fees and Costs**

On July 9, 2015, Ms. Borrell filed a Motion for Attorneys' Fees and Costs (Doc. 245) with accompanying declaration, affidavits and exhibits (Doc. 247), and a brief in support (Doc. 248). Ms. Borrell requests an hourly rate of $ 450.00 for 1,235.25 hours by Attorney Barry Dyller, a $ 350.00 hourly rate for 38.50 hours by Attorney Shelley Centini, and an hourly rate of $ 200.00 for 433.25 hours by Attorney Theron Solomon. (Doc. 245, ¶ 3.) Ms. Borrell also requests a $ 130.00 hourly rate for 131.75 hours of work performed by a paralegal, Ms. Nancie Redmond and a $ 100.00 hourly rate for 38.50 hours performed by another paralegal, Ms. Tammy Kitzmiller. (*Id*.)  A request for costs and expenses incurred in the litigation totaling $ 17,821.26 was also made. (*Id.)* Ms. Borrell additionally requests $ 450.00 per hour for the

eleven (11) hours of work expended by Attorney Dyller in preparing the current motion. (*Id.*) The total amount of fees and costs initially requested was $699,736.26. In replying to defendants' motions in opposition, Ms. Borrell requested an additional amount of $ 92,939.72 for the hours purportedly expended opposing defendants' post-trial motions discussed *supra* herein. (Docs. 284, 34; Docs. 285, 38-39.)

Both Dr. Ficca and the Geisinger Defendants oppose Ms. Borrell's motion, objecting to Ms. Borrells' counsel and paralegals' hourly rates; the number of hours for which Ms. Borrell seeks compensation; and the request for costs purportedly incurred during the litigation. (Docs. 269- 270.) The defendants specifically object to the motion for attorneys' fees and costs on the following grounds: Ms. Borrell's requested hourly fees are not reasonable in the relevant legal community (Doc. 269, 12-21; Doc. 270, 14-22.); the amount of hours expended were not reasonable, excessive and/or duplicative or redundant (Doc. 269, 21-28; Doc. 270, 22-25.); and the asserted costs were unexplained and undocumented (Doc. 269, 29-30; Doc. 270, 26.). The defendants request that the rates and hours be reduced. (Doc. 269, 30; Doc. 270, 27.)

The defendants also argue that Ms. Borrell's motion is premature and judgment should be reserved until all post-trial motions and appeals have been decided.[36] (Doc. 269, 11;Doc. 270, 10.)  This argument will be quickly addressed as I believe a decision on the request is not premature. I, along with other courts in this district, have previously denied requests to stay decisions on attorneys' fees and costs while an appeal was pending.  *See e.g., McLaughlin*

---

[36]

      Dr. Ficca requests that the motion for attorneys' fees be stayed pending the outcome of the Third Circuit appeal (Doc. 269, 10.), but the Geisinger Defendants only request a stay until the resolution of the post-trial motions pending before me. (Doc. 270, 10.) I disagree with Dr. Ficca because the stay of the attorneys' fees petition until decision on the appeal could lead to piecemeal appeals which are disfavored. Further, in light the disposition of the various post-trial motions *supra* herein, the Geisinger Defendant argument is moot.

*v. Fisher*, 2008 WL 4210475, at *2 (M.D. Pa. Sept. 9, 2008)(citing *In re Unisys Corp. Retiree Medical Benefits ERISA Litigation,* 2004 WL 4287393, at *2 (E.D. Pa. 2007)); *see also McCloud v. City of Sunbury*, 2006 WL 449198, at *1 (M.D. Pa. Feb. 23, 2006). Dr. Ficca has failed to persuade me that a stay is appropriate in this case pending the appeal. Also, because all post-trial motions have been addressed herein, the request for a stay pending disposition of those motions is moot. Therefore, both requests will be denied.

### 1.   Legal Standard

Congress has provided that "[i]n any action or proceeding to enforce a provision of section[] . . . 1983, . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. " 42 U.S.C.A. § 1988. "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim and [t]he plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, . . ."*Farrar*, 506 U.S. at 111(citing *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2675 (1987)).

"The starting point for a court's determination of reasonable attorney's fees is to calculate the 'lodestar' by multiplying the number of hours reasonably expended by each attorney by a reasonable hourly rate."  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2014 WL 2860863, at *5 (M.D. Pa. June 23, 2014), amended, 2014 WL 2991813 (M.D. Pa. July 2, 2014), aff'd, 612 F. App'x 612 (Fed. Cir. 2015), and aff'd, 612 F. App'x 612 (Fed. Cir. 2015) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The lodestar calculation is presumed to be a reasonable calculation of attorneys' fees. *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir.1996).

"The opposing party may object to the lodestar calculation, calling into question either the reasonableness of the hourly rate requested or the reasonable hours expended." *Clarke v. Whitney*, 3 F. Supp. 2d 631, 633–34 (E.D. Pa. 1998). When objecting to the hours

expended, "the opposing party may request a reduction of the lodestar on the grounds that, *inter alia,* the hours expended on the litigation were excessive, redundant, or unnecessary."*Id.* (citing *Hensley,* 461 U.S. at 434.) (emphasis in original) A court can also reduce the number of hours "litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Dellarciprete,* 892 F.2d at 1183. The party opposing the request "has the burden of proving that it is appropriate [to adjust the lodestar], and if that burden is met, 'the lodestar amount may be increased or decreased at the discretion of the District Court.'" *Dee v. Borough of Dunmore*, 2013 WL 685144, at *4 (M.D. Pa. Feb. 25, 2013), aff'd, 548 F. App'x 58 (3d Cir. 2013) (quoting *Lanni v. State of N.J.*, 259 F.3d 146, 149 (3d. Cir.2001)). I will first turn to the hourly rates.

### 2.    Analysis

#### a.    Hourly Rate

To determine prevailing market rates, the court "should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) *(*citing *Dellarciprete*, 892 F.2d at 1183.)) A burden shifting analysis is applied to determine the rate. *See Evans v. Port Auth. of N.Y.,* 273 F. 3d 346, 261 (3d. Cir. 2001). The plaintiff bears the initial burden of establishing a prima facie case through the production of sufficient evidence demonstrating a reasonable market rate "for the essential character and complexity of the legal services rendered." *Smith v. Phila. Hous. Auth.,* 107 F. 3d 223, 225 (3d Cir. 1997). To meet its burden, the fee petitioner must "submit evidence supporting . . . the rates claimed" *Dellarciprete*, 892 F.2d at 1183 *(*citing  *Hensley,* 461 U.S.  at 433), consisting "of satisfactory evidence, 'in addition to [the] attorney's own affidavits,' ... that the requested hourly rates meet this standard.'" *Loughner,*  260 F.3d at 180 (citing *Washington* 89 F.3d at 1035; *Blum,* 465

U.S. at 895 n. 11.).

The party opposing the fee petition "then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee." *Dellarciprete*, 892 F.2d at 1183 (citing *Bell v. United Princeton Properties, Inc.,* 884 F.2d 713 (3d Cir.1989)) "Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections." *Dellarciprete*, 892 F.2d at 1183 (citations omitted).

### 1.    Attorney Dyller

Ms. Borrell seeks a rate of $ 450.00 per hour for Attorney Dyller. In support of the requested rate,  Ms. Borrell attaches Attorney Dyller's affidavit wherein he outlines his over thirty years of experience, since his law school graduation in 1985. (Doc. 247, ¶ 20.) In 1992, Attorney Dyller founded his current firm, which is known for handling civil rights cases, and since that time has handled thousands of cases, tried about one hundred cases, including countless civil rights cases. (*Id.*)[37] Attorney Dyller also reviewed some of his prior counsel fee awards in the Middle District:

- *Garbacik v. Janson,* 3:98-cv-0085: In June 2001, Judge Vanaskie found Attorney Dyller's rate of $ 250.00 to be reasonable.

- *Gorey v. Plymouth Township*, 3:01-cv-2243: In March 2004, counsel agreed to an hourly rate of $ 300.00 for Attorney Dyller.

- *Salitt v. Stankus,* 720 F. Supp. 2d 645 (M.D. Pa. 2010): Counsel agreed to Attorney Dyller's hourly rate in the amount of $ 375.00 and Judge Munley approved the amount.

(*Id.* at ¶ 20.) Attorney Dyller also references that, in 2006, the Bankruptcy Court for the Middle

---

[37]    Attorney Dyller also attested to the following: his involvement with the Civil Rights Section of the American Association for Justice, his civil rights lecturing experience, publication of several articles and two book reviews, that he has been named a "Super Lawyer" in Civil Rights every year from 2008 to 2015, and that he is "AV Rated" by Martindale Hubble. (Doc. 247, ¶ 20.)

District approved a rate of $330.00 per hour as a special litigation counsel and later raised the rate to $ 350.00 per hour. *(Id.* at ¶ 20.)

Mr. Borrell also attaches the affidavits of six attorneys. (*See* Doc. 247-7, 1-21.) Attorney Clifford A. Rieders states that

> the rates suggested by Mr. Dyller and his law firm do not seem out of line at all to me and, as a matter of fact are quite consistent with what attorneys would charge for a civil rights 1983 case in the Middle District of Pennsylvania, Wilkes-Barre area, Williamsport area . . . , and in any of the surrounding areas, if they were charging on an hourly basis.

(Doc. 247-7, 2.) Attorney Reiders further states that "Mr. Dyller's hourly rate and those of the other attorneys in his firm are fair and reasonable and consistent with what is charged for civil rights cases" (*Id.*), that Attorney Dyller's requested rate is justified "based upon what any other lawyer in the Middle District would charge trying a comparable case." (*Id.* at 7.) Attorney Reiders attests that because it is difficult to find attorneys who will take on civil rights cases, "handle them well, and take the considerable financial risk involved, the rates are not out of line with what is fair or is being charged by attorneys with comparable experience." (*Id.* at 4.) Attorney Reiders charges $ 550.00 per hour from his practice in Williamsport and has twelve (12) more years experience that Attorney Dyller. (*Id.* at 4.)

Attorney Devon Jacob describes his experience defending civil rights cases and the opening of his own plaintiff's civil rights in 2013.  (Doc. 247-8, 12.) Attorney Jacob states he charges $ 350.00 for civil rights cases litigated within Pennsylvania based on thirteen (13) years of experience. (*Id.* at 14.) Attorney Jacob states Attorney Dyller's fee is "more than reasonable, if not, toward the low end of reasonableness." (*Id.* at 15.) Attorney Enid Harris further, states that "[b]ased the nature of the litigation in which Mr. Dyller engages and upon my experience and knowledge of the market and the reasonableness of these charges for such services I believe . . .the rates competitive with the local market and not excessive." (Doc. 247-7, 20.)

Ms. Borrell also attaches affidavits from several other attorneys who attest to Attorney Dyller's expertise and credentials but fail to provide evidence of their rates if trying a civil rights case in the Scranton/Wilkes-Barre community, and do not provide the prevailing market rate for the relevant market. For example, Attorney Neil O'Donnell, who graduated two (2) years after Attorney Dyller, attests to Attorney Dyller's experience and his position as the "preeminent civil rights lawyer in Northeastern Pennsylvania", and states that "in his estimation, $ 450 per hour for a lawyer of Mr. Dyller's qualifications, skill set, judgment and experience is both reasonable and appropriate."(Doc. 247-7, 8-10.) However, he fails to state the prevailing market rate. Similarly, Attorney Robert Gonos, shares office space with Attorney Dyller and believes that the rate requested by Attorney Dyller "is very reasonable for an attorney of his experience, skill, and reputation", but fails to quantify the amount a practitioner is expected to receive in the Scranton/Wilkes-Barre community. (Doc. 247-8, 17-18.)

Dr. Ficca and the Geisinger Defendants challenge the hourly rate requested by Ms. Borrell arguing that she has failed to meet her prima facie burden of proof that the rates requested match the prevailing market rates in the Wilkes-Barre/Scranton community. (Doc. 269, 14;  Doc. 270, 9-16.) The defendants contend that the affidavits fail to demonstrate that Ms. Borrell's counsels' rates are consistent with prevailing market rates" and fail to state what the attorneys who prosecute Section 1983 cases actually charge in the Scranton/Wilkes-Barre community.  (Doc. 269, 15-16; Doc. 270, 16-17.) Specifically, the defendants take issue with Attorney Reiders's affidavit arguing that there is no statement that $ 550.00 per hour was ever awarded to him  (Doc. 269, 15.), and that he fails to clarify what attorneys actually charge for a civil rights 1983 case in Scranton/Wilkes-Barre (Doc. 270, 18.)

Dr. Ficca[38] responds to Ms. Borrell's motion with her own evidence of attorneys in the relevant community with lower rates than Attorney Dyller. (Doc. 269, 16-18.)  First, Dr. Ficca cites to the billing practices of Attorney John Dean[39] whose hourly rate is $ 315.00 but, for civil rights cases, his rate is generally negotiated with insurance carriers and set at $ 180.00 per. (Doc. 269, 16; Doc. 269-1) Attorney Harry Coleman states his belief that "an attorney in the Luzerne/Lackawanna County area would receive $ 350.00 per hour for this type of case." (Doc. 269, 17; Doc. 269-2) Attorney Michael Donahue has been litigating civil rights cases since 1977 and is paid a negotiated insurance carrier rate of $ 160.00 per hour while he bills private clients at $ 190.00 per hour[40] in the Luzerne/Lackawanna County area. (Doc. 269, 17; Doc. 269-3) Attorney Frank Lavery also states he charges a standard rate of $ 250.00 per hour for federal court litigation, without specifying what types of cases that this rate is charged for. (Doc. 269, 17; Doc. 269-4.) However, Attorney Lavery posits that, in his knowledge and experience, the  "prevailing hourly rate for a skilled attorney with the necessary legal experience . . . for the claims litigated . . .is in the range of $ 250.00 to $ 300.00 per hour for a partner and $ 150-$175 per hour for an experienced associate." (Doc. 269-4, 3-4.)  Ms. Borrell challenges Dr. Ficca's evidence as not relevant as all the attesting attorneys have represented defendants and their rates are agreed to with insurance companies. (Doc. 284, 13-16.)

In addition to the affidavits, Ms. Borrell attaches Community Legal Services ("CLS") of

---

[38]

The Geisinger Defendants also rely on the affidavits of Attorneys Dean, Coleman and Lavery. (*See* Doc. 270, 21-21; Docs. 270-1; 270-2; 270-3)

[39]

Attorney Dean graduated law school in 1995, ten years after Attorney Dyller. (Doc. 269-1, 3.)

[40]

Attorney Donahue fails to state the type of cases for which he charges $ 190.00 per hour. (Doc. 269-3, 3.)

Philadelphia attorneys' fees chart as a tool for comparison. (Doc. 247, ¶ 27; Doc. 247-8) However, this evidence fails to assist Ms. Borrell in meeting her burden.[41] I will not consider the CLS chart as it is not relevant to a determination of the prevailing market rate in the Middle District and more specifically to Wilkes-Barre. *See Souryavong v. Lackawanna Cty.*, 159 F. Supp. 3d 514 (M.D. Pa. 2016), reconsideration denied, No. 13 CV 1534, 2016 WL 3940717 (M.D. Pa. July 21, 2016) ("the CLS of Philadelphia . . . do[es] not speak to what the prevailing market rates are in the forum litigation, *i.e.*, the Middle District of Pennsylvania.").[42]

Ms. Borrell's recitation of Attorney Dyller's awards in other cases also fails to provide evidence of the reasonableness the requested rate. "[H]ourly rates previously set for a specific attorney by a court do not generally constitute record evidence," *Dellarciprete*, 892 F.2d at 1183–84(citing *Smith v. Phila. Hous. Auth.,* 107 F. 3d 223, 226 (3d Cir. 1997)), "unless the rates were set for the same attorney and for the same type of work over a contemporaneous period." *Dellarciprete*, 892 F.2d at 1183–84. Further, the only awards Attorney Dyller has offered that are relatively close in time were agreed to by the parties and not the product of a court's analysis. Therefore, such are not persuasive evidence of prevailing market rates.

I find that Ms. Borrell has failed to satisfy her burden of establishing a prima facie case that the requested hourly rates are consistent with prevailing market rates. "Reasonableness, . . . is not the standard. The standard is the prevailing market rate in the community." *See J.S.*

---

[41]

The defendants take issue with Ms. Borrell's reliance on this chart "as an inappropriate benchmark in this case and not sufficient evidence to justify the proposed rates." (Doc. 269, 18-19; Doc. 270, 16.)

[42]

Ms. Borrell replies to the defendants by attaching retention letters evidencing fee agreements entered into by Luzerne County. (*See* Doc. 284, 17; Doc. 284-6; Doc. 284-7; Doc. 285, 27-28; Doc. 285-4; Doc. 285-5.) However, these letters do not provide any information about the complexity of the cases, the experience of the counsel or any other relevant information. Similar to the CLS chart, the letters do not provide support for the requested rate for Attorney Dyller or the members of his firm and therefore, are not relevant and will not be considered.

*ex rel. Snyder v. Blue Mountain Sch. Dist.*, 2014 WL 1321116, at *6–7 (M.D. Pa. Mar. 31, 2014) (finding language of an affidavit stating requested fee was "in line with the rates charged and paid for attorneys of comparable experience in similarly sophisticated litigation. . ." is close to the applicable standard of "prevailing market rate")(Munley, J.). None of Ms. Borrell's affidavits indicate the "'typical/standard rate' charged by plaintiff civil rights lawyers" in the relevant community. *See Id.* Although Attorney Reiders and Harris indicate that the rates are "consistent" and "competitive" with the local market come close to stating the prevailing market rate, they fail to demonstrate through sufficient evidence, the reasonableness of Ms. Borrell's requested rate. (Doc. 247-7, 3; 20.) Further, Ms. Borrell has not submitted any evidence that $ 450.00 is the prevailing market rate that is *awarded* in the Scranton/Wilkes-Barre community in civil rights cases.

Ms. Borrell has failed to satisfy her burden. I must therefore, conduct my own analysis to determine what is a reasonable award. *See Carey v. City of Wilkes-Barre,* 496 F. App'x 234, 237 (3d. Cir. 2012)("If the plaintiff fails to meet her prima facie case, the district court has the discretion to determine what award is reasonable.")

Defendants contend that recent decisions in the Middle District "suggest an appropriate fee for experienced civil rights practitioners in Scranton/Wilkes-Barre market is between $ 250.00 and $ 350.00 per hour, but  request an hourly rate of $ 325.00 for Attorney Dyller. (Doc. 269, 18; Doc. 270, 22.); s*ee  Snyder*, 2014 WL 1321116, at *6–7(accepting Magistrate Judge's recommendation for an award of $ 300.00 per hour for attorneys with extensive experience in civil rights litigation); *Dee,* 2013 WL 685144, at *10 ($250.00 per hour awarded for an attorney with twenty years experience in a Fourteenth Amendment Due Process and First Amendment Retaliation case)*; Lukawski v. Client Servs., Inc.*, 2013 WL 6154544, at *3 (M.D. Pa. Nov. 22, 2013) (A rate of $300 per hour was deemed appropriate for Plaintiff's lead counsel with fourteen years experience; $200 per hour rate for both associate attorneys, with

three and four years experience; and a $75 per hour rate is appropriate for Plaintiff's support staff in an FDCPA case.) (Nealon, J.); *Shaw v. Cumberland Truck Equip. Co.*, 2012 WL 1130605, at *3 (M.D. Pa. Mar. 30, 2012) (rate of $275.00 per hour in ADA case was reasonable for attorneys practicing employment law with, respectively, eighteen and sixteen years experience) (Conner, J.); *Supinski v. UPS*, 2012 WL 2905458, at *2 (M.D.Pa. July 16, 2012) (finding an hourly rate of $250.00 to be reasonable in a ADA and Pennsylvania Human Relations Act case for an attorney with 20 years of experience); *Carey v. City of Wilkes-Barre*, 2011 WL 1900169, at *2 (M.D. Pa. May 19, 2011), aff'd, 496 F. App'x 234 (3d Cir. 2012) (deeming a rate of $225.00 per hour reasonable in a First Amendment Retaliation case for an attorney with approximately 20 years of experience) (Rambo, J.).

Based on my experience with this case and the evidence before me, I find Ms. Borrell's requested hourly rate for Attorney Dyller of $ 450.00 to be unreasonable. However, in light of Attorney Dyller's experience and expertise, I also find the defendants' requested rate of $325.00 to be unreasonable. I find an hourly rate in the amount of $ 375.00 is reasonable. Therefore, I will award Ms. Borrell $ 375.00 per hour of Attorney Dyller's reasonably expended time.

### 2.      Attorney Centini

Ms. Borrell requests an hourly rate of $350.00 for Attorney Shelly Centini, a partner in Attorney Dyller's firm. (Doc. 247 at ¶ 23.) Attorney Centini graduated law school in 2000 and has been primarily employed at the Dyller Law Firm where she has had extensive trial experience in high stakes and complex litigation.    *Id.*  Defendants object to the requested rate for Attorney Centini arguing that Ms. Borrell provides no relevant evidence to aid in determining a reasonable fee for Attorney Centini. (Doc. 269, 18-20; Doc. 270, 18.) Other than Ms. Borrell's citation to the CLS chart, which, as stated above, is not relevant, and Attorney Reider's statement that the hourly rate of "other attorneys in [Attorney Dyller's] firm

are fair and reasonable and consistent with what is charged for 1983 civil rights cases" (Doc. 237-7, 2.), she provides no specific information with regard to the prevailing market rate in civil rights cases for an attorney with Attorney Centini's experience. The defendants suggest a rate of $ 200.00 for Attorney Centini. (Doc. 269, 20;  Doc. 270, 22.)[43]

In light of the fact that Attorney Centini's work in this case was limited to pre-trial matters that are not alleged to have required any special skill or expertise, and are described primarily as consultations, revision of drafts and case law research (*See* Doc. 247-2), a fee in the amount of $ 225.00 is a reasonable fee for Attorney Centini. *See Souryavong v. Lackawanna Cty.*, 159 F. Supp. 3d 514 (M.D. Pa. 2016), reconsideration denied, No. 13 CV 1534, 2016 WL 3940717 (M.D. Pa. July 21, 2016) (awarding lead counsel with approximately 20 years experience an hourly rate of $ 250.00)

### 3.    Attorney Solomon

Ms. Borrell requests an hourly rate of $200.00 for Attorney Theron Solomon.  (Doc. 247 at ¶ 24.) Attorney Solomon graduated law school in 2013 and has worked for the Dyller Law Firm for one year. (*Id.*) Again, Ms. Borrell provides no relevant information with regard to the prevailing market rate in the relevant community for an attorney with Attorney Solomon's experience. Defendants suggest a rate of $ 125.00. (Doc. 269, 20; Doc. 270, 22.) I find that an hourly rate of $ 150.00 is a reasonable rate for Attorney Solomon.

### 4.    Paralegals

Ms. Borrell requests an hourly rate of $130.00 for paralegal Nancie Redmond and $

---

[43]

Ms. Borrell contests the defendants' assertion by stating that Attorney Centini is the only plaintiff's civil rights attorney, other than Attorney Dyller, to be named a "Super Lawyer" in all of Northeastern Pennsylvania. (Doc. 284, 17-18.)

100.00 per hour for paralegal Tammy Kitsmiller. (Doc. 247 at ¶ 25-26.)[44] Defendants object to the requested rates arguing that Ms. Borrell provides no relevant evidence for determining a reasonable fee for paralegals in the Scranton/Wilkes-Barre community. (Doc. 269, 18-20; Doc. 270, 18.) Dr. Ficca suggests a rate of $85.00 per hour for Ms. Redmond and $ 75.00 per hour for Ms. Kitzmiller. (Doc. 269, 20.)The Geisinger Defendants suggest a rate of $ 85.00 per hour for both paralegals. (Doc. 270, 22.)

I recently reviewed the billing rates of paralegals in this relevant community, finding the following:

> that hourly rates range from $75.00 to $150.00. *See, e.g.*, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02–cv–0134, 2014 WL 2860863, at *13 (M.D.Pa. June 23, 2014) (approving hourly rates of $120.00 and $130.00 for legal assistants); *Dino v. Pennsylvania*, No. 1:08–cv–1493, 2013 WL 6504749, at * 3 (M.D.Pa. Dec. 11, 2013) (approving an hourly rate of $150.00 for a legal assistant in an FLSA case); *Dee*, 2013 WL 685144, at *11 (approving an hourly rate of $75.00 for a legal assistant); *Overly v. Global Credit & Collection Corp., Inc.*, 1:10–cv–2392, 2011 WL 2651807, at *5 (M.D.Pa. July 6, 2011) (noting that typical rates for legal assistants in the Middle District of Pennsylvania are between $70.00 and $120.00 an hour); . . .

*Souryavong,* 159 F. Supp. 3d 514 (finding Plaintiffs' requested hourly rate of $100.00 for their legal assistant reasonable). In light of the foregoing, and Ms. Redmond's seventeen years of experience and Ms. Kitzmiller's eight years of experience, I do not find their rates of $130.00 and $100.00, respectively, unreasonable.

Having determined the reasonable fees to be awarded, I will now turn to the

---

[44]

Dr. Ficca asserts that Ms. Borrell has failed to provide documentation about the prevailing market rates for paralegals in the Middle District and instead only lists the hourly rates and the number of hours worked by the paralegals, therefore, the paralegals' hours should be eliminated from the fee petition. (Doc. 269, 28.) I disagree with Dr. Ficca because "[i]f a party fails to meet its burden to demonstrate a prima facie case that the requested rates were the prevailing rates in the community, 'the district court must exercise its discretion in fixing a reasonable hourly rate.'" *Babish v. Sedgwick Claims Mgmt. Servs., Inc.*, 2009 WL 2177234, at *4 (W.D. Pa. July 22, 2009)(citing *Washington,* 89 F.3d at1036). I will therefore determine a reasonable rate for the paralegals in this case.

reasonableness of the hours expended

### b.    Hours Expended[45]

Turning to the reasonableness of the hours expended, the starting point is to ascertain the claimed hours for which there is evidentiary support and then deduct as necessary those

> hours that are not reasonably expended. [*Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939.] Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary. *Id.* Further, the court can reduce the hours claimed by the number of hours "spent litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Institutionalized Juveniles,* 758 F.2d at 919 (quoting, *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943). The court also can deduct hours when the fee petition inadequately documents the hours claimed. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939.

*Dellarciprete*, 892 F.2d at 1183. The party challenging the reasonableness of the hours expended must provide sufficiently specific objections and

> the briefs or answers challenging the fee request must be clear in two respects. First, they must generally identify the type of work being challenged, and second, they must specifically state the adverse party's grounds for contending that the hours claimed in that area are unreasonable. The briefs must be specific and clear enough that the fee applicants have a fair chance to respond and defend their request.

*Bell*, 884 F.2d at 720.  The adverse party "cannot merely allege in general terms that time spent was excessive." *Id.*

As a threshold matter, the Geisinger Defendants assert that because judgment was entered against the Geisinger Defendants only on Ms. Borrell's due process claim, Ms. Borrell should not be awarded any fees or costs associated with claims other than the due process

---

[45] Ms. Borrell is "not seeking attorneys' fees for the work of her initial counsel, despite having paid him and despite the fact that he expended time on the case." (Doc. 247, 2 n. 1).

claim.[46] (Doc. 270, 12-13.) The Geisinger Defendants request the following hours be excluded or deducted: (1) fifty-six (56) hours devoted to summary judgment research; (2) over four (4) hours spent on the abandoned request for injunctive relief; (3) a minimum of forty (40) hours on opposing the motions to dismiss for breach of contract claims and claims against Bloomsburg and Dr. Ficca and Mr. Richer in their official capacities, as these claims were dismissed; and (4) a minimum of one hundred and ten (110) hours for work on summary judgment motions and responses that ultimately led to a lack of success on Ms. Borrell's liberty interest and equal protection claim. (*Id*. at 12-13.) Ms. Borrell contends that the Geisinger Defendants are wrong about how time was allocated and about the advancement of her ultimate successful result. (Doc. 285, 9.)

A "court can reduce the hours claimed by the number of hours "spent litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Dellarciprete*, 892 F.2d at 1183 (citing *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 919 (3d Cir. 1985); *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943). However, "[t]he [Supreme] Court noted that if 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount,'" but "[t]his excessive amount could arise 'even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.'" *Dee*, 2013 WL 685144, at \*12 (citing *Hensley,* 461 U.S. at 431.) Therefore, "[w]here successful and unsuccessful claims share a common core of facts and

---

[46]
The Geisinger Defendants assert Ms. Borrell was unsuccessful on the following claims: "an unsuccessful and ultimately abandoned attempt at injunctive relief"; "two unsuccessful breach of contract claims"; "unsuccessful claims against Bloomsburg and Ficca and Richer in their official capacities"; "unsuccessful due process liberty claim"; and an "unsuccessful equal protection claim." (Doc. 270, 12.)

related legal theories, it may be impossible to parse out the hours spent litigating the successful claims from the unsuccessful claims." *Butler v. Frett*, 2006 WL 1806412, at *11 (D.N.J. June 29, 2006) (citing *Hensley,* 461 U.S. at 435; *Abrams v. Lightolier*, 50 F.3d 1204, 1222 (3d Cir.1995)).  "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* But, "[t]he appropriate adjustment to avoid excessive fees is left to the discretion of district courts" and "the degree of success obtained is the most critical factor." *Dee v*, 2013 WL 685144, at *12 (citing *Hensley,* 461 U.S. at 436-37.)

As stated, Ms. Borrell brought five claims in four counts (Doc. 21), but she was ultimately only successful on her Fourteenth Amendment due process claim at trial.[47]  As stated, I  can attempt to apportion the hours devoted to claims that are separate and apart from the successful claims or I can consider Ms. Borrell's overall success and concomitant failures in determining the overall fee awarded.  The claims for breach of contract and equal protection involve separate legal theories and therefore, I will attempt to specifically apportion hours spent on these claims where possible.

### 1.    Attorney Dyller[48]

---

[47]

The Geisinger Defendants also seek the exclusion of all hours devoted to the request for injunctive relief. (Doc. 270, 13.) These hours are addressed in Section (b)(1)(a) below.

[48]

The Geisinger Defendants argue that the time records provided lack the required specificity and have "incomplete and abbreviated descriptions, fail to itemize time by task and fail to clearly describe the time spent on each task or claim" and request that any doubts about the reasonableness of the time entry be held against Ms. Borrell. (Doc. 270, 22-23.) Ms. Borrell counters that all time entries are adequately documented and in accord with Third Circuit precedent.(Doc. 285, 12.) Ms. Borrell cites primarily to *Washington v. Philadelphia Cty. Court of Common Pleas*, 89 F.3d 1031 (3d Cir. 1996), wherein the court stated that a requesting party must "provide enough information as to what hours were devoted to various activities and by whom for the district court to determine if the claimed fees are reasonable," "however, 'it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.'" *Id.* at 1038 (citing *Dellarciprete*, 892 F.2d at 1190-91.) (citation omitted). I will address the specificity

Ms. Borrell asserts that Attorney Dyller spent 1,235.25 hours litigating the case. (Doc. 245, ¶ 3.)[49] Preliminarily, the defendants argue that due to Attorney Dyller's asserted experience and expertise, many of the hours expended should be reduced as excessive. (Doc. 269, 21; Doc. 270, 24.) "Excessiveness of time spent in light of an applicant's expertise is a legitimate reason for reducing a fee award" *Bell*, 884 F.2d at 721, because "[a] fee applicant cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law." *Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983). As justification of Attorney Dyller's requested rate is based on his expertise and experience, I will consider this principle accordingly if necessary.

### a.      Preliminary Injunction

The Geisinger Defendants seek to exclude an estimated four (4) hours of Mr. Dyller's time related to Ms. Borrell's abandoned request for a preliminary injunction. (Doc. 270, 13.) In reply, Ms. Borrell argues that the 4.25 hours billed on January 16, 2013 was spent reviewing the filings of prior counsel and ultimately determining that seeking injunctive relief was a losing proposition, and therefore, not wasted time. (Doc. 285, 10.) I agree that the review of prior counsel's filings was necessary and reasonable. I will overrule the Geisinger Defendants objection and will not deduct these hours.

### b.      Motions to Dismiss

Attorney Dyller spent 72.75 hours responding to the defendants' motions to dismiss (Doc. 247-1, 2-3.), and the defendants seek to exclude some of these hours. (Doc. 269, 22-23;

---

of the entries as the needs arises.

[49]    Many of Dr. Ficca's and the Geisinger Defendants' challenges to the reasonableness of Attorney Dyller's hours overlap and therefore, where appropriate, I will address the challenges together.

Doc. 270, 13.) Dr. Ficca seeks a reduction by one-third (1/3) on the basis that it should not have taken an attorney with Attorney Dyller's experience that amount of time to respond to the motions and in light of the fact that she unsuccessfully defended her contract claims, the claims against Bloomsburg, and the claims against Dr. Ficca and Mr. Richer in their official capacities. (Doc. 269, 22-23.) The Geisinger Defendants seek to exclude forty (40) hours due to Ms. Borrell's lack of success on claims. (Doc. 270, 13.) Ms. Borrell contends that, despite experience, both motions to dismiss cited a large amount of cases that needed to be read and briefed, and counsel needed to do his own research, in addition to drafting two opposition briefs. (Doc. 284, 19-20; Doc. 285, 14-15.) Ms. Borrell also asserts that little time was spent on unsuccessful claims. (Doc. 285, 15.)

In light of Ms. Borrell's statement that little time was spent on unsuccessful claims, and based on Mr. Dyller's experience and expertise, I believe a reduction of the hours devoted to responding to the motions to dismiss is warranted. I will therefore I will deduct thirty (30) hours from the total, leaving 42.75 hours.

### c.    **Discovery**

Dr. Ficca next takes issue with the time Ms. Borrell devoted to discovery. (Doc. 269, 23.) Based on Attorney Dyller's experience, Dr. Ficca seeks a one-third (1/3) reduction of the 25.75 hours spent on discovery related matters asserting that 3.5 hours was excessive to review 280 pages; 1.5 hours was excessive to review 62 pages; and 20.7 hours was excessive to prepare Ms. Borrell for her deposition. (*Id.*) I note that two of Dr. Ficca's objections do not coincide with the time sheets submitted. On May 29, 2013, Attorney Dyller lists one (1) hour and describes it as: "review docs from bsu and ficca; emails to keli neary." (Doc. 247-1, 3.) From February 1, 2014 to February 6, 2014, 16.75 hours are listed as opposed to 20.75. (*Id.* at 4-5.) On April 4, 2014, Attorney Dyller recorded 1.5 hours of "doc review; depo prep." (*Id.* at 6.) Dr. Ficca provides no justification for why or how the review of the pages could have

been completed in less time. The hours specifically referenced were reasonably expended and I will overrule Dr. Ficca's objections.

### d.   Summary Judgment

According to the Geisinger Defendants, Attorney Dyller expended over 280 hours on Ms. Borrell's motion for summary judgment and in opposing defendants' motions. (Doc. 270, 24.) The Geisinger Defendants first request that an estimated fifty-six (56) hours of "research that does not specifically state that it relates to [Ms.] Borrell's due process claim" be deducted because research without designation is more likely than not  "research conducted on unsuccessful claims." (Doc. 270, 13.)[50] The Geisinger Defendants also seek a reduction of one hundred and ten (110) hours to account for unsuccessful claims and twenty (20) hours purportedly attributable to excess. (Doc. 270, 14; 24.)  Dr. Ficca seeks a one-third (1/3) reduction of the two hundred and fifty-nine (259) hours she contends Attorney Dyller spent on motions for summary judgment because of Attorney Dyller's experience and the fact that "[j]udgment was entered in favor of the Defendants on two thirds of the claims, Plaintiff's Fourteenth Amended [sic] liberty interest and equal protection claim." (Doc. 269, 24.)

In support of its position, the Geisinger Defendants state that the briefs filed in

---

[50]   The Geisinger Defendants fail to specify which entries devoted to legal research are to be deducted, therefore, this objection requires no further discussion. While "the party raising . . . challenges, which affect an entire category (or several categories) of work, need only specify with particularity the reason for its challenge and the category (or categories) of work being challenged; it need not point to each individual excessive entry," *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 721 (3d Cir. 1989), however, "briefs must be specific and clear enough that the fee applicants have a fair chance to respond and defend their request." *Id.* I understand the Geisinger Defendants' argument rests on the premise that Ms. Borrell failed to specify what issue was being researched, but its failure to provide any specifics with regard to the challenged summary judgment research hours, while only providing an estimation of the time to be excluded, is insufficient to warrant a reduction. (*See* Doc. 270, 13.) I will overrule the objection because of a lack of specifics and also because I do not believe Ms. Borrell should not be permitted to seek compensation for time only specifically spent researching due process claims.

opposition by Ms. Borrell covered substantially similar legal arguments, therefore, "it should not take a lawyer with such skill time equivalent to eight hours per day for seven weeks to prepare a summary judgment motion and response." (Doc. 270, 24.) Ms. Borrell responds to these objections by arguing that no matter the skill or knowledge of an attorney, "the facts of each case are different and require painstaking detail. . . " (Doc. 284, 24; Doc. 285, 32-33.)

The Geisinger Defendants also object on the basis that Ms. Borrell's time records "bear vague labels" thereby overstating "what is reasonably compensable and should be reduced accordingly." (Doc. 270, 24.) I have previously rejected time entries that lacked "any specific description of the tasks performed." *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2016 WL 3522964, at *10 (M.D. Pa. June 28, 2016) (collecting cases)("rejecting time entries such as "review documents & memos" without identification of what the entry pertains to.) However, Ms. Borrell's entries are not so vague as to warrant reduction, as they provide enough detail to know "what hours were devoted to various activities." *See Washington*, 89 F.3d at 1038.

In this case, Ms. Borrell filed a motion for summary judgment and opposed two separate motions for summary judgment. I reviewed the parties' extensive filings. Ms. Borrell filed over two hundred and fifty-six (256) pages of drafted material on a myriad of issues with admitted limited success. After reviewing the time sheets, including any reference to summary judgment, the total amount of hours amounted to two hundred and ninety-eight (298) hours. (*See* Doc. 247-1, 5-8.) Although the facts of each case are different, I find other cases instructive in determining the reasonableness of the hours expended. In *Styers v. Pennsylvania*, 621 F. Supp. 2d 239, 245 (M.D. Pa. 2008), Judge Caldwell deemed forty-eight (48) hours a reasonable amount of time for a thirteen (13) page opposition to summary judgment in a First Amendment Retaliation case. In *Kurschinske v. Meadville Forging Co.,* No. 06–87, 2008 WL 4462294, at *4 (W.D.Pa. Sept.30, 2008), which was described as a "'not particularly complex' Title VII case", the court found that a sixteen (16) page opposition to a

motion for summary judgment could be completed in twenty-five (25) hours. In *Trucksess v. Thompson Auto. Grp., Inc.*, 2011 WL 6415047, at *5 (E.D. Pa. Dec. 14, 2011), the court accepted counsels' 29.4 hours spent opposing the motion . . .for summary judgment" as reasonable**.**

Although I do not find the hours expended by Attorney Dyller to be excessive based on the nature of summary judgment motions in general and my familiarity with the filings in this case, I am mindful of the outcome at the summary judgment stage. Ms. Borrell was unsuccessful at the summary judgment stage in defending her Fourteenth Amendment liberty interest claim and on her equal protection claim. *See Borrell II,* 643 F. Supp 3d at 440, 442. However, she was successful on the claim for which she sought judgment in her favor and her success decided liability in this case. I believe a fifty (50) hours reduction from Attorney Dyller's time is reasonable and warranted to account for Ms. Borrell's partial lack of success.

### e.    Trial/Trial Prep

Defendants object to time documented by Attorney Dyller as "work on witness exams" between November 19, 2014 and November 28, 2014, totaling 32.5 hours, as excessive, because the trial had been rescheduled to June 22, 2015. (Doc. 269, 24-25; Doc. 270, 25 n. 5.) Citing to an additional 97.25 hours also labeled as witness exams between March of 2015 and June 3, 2015, Dr. Ficca argues that it was excessive for an attorney "who has tried 'over 100 cases'" to spend 129.75 hours on witness preparation. (Doc. 269, 25.) Dr. Ficca requests that the hours be reduced by one-half (½) (*Id.*), while the Geisinger Defendants seek a reduction of at least one hundred (100) hours[51] (Doc. 270, 25.). Ms. Borrell counters that it would have been fruitless to postpone trial preparation as all defendants were opposed to

---

[51] The Geisinger Defendants combine the hours listed for Attorney Dyller and Attorney Solomon, asserting approximately 282.50 hours were expended in trial prep. (Doc. 270, 25.)

settlement discussions and the attorneys were being "careful not to be caught at the end with unfinished or sloppy work." (Doc. 284, 26.)

Ms. Borrell fails to provide any details about the specific witness or witness exam being prepared and therefore, I have no way of discerning "if the hours claimed are unreasonable for the work performed," *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 F. App'x 93, 100 (3d Cir. 2006)(citing *Washington,* 89 F.3d at 1037.); (*see also*   Doc. 247-1, 8-10.) Despite applauding Ms. Borrell's attempts at preparedness, descriptions accompanying hours listed as "work on witness exams" are vague and fail to specify, therefore,  I will reduce the number of hours by 30. However, I believe that approximately 100 hours is a reasonable amount of time to prepare for the many witnesses that testified in this case.

The Geisinger Defendants request that time Attorney Dyller devoted to motions *in limine* (43.75 hours) be reduced by twenty (20) hours because the motions were substantially denied. (Doc. 270, 24.)[52] Ms. Borrell argues it is inappropriate to deduct hours for unsuccessful motions as it is the overall success of the party that matters. (Doc. 285, 30-31.) Although a court can exclude time or reduce the award based on unsuccessful claims, the Geisinger Defendants have failed to cite to any case law that states that the work on unsuccessful non-dispositive motions is to be excluded and fail to provide any specifics with regard to which motions are being challenged. Ms. Borrell cites cases that address whether attorney's fees may be awarded for a first unsuccessful trial upon a subsequent successful result, and while not perfectly analogous, I believe that the same reasoning applies to motions *in limine*. (Doc. 285, 30-31.); *see Cabrales v. Cty. of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991) ("The rationale is clear: If a plaintiff ultimately wins on a particular claim, she is entitled to all attorney's fees reasonably expended in pursuing that claim-even though she may have

---

[52] Notably, the Geisinger Defendants argue in post-trial motions that it was error to grant several of Ms. Borrell's motions *in limine. (See* Docs. 257; 293.)

suffered some adverse rulings."); *Butler v. Frett*, 2006 WL 1806412, at *8 (D.N.J. June 29, 2006) ("Court will not exclude the hours spent by [plaintiff] on the first trial and appeal.") The Geisinger Defendants take too narrow a view of "prevailing party" with regard to discrete aspects of this case and fail to specify which motions *in limine* are being challenged, therefore, I will overrule the objection.

The Geisinger Defendants also object and assert excessiveness with regard to "[a]pproximately 282.5 hours spent by [Attorney] Dyller and [Attorney] Solomon in trial prep, including preparation of witness exams, for a trial only on damages." (Doc. 270, 25.) A reduction of at least one hundred (100) hours is requested, arguing the time spent was "clearly excessive." (*Id.*) The Geisinger Defendants provide no real basis for why the hours expended are excessive. I will overrule this objection.

### f.    Fee Petition

Ms. Borrell seeks compensation for a total of eleven (11) hours expended by Attorney Dyller in preparation of the fee petition. (Doc. 247, ¶ 15.) **"A party entitled to an award of attorneys' fees is also entitled to reimbursement for the time spent litigating its fee application."** *Planned Parenthood of Cent. New Jersey v. Attorney Gen. of State of New Jersey*, 297 F.3d 253, 268 (3d Cir. 2002) (citation omitted). Dr. Ficca concedes that the time spent on a fee petition is compensable, however, reduction is sought to the extent the lodestar is reduced. (Doc. 269, 29.) I will consider Dr. Ficca's request in determining the reasonableness of the overall award. *See Institutionalized Juveniles v. Sec'y of Pub. Welfare*, 758 F.2d 897, 924 (3d Cir. 1985).  At this juncture, the hours expended on the fee petition are compensable and therefore, in light of my determination that Attorney Dyller's reasonable hourly fee is $ 375.00, I will award $ 4,125.00 as opposed to the requested $ 4,950.00

### 2.    Attorney Solomon

The Geisinger Defendants object to the combined time of Attorneys Dyller and Solomon

(in excess of one hundred and thirty-six (136) hours) spent "researching and opposing defendants['] use of the *Carey*[53] defense", or same decision defense, as the parties' have deemed it, arguing that it is "an excessive amount of time to review essentially one case and affirmative defense, particularly in light of [Attorney] Dyller's skill and expertise in civil rights claims." (Doc. 270, 24-25.) While Dr. Ficca objects to the one hundred and twenty-five (125) hours expended by Attorney Solomon researching, drafting and revising a brief in opposition to the defense, she also argues Attorney Dyller's experience and that the time was excessive, especially in light of the fact that Ms. Borrell's brief in opposition, as well as her motion *in limine* regarding the defense were denied.(Doc. 269, 25-26.) The Geisinger Defendants ask, without distinguishing between counsel, for a reduction of 104 hours. (Doc. 270, 25.) Dr. Ficca requests that the hours expended by Attorney Solomon be reduced by two-thirds (2/3). (Doc. 269, 26.) Dr. Ficca sets forth Attorney Solomon's hours between November 12, 2014 to January 2, 2015 as one hundred and twenty-five (125) and Attorney Dyller's hours as 1.5 on December 30, 2014; 5.0 on December 31, 2014; and 5.25 on January 2, 2015. (Doc. 269, 26.) Therefore, it appears that the Geisinger Defendants, without specifying such, are objecting to the same time entries.

The affirmative defense asserted by defendants did not involve the review of one case

---

[53] Defendants sought to introduce an affirmative defense at trial based on *Carey v. Phiphus*, 435 U.S. 247, 98 S. Ct. 1042 (1978). Ms. Borrell filed a motion *in limine* and supporting brief in an attempt to preclude the defendants from arguing that the same decision would have been made, despite the level of process provided to Ms. Borrell. (Docs. 156; 157.) Defendants opposed Ms. Borrell's motion, asserting the *"Carey"* defense as a defense to compensatory damages because "damages for due process violations cannot be presumed." (Doc. 166, 1; *see also* Doc. 167.) I denied Ms. Borrell's motion *in limine* (*See* Doc. 189) and the jury was ultimately asked, as discussed *supra* if Ms. Borrell would have been terminated despite the level of due process provided. (Doc. 236) They answered in the affirmative.

as defendants contend.[54] The supporting brief for the motion *in limine* cited to sixteen (16) cases and covered approximately seventeen (17) pages of substantive text. (Doc. 157) Therefore, it is clear that more than one case needed to be reviewed. However, I do believe that the amount of hours Attorney Solomon devoted to the defense was excessive in light of the hours expended by Attorney Dyller and I will therefore reduce the compensable time by half for a total of 62.5 hours. I also find this reduction warranted as Ms. Borrell was unsuccessful with regard to this affirmative defense and her compensatory damages were thereby limited.

### 3.    Paralegals

Ms. Borrell sets forth that paralegal Nancie Redmond worked a total of 131.75 hours, and paralegal Tammy Kitzmiller worked a total of 38.5 hours.  (Doc. 247, ¶ 12.) Defendants raise several objections as to Ms. Redmond's and Ms. Kitzmiller's billing. (Doc. 269, 27-28; Doc. 270, 23; 25.)

Dr. Ficca requests that Ms. Kitzmiller's hours be limited to fourteen (14) hours for the preparation of exhibits. (Doc. 269, 28.)[55]  Specifically, Dr. Ficca objects to hours spent by Ms. Kitzmiller scanning and redacting documents on August 23, 2013. (Doc. 269, 28.) Dr. Ficca asserts four redactions were made and, as a clerical task, should not be billed at $ 100.00. (*Id.*) Ms. Borrell does not respond to this objection. (*See* Doc. 284, 31.) I agree with Dr. Ficca that the tasks described are clerical in nature and not properly billable at $ 100 per hour, therefore, three (3) hours of time will be eliminated from Ms. Kizmiller's total hours. Dr. Ficca also challenges time Ms. Kitzmiller expended on June 29, 2015 delivering documents to the

---

[54]
Both defendants also filed motions to amend/correct the answers to the amended complaint seeking to amend the answers to include the affirmative defense. (Docs. 162; 164.)

[55]
Dr. Ficca inexplicably fails to include an additional .5 hours designated "prepared exhibits on June 17, 2015. (Doc. 269, 28; *compare* Doc. 267-5.)

courthouse. (Doc. 269, 28.) Ms. Borrell agrees this time should be eliminated. (Doc. 284, 30 n. 14.) Therefore, an additional .5 hour will be subtracted from Ms. Kitzmiller's time.

Dr. Ficca also objects to the following five entries of Ms. Kitzmiller's described as "reviewed documents": four (4) hours on August 26, 2013; three (3) hours on August 27, 2013; four (4)  hours on September 6, 2013; three (3) hours on November 23, 2013; and three (3) hours on November 24, 2013.  (Doc. 269, 28; *see also* Doc. 247-5) In addition, Ms. Kitzmiller lists one (1) hour on June 19, 2015 that Dr. Ficca mentions but does not specifically state why it should be eliminated. (Doc. 269, 28.) Without providing specific dated entries, the Geisinger Defendants also object to 20.5 hours billed by Ms. Kitzmiller for "reviewed documents" and "trial prep" as "too vague to credit."(Doc. 270, 25.) Ms. Borrell contends that it was prudent to have Ms. Kitzmiller review documents because her hourly rate was less than that proposed for the attorneys in this case and further, that "Ms. Kitzmiller reviewed certain documents and depositions to give [Attorney Dyller] a non-lawyer perspective for help in relating to the jury" and purportedly "could have been completed at a much higher cost, by a jury consultant." (Doc. 284, 31; Doc. 285, 35-36.) Because Dr. Ficca and the Geisinger Defendants fails to persuade me that it was unnecessary or excessive for Ms. Kitzmiller to review documents in this case, I will not limit her hours as defendants requested and I will overrule defendant's objections with regard to document review and trial prep. I will however deducted 3.5 hours for clerical tasks, Therefore, the hours awarded for Ms. Kitzmiller will total thirty-four (34) hours.

The Geisinger Defendants object to a combined eighty-two (82) hours of time the paralegals spent on "trial and trial prep" because it was in addition to the time expended by Attorneys Dyller and Solomon; including eleven (11) hours of time Ms. Redmond devoted to "trial and trial prep" on June 25, 2015. (Doc. 270, 23.) Contending the "description is too vague and generic to warrant recovery" and "billing for two attorneys and a paralegal during trial is

excessive when there is no explanation . . .", the Geisinger Defendants seek the elimination of all eighty-two (82) hours. (*Id.*) Ms. Borrell argues in response that the use of two attorneys and one paralegal during trial is "self-explanatory" and during non-trial moments, the attorneys and Ms. Redmond "prepared exhibits, spoke with witnesses, compared notes, discussed strengths and weaknesses in the presentation, juror reactions to evidence and argument, possible use of deposition testimony, and myriad other minuitiae of presenting an organized and convincing case." (Doc. 285, 29.) I do not find the amount of time Ms. Redmond devoted to trial prep or to being present at trial to be excessive and I will therefore, overrule the Geisinger Defendants' objection.

Dr. Ficca also objects to time Ms. Redmond spent between August 22, 2013 and August 23, 2013 (twelve (12) hours total) reviewing Ms. Borrell's Facebook messages and photographs. (Doc. 269, 28.) Dr. Ficca argues that this amount of time was excessive "[g]iven the amount of photographs and messages that were produced" and requests a reduction to 6 hours. (*Id.*) Ms. Borrell contends that Attorney Dyller was in the process of complying with disclosure requirements as well as producing documents responsive to discovery requests and therefore, the task was delegated to Ms. Redmond who requests a lower hourly rate than Attorney Dyller. (Doc. 284, 30.) Dr. Ficca fails to persuade that twelve (12) hours was an unreasonable amount of time to review Ms. Borrell's Facebook messages and photographs, especially since she provides no specifics regarding the amount of material to be reviewed, therefore, her objection will be overruled.

Dr. Ficca's next objection with regard to Ms. Redmond is that the fourteen (14) hours spent on unspecified trial prep on June 18th and 19th, 2015 was excessive and therefore, she requests a reduction to seven (7) hours. (Doc. 269, 28.) As Ms. Borrell argues, Ms. Redmond was actively involved in review of every exhibit, organized the attorneys and witnesses and went to the courtroom to work with the technology. (Doc. 284, 31.) I do not view fourteen (14)

hours of trial prep by Ms. Redmond unreasonable in this case. I will overrule Dr. Ficca's objection.

### 4.    Duplicative or Redundant time

The Geisinger Defendants seek a reduction of 22.5 hours from the time spent by Attorney Dyller, Attorney Solomon and paralegal Ms. Redmond reviewing deposition Transcripts. (Doc. 270, 25.) However, the Geisinger Defendants fail to specify why this time is redundant. "The Third Circuit has explained that an objecting party must make a '*sufficiently specific objection*' to a time entry before a reduction for excessiveness may be made." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2016 WL 3522964, at *8 (M.D. Pa. June 28, 2016) (citing *United States v. Eleven Vehicles, Their Equipment & Accessories*, 200 F.3d 203, 211 (3d Cir. 2000))(emphasis in original). Therefore, I will overrule the objection.

The Geisinger Defendants also seek reduction of 19.25 hours of Attorney Solomon's time to seven (7) hours because it was spent revising an unidentified brief that Attorney Dyller had already revised, as per his time records, and therefore, the hours spent were redundant. (Doc. 270, 25.) Ms. Borrell, in response, questions why attorneys should not work together, questions whether the Geisinger Defendants' counsel did not collaborate, and argues that "effective and comprehensive written work is prepared" in this way. (Doc. 285, 36-37.) Attorney Solomon's time record indicates that the hours accounted involved 8.5 hours revising the second draft of a brief (December 2, 2014),  revising the third draft of the brief for 6.5 hours (December 8, 2014), and 4.5 hours making final revisions on the brief and discussing the matter with Attorney Dyller (December 9, 2014)). (Doc. 247-3) The brief filed by Ms. Borrell was approximately seventeen (17) substantive pages. (Doc. 157) While I commend Attorney Solomon's thoroughness, 19.25 hours spent editing seems excessive when considering the length of the brief, and not including the hours spent on the original draft. Therefore, I will reduce Attorney Solomon's hours by ten (10) hours to 9.25.

Dr. Ficca seeks elimination of the time spent by Attorney Solomon (fourteen (14) hours) on closing arguments citing Attorney Dyller's experience and the fact that Attorney Solomon did not deliver the closing argument in this case. (Doc. 269, 27.) Ms. Borrell contends that the time spent by Attorney Solomon was not duplicative as not all time was spent with Attorney Dyller but was instead spent "looking at different aspects of the evidence for inclusion in the closing argument or rebuttal closing argument," and that collaboration should be commendedm, not frowned upon. (Doc. 284, 28.) Attorney Solomon's entries are listed as "Prepared closing arguments" for 4.5 hours on June 27, 2015 and "Reviewed trial materials and prepared closing arguments" for 9.5 hours on June 28, 2015. (Doc. 247-3.)  The amount of time spent by Attorney Solomon is excessive in that he did not deliver the closing, therefore, I will reduce his time spent on the closing by 4.5 hours.

Dr. Ficca also contends that the time Attorneys Dyller and Solomon spent (twenty (24) hours) researching and preparing a six (6) page brief regarding peremptory challenges is duplicative or excessive, and therefore requests elimination of Attorney Solomon's sixteen (16) hours. (Doc. 270, 27.) Dr. Ficca fails to specify her reasoning why the time is duplicative or excessive and as Ms. Borrell states, the result was favorable to her in that she was given six (6) peremptory challenges to match the defendants, as opposed to three (3). (Doc. 284, 29.) Dr. Ficca has failed to demonstrate why the time expended by Attorney Solomon was unreasonable.  I will overrule Dr. Ficca's objection.

### c.   Additional Request for Fees and Costs[56]

Ms. Borrell requested in reply an additional sum of $ 92,939.72 for additional time her attorneys spent responding to the defendants' opposition to her motion for attorneys' fees and costs and in opposing defendants' post-trial motions. (Doc. 284, 34; Doc. 285, 38-39.) Ms.

---

[56] Defendants did not request permission to file a sur-reply upon Ms. Borrell's filing of the request for additional fees and costs.

Borrell filed an additional, supplemental declaration providing records for time spent by Attorneys Dyller and Solomon;  as well as documentation of the costs incurred following trial. (Doc. 286)

Ms. Borrell asserts Attorney Dyller spent an additional 164.25 hours responding to the motions and Attorney Solomon spent an additional 85.75[57] hours responding. (Doc. 286, ¶ 7.) I will grant Ms. Borrell's request for additional attorneys' fees and multiply the hours stated by the rates I deemed reasonable for both Attorney Dyller and Attorney Solomon.

### d.    Lodestar Calculation and Adjustments

As stated I will reduce Attorney Dyller's hours expended in the litigation of the case by one hundred and ten (110) hours, leaving a total of 1125.25 hours. Attorney Dyller will be awarded eleven (11) hours for his work on the fee petition and the additional 164.25 hours expended on post-trial motions and in replying to defendants' opposition to Ms. Borrell's request for attorneys' fees and costs. Therefore, the total amount of hours for Attorney Dyller is 1,297.50. I will reduce Attorney Solomon's initially requested hours by seventy-seven (77) for a total of 356.25. I will add to that amount the 85.75 hours Ms. Borrell requested for post-trial work. Therefore, the Attorney Solomon's total hours amount to four hundred and forty-two (442).  I will also reduce Ms. Kitzmiller's hours to a total of thirty (35) hours.  I will not reduce Attorney Centini's or Ms. Redmond's hours.

The following table represents a calculation of the lodestar after determining a reasonable rate and taking the stated deductions.

---

[57]

Ms. Borrell lists Attorney Solomon's additional hours as 85.75, however, the hours listed on the time sheet amounted to 121 hours. However, it is assumed Ms. Borrell is only seeking an award for 85.75 hours and therefore, I will limit consideration to that amount.

| Attorney/Paralegal | Hourly Rate | Number of Hours | Total |
|---|---|---|---|
| Attorney Dyller | $ 375.00 | 1,297.50 | $ 486,562.50 |
| Attorney Centini | $ 225.00 | 38.50 | $ 8,662.50 |
| Attorney Solomon | $ 150.00 | 442 | $ 66,300.00 |
| Paralegal Redmond | $ 130.00 | 131.75 | $ 17,127.50 |
| Paralegal Kitzmiller | $ 100.00 | 35 | $ 3500.00 |
| LODESTAR | | | $ 582,152.50 |

Once the lodestar is calculated, "the court has discretion to adjust the fee for a variety of reasons, most notably 'the 'results obtained' by the [prevailing party.]'" *Snyder*, 2014 WL 1321116, at *2(citing *Pub. Interest Research Grp. of N.J., Inc. v. Windall,* 51 F.3d 1179, 1185 (3d Cir.1995); *Hensley,* 461 U.S. at 434.). "The court can adjust the lodestar downward if the lodestar is not reasonable in light of the results obtained." *Dellarciprete*, 892 F.2d at 1183(citing *Hensley,* 461 U.S. at 434–37, 103 S.Ct. at 1940–41.) "This general reduction accounts for time spent litigating wholly or partially unsuccessful claims that are related to the litigation of the successful claims."*Id.* (citing *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941.)

While both defendants fail to request a specific reduction in the overall lodestar amount, objections were made to the specific hours expended and the defendants requested  that I apportion Ms. Borrells' fees based on successful and unsuccessful claims. The defendants referenced Ms. Borrell's overall success in arguing the reasonableness of the hours expended. I have considered such and have made specific deductions where appropriate.

In the exercise of my discretion, I can adjust the lodestar if it is not reasonable in light of the results obtained. As stated, Ms. Borrell brought five claims in four counts. (Doc. 21) She was ultimately only successful on her Fourteenth Amendment due process claim at trial. Ms. Borrell was unsuccessful on her breach of contract claims at the motion to dismiss stage and on her Fourteenth Amendment liberty interest and equal protection claims at the summary judgment stage.  These claims were disposed of at least nine months before trial commenced.

Additionally, the discovery in this case and the defenses raised by the defendants were interrelated and carried through trial. I conclude a 20% reduction of the lodestar amount is warranted. Such a reduction takes into account the fact Ms. Borrell was successful on her remaining claim at trial while also considering the fact that she was unsuccessful prior to trial on four claims. Included in my consideration was the fact that there were no settlement offers made by the defendants in this case. The adjusted lodestar in this case is therefore calculated at **$465,722.**

### g.    Costs

The defendants argue against the award of costs because Ms. Borrell failed to substantiate the request for $ 17,821.26 in costs. (Doc. 269, 19; Doc. 270, 26.) Both argue that no costs should be awarded because Ms. Borrell did not submit any bills or invoices (Doc. 269, 30; Doc. 270, 26) and seek a fifty (50) percent reduction. (*Id.*) Ms. Borrell attached a list of costs to her motion (Doc. 247-6.), and provided additional documentation to verify the amounts sought when replying to defendants' objections. (*See* Docs. 284-8; 285-7.) "Parties prevailing in federal court may recover the taxable costs referenced in Fed.R.Civ.P. 54(d)(1) and enumerated in 28 U.S.C. § 1920." *Petrunich v. Sun Bldg. Sys., Inc.*, 625 F. Supp. 2d 199, 211 (M.D. Pa. 2008) (citing M.D. Pa. L. R. 54.4.)  Additionally, "prevailing parties in civil rights cases are generally entitled to recover any reasonable costs associated with litigating their claims, provided that the costs are necessary and properly documented." *Petrunich*, 625 F. Supp. 2d at 211(citing *Kratzer v. Wegman's Rest., LLP,* No. Civ. A. 04-05889, 2005 WL 2847320, at *3 (E.D.Pa. Oct.27, 2005)).

The defendants object to the costs as inadequately documented, however, other than one specific objection by the Geisinger Defendants to costs of $ 1,337.60 related to the "Depo of Richer" (Doc. 270, 26.), the defendants fail to elaborate on what costs are to be eliminated. (*See* Doc. 269, 29-30; Doc. 270, 26.) With regard to the specific objection by the Geisinger

Defendants, Ms. Borrell attached an invoice from Accuscript Inc., in the amount of $ 1,337.60. (Doc. 285-6, 10.) Therefore, I find this cost permissible and properly documented.

I have further reviewed Ms. Borrell's request for costs and supporting documentation. She has submitted bills and invoices totaling $ 12,187.35. (*See* Docs. 284-8; 284-8; 285-6; 285-7.) Additionally, upon my review, the costs incurred for the filing fee, postage, photocopies and travel amount to $ 5,302.62. (*See* Doc. 247-6) Ms. Borrell also requests reimbursement for mileage for a witness in the case, Mr. Justin Young, in the amount of $ 123.60. (*Id.* at 3.) The combined costs as documented through bills and invoices and the expenses reasonably incurred amount to $ 17,613.57.[58]

Ms. Borrell also asserts that an additional $ 1, 877.22 was spent on trial transcripts, copying, and postage in order to respond to defendants' post-trial motions. (*Id.* at ¶ 8; Doc. 286-1; Doc. 286-4.)  Upon review of the documented costs and supporting invoices, I find costs in the amount of $ 1,877.22 to have been reasonably expended.

I will therefore award costs in that amount to Ms. Borrell in the amount of **$ 19,490.79.**

### E.    Ms. Borrell's Motion to Supplement

Ms. Borrell filed a Motion for Leave to File a Supplemental Declaration and Exhibits Concerning Plaintiff's Motion for An Award of Costs and Attorneys' Fees and a brief in support. (Doc. 296; Doc. 297.)The Geisinger Defendants filed a motion in opposition. ( Doc. 298) Ms.

---

[58]    I have eliminated from the calculation any costs designated as "lunch" as no documentation has been provided to substantiate those costs. In total, $ 207.69 was excluded. While, "[a] district court is permitted to award non-taxable expenses, which may include costs for postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food." *Bowers v. Foto Wear, Inc., No.,* 2007 WL 4086339, at *5 (M.D. Pa. Nov. 15, 2007) (citing *David v. AM Intern.,* 131 F.R.D. 86, 90 (E.D.Pa.,1990); *Rank v. Balshy,* 590 F.Supp. 787, 801-804 (M.D.Pa.1984))  *see also Blagrave v. Nutrition Mgmt. Servs. Co.,* No. CIV.A. 05 6790, 2009 WL 440299, at *8 (E.D. Pa. Feb. 20, 2009), "the expense must be adequately documented and reasonable." *Becker v. ARCO Chem. Co.,* 15 F. Supp. 2d 621, 637 (E.D. Pa. 1998).(citation omitted).

Borrell then filed a reply brief. (Doc. 299)

Ms. Borrell seeks to supplement her motion for attorneys' fees and costs with previously unavailable evidence of what she purports to be relevant documentation of the prevailing market rate for attorneys in the Middle District of Pennsylvania. (Doc. 297, 2.) Ms. Borrell did not attach the proposed supplemental documents to her original motion in a show of deference to my ability to deny the motion. (Doc. 296, ¶ 7.) The Geisinger Defendants oppose Ms. Borrell's request to file the supplemental materials on two grounds: Ms. Borrell failed to attach the supplemental documentation as required by M.D. Pa. L.R. 7.3 (Doc. 298, 3); and, because the material Ms. Borrell seeks to introduce is not relevant (Doc. 298, 4-8.). Ms. Borrell attached the proposed supplemental materials to her reply brief. (*See* Doc. 299-1.)

For the same reasons I declined to consider the CLS attorneys' fees chart and the Luzerne County retainer agreements in Section C. (2)(a)(1) *supra* as relevant evidence of the prevailing market rates for the relevant community, I will not consider Ms. Borrell's proffered supplemental materials in support of her motion for attorneys' fees and costs. The document attached to Ms. Borrell's reply brief is a "Contract for Legal Services" entered into by the Office of the Attorney General of the Commonwealth of Pennsylvania. (Doc. 299-1, 6-16.) Ms. Borrell also attaches biographical information on the attorneys retained. (Doc. 299-1, 19-36.) While the agreement provides the compensation and the type of  legal services to be rendered, it does not provide a specific locale for the rendering of the services. Additionally, there is no information contained therein that speaks to the prevailing market rate for attorneys litigating civil rights cases. The agreement does not provide evidence relevant to Ms. Borrell's request for attorneys' fees and costs. I will therefore deny Ms. Borrell's Motion for Leave to File a Supplemental Declaration and Exhibits Concerning Plaintiff's Motion for Attorneys' Fees and Costs.

**IV. Conclusion**

For the all of the above stated reasons, Dr. Ficca's and the Geisinger Defendants' motions will be granted in part and denied in part. Ms. Borrell's Motion for Attorneys' Fees and Costs will also be granted in part and denied in part. However, Ms. Borrell's Motion for Leave to File a Supplemental Declaration and Exhibits Concerning Plaintiff's Motion for Attorneys' Fees and Costs will be denied.

An appropriate order follows.

September 19, 2016                                          /s/ A. Richard Caputo
Date                                                                A. Richard Caputo
                                                                    United States District Judge